## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

**THE ASSOCIATED GENERAL
CONTRACTORS OF AMERICA, INC.**
2300 Wilson Blvd., Suite 300
Arlington, VA 22201

**LOUISIANA ASSOCIATED GENERAL
CONTRACTORS,**
666 North St.
Baton Rouge, LA 70802

              Plaintiffs,

v.

**JOSEPH R. BIDEN, JR.**, in his official
capacity as President of the United States;
**FEDERAL ACQUISITION
REGULATORY COUNCIL; GENERAL
SERVICES ADMINISTRATION**;
**JEFFREY E. KOSES**, in his official
capacity as Administrator of General
Services Administration; **OFFICE OF
FEDERAL PROCUREMENT POLICY**;
**CHRISTINE J. HARADA,** in her official
capacity as FAR Council Chair and Senior
Advisor to the Deputy Director for
Management, Office of Federal
Procurement Policy; **DEPARTMENT OF
DEFENSE; JOHN M. TENAGLIA**, in
his official capacity as Principal Director,
Defense Pricing and Contracting, Office of
Secretary of Defense; **NATIONAL
AERONAUTICS AND SPACE
ADMINISTRATION**; **KARLA S.
JACKSON**, in her official capacity as
Assistant Administrator for Procurement,
National Aeronautics and Space
Administration

              Defendants,

Civil Action No. 6:24-cv-37

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION AND STAY

## **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND ........................................................................................................3

    A.  Executive Order 14063 and the PLA Mandate ................................................ 3

    B.  The Impacts of the PLA Mandate .................................................................. 5

    C.  The Final Rule Implementing the Order ......................................................... 7

III.  LEGAL STANDARD .................................................................................................8

IV.   ARGUMENT ..............................................................................................................8

    A.  Plaintiffs are Likely to Succeed on the Merits............................................... 9

        1.   Executive Order 14063 Is Beyond the Scope of the President's
           Statutory Authority and Is *Ultra Vires* (Count 1). ..............................9

        2.   Executive Order 14063 Exceeds the President's Constitutional
           Authority (Count 2)............................................................................17

        3.   The Implementing Regulations are Contrary to Law (Count 3). ....................18

    B.  The Plaintiffs will be Irreparably Harmed Absent Preliminary Relief. ...................... 22

    C.  The Balance of the Harms and Public Interest Favor Preliminary Relief.................. 24

V.    CONCLUSION............................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   141 S. Ct. 2485 (2021)...........................................................................................15

*Am. Fed'n of Lab. & Cong. of Indus. Org. v. Kahn*,
   618 F.2d 784 (D.C. Cir. 1979)..................................................................................4

*Am. Safety Council, Inc. v. United States*,
   122 Fed. Cl. 426 (2015)..........................................................................................19

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023)..................................................................................4, 10, 15

*Chamber of Commerce of the United States v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996).......................................................................4, 15, 20

*City of Dallas v. Delta Air Lines, Inc.*,
   847 F.3d 279 (5th Cir. 2017) ....................................................................................8

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019)............................................................................................13

*FDA. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).................................................................................................14

*Feds for Medical Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023), *cert. granted, vacated as moot*, No. 23-60, 2023
   WL 8531839 (U.S. Dec. 11, 2023) ............................................................................1

*Georgia v. Biden*,
   46 F.4th 1283 (11th Cir. 2022) ...............................................................................19

*Georgia v. Biden*,
   574 F. Supp. 3d 1337 (S.D. Ga. 2021), *aff'd in part, vacated in part,* 46 F.4th
   1283 (11th Cir. 2022)..............................................................................................11

*Golden State Transit Co. v. City of Los Angeles*,
   493 U.S. 103 ...........................................................................................................20

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013).................................................................................24

*Hill Dermaceuticals, Inc. v. FDA*,
   524 F. Supp. 2d 5 (D.D.C. 2007).............................................................................8

*HP Enter. Servs., LLC v. United States*,
104 Fed. Cl. 230 (2012) ..............................................................25

*Ingebretsen v. Jackson Public School Dist.*,
88 F. 3d 274 (5th Cir. 1996) ........................................................24

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ...........................................2, 11, 19

*Kentucky v. Biden*,
571 F. Supp. 3d 715 (E.D. Ky. 2021) ...........................................19

*Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v.*
*Wisconsin Empt Relations Comm'n.*,
427 U.S. 132 (1976)................................................................18, 20

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .......................................... *passim*

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990)........................................................................20

*Nat'l Horseman's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ........................................................16

*Natl Fed'n of Indep. Bus. (NFIB) v. Occupational Safety & Health Admin.*,
142 S. Ct. 661 (2022)....................................................................15

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................8

*Piedmont Propulsion Sys., LLC v. United States*,
No. 23-330 C, 2023 WL 5341505 (Fed. Cl. July 31, 2023) ..................19

*Sackett v. EPA*,
143 S. Ct. 1322 (2023)...........................................................10, 16

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) ........................................................23

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .......................................................25

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994)......................................................................21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)......................................................................14

*Wages & White Lion Inv., L.L.C. v. FDA*,
    No. 21-60766, 2021 WL 4955257 (5th Cir. Oct. 26, 2021) ....................................23

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ................................................................................23

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)...........................................................................................15

*Whitman v. American Trucking Ass'ns., Inc.*,
    531 U.S. 457 (2001)................................................................................................16

*Youngstown Sheet & Tube v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................16, 17

**Statutes**

5 U.S.C. § 705............................................................................................................3

29 U.S.C. § 151-169 ...................................................................................................5

40 U.S.C. § 101 ............................................................................................... *passim*

41 U.S.C. § 3301 .......................................................................................................19

41 U.S.C. § 3306 .......................................................................................................19

Procurement Act .....................................................................................................2, 18

**Other Authorities**

93 Cong. Rec. 7485-7489 (1947)...............................................................................20

87 Fed. Reg. 7363 (Feb. 9, 2022) ..................................................................... *passim*

88 Fed. Reg. 88708 (Dec. 22, 2023) ................................................................. *passim*

Booz Allen Hamilton, Inc., B-418449, 2020 CPD ¶ 178 (May 18, 2020) ...................19

Fed. R. Civ. P. 65(a) ...................................................................................................3

## I.    INTRODUCTION

President Biden's Administration continues to impose mandates far beyond its legal authority. As with the COVID vaccine mandates roundly rejected by the courts, *see, e.g., Feds for Medical Freedom v. Biden,* 63 F.4th 366 (5th Cir. 2023), *cert. granted, vacated as moot,* No. 23-60, 2023 WL 8531839 (U.S. Dec. 11, 2023), *Louisiana v. Biden,* 55 F.4th 1017 (5th Cir. 2022), the Administration here seeks to use the federal procurement process to advance unrelated policy objectives. Defendants are promoting the President's *labor relations* agenda through Executive Order 14063, "Executive Order on Use of Project Labor Agreements for Federal Construction Projects," signed by President Biden on February 4, 2022, 87 Fed. Reg. 7363 (Feb. 9, 2022) ("Order"), and the regulations implementing the Order, published on December 22, 2023, Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708 (Dec. 22, 2023) ("Final Rule"). These actions impose an unprecedented mandate on contractors engaged for federal construction projects that are projected to cost the Government $35 million or more ("Large-Scale Federal Projects") to operate exclusively under a particular type of collective bargaining agreement, known as a project labor agreement (collectively, the "PLA Mandate").

The PLA Mandate is a startling case of Executive Branch overreach. Unlike any prior Executive Order, the Government is telling general contractors and subcontractors participating in the federal market (collectively, the "Contractors") they must operate under new collective bargaining agreements that they have no role in negotiating and which will effectively be imposed by labor unions with which Contractors often have no pre-existing relationships. Contractors will be unable to rely on their trusted regular employees because they will be compelled to use strangers obtained from a union hiring hall. Worse, the PLA Mandate will prevent general contractors from

finding qualified subcontractors necessary to complete projects safely, on time and on budget. As a result, the PLA Mandate will cause massive disruptions in the market.

The PLA Mandate cannot stand. Through the Federal Property and Administrative Services Act of 1949, ch. 288, 63 Sat. 37, 40 U.S.C. § 101 *et seq.* ("Procurement Act"), Congress has delegated to the President certain specific authority to manage federal contracting through an "economical and efficient system." 40 U.S.C. § 101. The Procurement Act authorizes the President to "prescribe policies and directives…necessary to carry out this subtitle," *i.e.*, to direct the procurement agencies to make the federal contracting system "less duplicative and inefficient." *Kentucky v. Biden*, 57 F.4th 545, 553 (6th Cir. 2023) (internal quotation marks and citation omitted).

The PLA Mandate exceeds the Procurement Act authority delegated to the President by Congress, exceeds whatever inherent authority the President and his agencies possess under the U.S. Constitution, and is contrary to law (specifically, government contract procurement statutes and federal labor law).

Not only is the PLA Mandate unlawful, its implementation is already causing chaos for Contractors. As explained below, Contractors will face an impossible dilemma as they scramble to determine if and how they will be able to account for the increased cost of complying with the PLA Mandate. Among other immediate concerns, Contractors lack basic information necessary to make informed decisions about pricing their bids. Because the essential terms of the mandated new collective bargaining agreements are unknowable, the bidding process will become a guessing game, causing irreparable harm both to Contractors and to the federal procurement system. These disruptions are contrary to the public interest in the successful completion of Large-Scale Federal Projects and thus warrant preliminary injunctive relief.

Plaintiffs support free and open competition for publicly funded construction contracts, both for Contractors that are signatory to collective bargaining agreements ("Signatory Contractors") and for those that maintain non-union operations using the open-shop business model ("Open Shop Contractors"). Complaint, ECF 1 ¶ 35. Plaintiffs, whose memberships include both categories of Contractors, oppose any federal or other measures that would change the balance of bargaining power between labor and management in the construction industry intended by Congress (as evinced by federal labor law). Plaintiff Associated General Contractors of America ("AGC") opposed the position taken by President George H. W. Bush, in 1992, when he issued Executive Order 12818, which categorically *prohibited* federal agencies from requiring PLAs on federal construction projects. *Id.* Likewise, it now opposes the PLA Mandate based on the same concerns.

For these reasons, Plaintiffs seek both a preliminary injunction prohibiting Defendants from taking any action to implement or enforce the PLA Mandate, and a stay of the effective date of the Final Rule. *See* Fed. R. Civ. P. 65(a); 5 U.S.C. § 705.

## II.    BACKGROUND

### A.    Executive Order 14063 and the PLA Mandate

In Executive Order 14063, President Biden invoked the Procurement Act to "require," subject to very limited exceptions, that "every contractor or subcontractor engaged in" a construction project estimated to cost the Government at least $35 million "agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." Order § 3, 87 Fed. Reg. at 7364. To that end, President Biden directed the Federal Acquisition Regulatory Council ("FAR Council")—an Executive Branch agency charged with managing federal procurement and composed of members from the Office of Federal Procurement Policy ("OFPP"), the Department of Defense ("DOD"), the General Services Administration

("GSA"), and the National Aeronautics and Space Administration ("NASA")—to promulgate implementing regulations. Order § 8, 87 Fed. Reg. at 7365.

First enacted in 1949, the stated purpose of the Procurement Act is "to provide the Federal Government with an economical and efficient system for," among other things, "[p]rocuring and supplying property and nonpersonal services"—a purpose carried forward in recodifications of the statute. *See* 40 U.S.C. § 101. This limited focus is material. While the President is charged with managing federal contracting to advance economy and efficiency, the Procurement Act does not give the President unfettered discretion to use federal procurement to advance unrelated policy goals. *See Louisiana*, 55 F.4th at 1023 n.17 (observing that "the statement of purpose acts as a set of guidelines within which" any policies directed by an executive order "must reside"); *accord Am. Fed'n of Lab. & Cong. of Indus. Org. v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (stating the Procurement Act is not a "blank check for the President to fill in at his will").

The overreach of the PLA Mandate in trying to re-calibrate federal labor law applicable to Contractors is apparent: the Procurement Act says nothing about, and has nothing to do with, federal labor law. *See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (stating "nothing in the Procurement Act ... addresses labor relations"). The actual (non-procurement related) impetus for the Order is evident: President Biden, early in his term, announced his intention to fulfill a campaign promise to be the "most pro-union President" in American history, ECF 1 ¶ 14, a commitment he promoted by joining a UAW picket line in September, 2023 in Detroit, the first U.S. President ever to do so. Customary rules of statutory interpretation dictate that the Procurement Act cannot be read to authorize the PLA Mandate. *See Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

### B.     The Impacts of the PLA Mandate

On the heels of President Biden issuing the Order, political leaders seized on the impending harm the PLA Mandate would pose to federal procurement and Contractors. For example, a group of 43 United States Senators penned a letter to the President on March 7, 2022, expressing "strong opposition" to the effort to require PLAs on federal contracts, noting that 87.4% of the U.S. construction workforce does not belong to a union, and that mandating PLAs will prevent qualified contractors from fairly competing for contracts on federal projects. Letter from Todd Young, U.S. Senator, to Joseph R. Biden, Jr., President of the United States (March 7, 2022),

The critics are correct. The PLA Mandate, if left in place, will cause (and is already causing) serious, incalculable injury to Plaintiffs' members. Understanding the injury requires an appreciation of the unique labor laws and practices of the construction industry. Most notably, in Section 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151-169, Congress has provided employers engaged primarily in the building and construction industry the unique right to voluntarily enter into collective bargaining agreements with unions representing construction workers ("Unions"), absent any showing that a majority of the employees that would be covered by the agreement support the Union and even before any such employees have been hired. In response to project owner requirements, and for other business reasons, Plaintiffs' Signatory Contractor members have elected to become parties to such collective bargaining agreements, often referred to as "pre-hire agreements." ECF 1 ¶ 54 By contrast, Plaintiffs' Open Shop Contractor members have elected not to voluntarily enter into collective bargaining agreements and, instead, operate under the open-shop or merit-shop business model, ECF 1 ¶ 55, which, in their view, affords them a meaningful competitive advantage. *See* Exh. A, Declaration of Jeff Harper ¶¶ 4, 22-23, 25.

Contractors know they can succeed only if they are able to predict labor costs accurately in preparing bids for the firm fixed-price contracts that predominate in the federal construction market. The PLA Mandate will make this impossible. First, and foremost, Contractors are now obligated by the PLA Mandate to perform under new collective bargaining agreements they will have no effective or meaningful role negotiating, and which are likely to be materially different from their existing agreements. ECF 1 ¶¶ 48, 57, 62. While Contractors have no idea about the basic terms of these agreements (including the wage rates), they *do* know that the terms effectively will be dictated by Unions that have no legal obligation or incentive to negotiate reasonable terms with them. ECF 1 ¶¶ 52, 59, 61, 118; Exh. B, Declaration of George Rogers ¶ 13. All Contractors can be sure of now is that they will be forced to operate under currently unknowable terms that make accurate pricing impossible and that will substantially increase project costs. On its own, this mandate improperly impedes the Contractors' right under federal labor law to choose how to run their businesses.

Beyond that, Plaintiffs' members will experience several specific harms. Open Shop Contractors risk losing valued members of their own workforces who are unwilling to accept the additional cost and burden of involuntary labor union representation on covered projects. Many will simply quit and find jobs elsewhere. ECF 1 ¶ 91 (AGC survey shows two-thirds of Plaintiffs' members expect it to be harder to find qualified craft workers). Signatory Contractors could likewise lose valuable craft workers on their more permanent staff who do not want to be covered by a PLA instead of the current collective bargaining agreements under which they work. Many such craft workers will not have the opportunity to work on Large-Scale Federal Projects; workers represented by different Unions who are entitled to work normally assigned to them under PLAs will get those opportunities because of local hiring hall preference. This loss of experienced,

skilled employees will threaten the ability of both types of Contractors to efficiently and economically perform on Large-Scale Federal Projects. A booming commercial construction market and the country's general labor shortage make this a critical problem for Contractors. ECF 1 ¶ 91; Exh. C, Declaration of Eddie Stewart, ¶¶ 13, 18.

Further, both types of Contractors will be unable to work with their established subcontractors, many of which operate small, non-union businesses. These subcontractors will be unwilling to agree to a PLA and will simply migrate to the private and non-federal government sectors of the market. *See* Exh. A ¶ 5 (substantial number of eligible subcontractors withdrew from bidding on a recent project in California, resulting in the Air Force deciding to rescind the requirement for a PLA). This will force Contractors to work with subcontractors with which they have no experience. Because the new subcontractors (and their employees) necessarily will be unfamiliar with the Contractors' business practices and skill requirements, the PLA Mandate will jeopardize project schedules and raise construction costs for Contractors. Exh. A ¶ 13. These additional costs will necessarily be passed on to the Government and the taxpayer. In many cases, this triple-whammy will induce Contractors to exit the federal market.

### C.    The Final Rule Implementing the Order

Notwithstanding the swift and strong negative reaction to Executive Order 14063, on December 22, 2023, the FAR Council published a Final Rule to implement the PLA Mandate.  *See generally* 88 Fed. Reg. 88708.

Despite receiving hundreds of comments criticizing the Proposed Rule, issued in August 2022—including those of AGC of America urging the FAR Council to abandon its implementation of the PLA Mandate (for the same reasons now raised in this lawsuit)—the Final Rule hews closely to the proposed rule, failing to address adequately the criticisms raised during the rulemaking. Aside from deleting certain text included in the proposed rule that the FAR Council acknowledges

inaccurately depicted how PLAs are established, the Final Rule carries forward the rule as proposed and bulls ahead with implementing the PLA Mandate without meaningfully wrestling with its inconsistencies with federal labor law and the Procurement Act, or explaining how it rationally furthers economy and efficiency in federal contracting.

## III.    LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction and stay if they can demonstrate: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury [if the preliminary injunction is not granted pending the Court's final resolution of the case]; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). *See also Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (setting out stay standard); *Hill Dermaceuticals, Inc. v. FDA*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007) ("The four-factor standard used by courts for a motion to stay agency action is the same legal standard as that used in a motion for preliminary injunction.").

## IV.    ARGUMENT

Plaintiffs have a substantial likelihood of success on all three of their claims: Executive Order 14063 exceeds the President's authority under the Procurement Act and exceeds the President's authority under Article II of the U.S. Constitution, and the Final Rule is contrary to law. Plaintiffs' members also stand to face immediate and irreparable harm absent preliminary relief. Furthermore, the equities and the public interest favor imposing a preliminary injunction and stay.

### A.    Plaintiffs are Likely to Succeed on the Merits.

#### 1.    Executive Order 14063 Is Beyond the Scope of the President's Statutory Authority and Is *Ultra Vires* (Count 1).

Executive Order 14063 exceeds the authority granted by Congress to the President by the Procurement Act. The purpose of the Procurement Act is to provide the federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The President's authority under the Procurement Act must be exercised consistent with that purpose, and thus is limited to issuing directives "necessary to carry out" the Act. Any action taken by the President under a claim of Procurement Act authority must necessarily have a genuine and logical nexus to the purposes embodied in its text. Where a presidential action fails to rest on any such nexus, the President exceeds the authority granted by the Procurement Act and acts *ultra vires*. The Order is *ultra vires* because it is aimed squarely at *labor law and policy*, and lacks any discernible nexus to promoting economy and efficiency in federal procurement.

*First,* the focus of the PLA Mandate on federal labor law and policy is evident both from the terms of the Order, the Final Rule, and from the Administration's stated policy goal of promoting the parochial interests of the Unions. However laudable the Administration's labor-oriented policy, the Procurement Act is not the vehicle to exercise it. In dictating labor law and policy on Large-Scale Federal Projects, the Order will alter how Contractors engage with subcontractors, pay their employees, assign and schedule their work, and provide them with employee benefits. The PLA Mandate compels Open Shop Contractors to enter into a collective bargaining agreement imposed on them on a take-it-or-leave-it basis. ECF 1 ¶¶ 61, 72. And it compels Signatory Contractors to override their existing agreements, without meaningful negotiations, and operate under a new agreement with many Unions, including "strangers" with

9

whom they have no experience. ECF 1 ¶¶ 44, 46. The PLA Mandate thus conflicts with and would displace decades of settled labor law policy prescribed by Congress. The Procurement Act does not authorize this.

The Procurement Act is not a tool of convenience for a President to implement policies that are legislative in nature, even in support of other laudable public policy goals, where those policies are unrelated to the stated purposes of the statute. This is no less true of a policy goal of intending to increase the presence of unionized labor in federal construction contracting than it is of a policy goal concerning public health during a pandemic. *See, e.g.*, *Louisiana*, 55 F.4th at 1029 ("[T]his federal contractor mandate is neither a straight-forward nor predictable example of procurement regulations authorized by Congress to promote 'economy and efficiency.'"). As with the federal contractor vaccine mandate, the PLA Mandate is an "enormous and transformative expansion" of the President's authority under the Procurement Act. *Id.* at 1031.

*Second,* there is no nexus between the Order and the Procurement Act's express purpose of providing an "economical and efficient system" of procurement. 40 U.S.C. § 101. The Order speaks of Large-Scale Federal Projects as posing "special challenges to efficient and timely procurement by the Federal Government," and then posits that the imposition of project labor agreements on the contractors hired to do those jobs will "promote economy and efficiency" because a PLA will "provide structure and stability to large-scale construction projects" by avoiding downstream "labor-related disruptions" and other "unnecessary interruptions." Order § 1. Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363 (Feb. 9, 2022) . This conclusion is negated by the Government's own empirical data. Such data shows that PLAs are seldom used on federal construction projects precisely because they do not produce efficiencies. ECF 1 ¶¶ 11, 76. The experience of Plaintiffs' members confirms this data. Exh. B ¶¶

40-41; Exh. D, Declaration of Scott Victor ¶ 9. However aspirational President Biden's commitment to organized labor may be, the Procurement Act cannot be stretched to accommodate policies unmoored from economy and efficiency in procurement. *Cf. Biden*, 143 S. Ct. at 2371 ("However broad the meaning of 'waive or modify,' that language cannot authorize the kind of exhaustive rewriting of the statute that has taken place here"); *Sackett v. EPA*, 143 S. Ct. 1322, 1341 (2023) (emphasizing that the "text and structure" of a statute controls its interpretation and rejecting a previous "close nexus" formulation not anchored in its text).

Notwithstanding its conclusory language, the Order extends well beyond what the Procurement Act permits. As the Sixth Circuit has observed, the Procurement Act only authorizes the President "to implement systems making the government's entry into contracts less duplicative and inefficient"; it does not permit the Government to impose requirements on *contractors* themselves regardless of what the Administration might say about how its actions will enhance the efficiency of those contractors. *Kentucky,* 57 F.4th at 552. The text and structure of the Procurement Act make it evident that the Order's "directives and resulting impact radiate too far beyond the purposes of the Procurement Act and the authority it grants to the President." *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1355 (S.D. Ga. 2021), *aff'd in part, vacated in part,* 46 F.4th 1283 (11th Cir. 2022).

Implementation of the PLA Mandate operates at cross-purposes to economy and efficiency in procurement. To begin, the PLA Mandate will dramatically limit general contractors' ability to work with their existing roster of experienced subcontractors and inevitably increase the cost of covered projects. *See* Exh. C ¶¶ 8, 9; Exh. B ¶¶ 7, 8; Exh. A ¶¶ 4 (Contractor will "lose our subcontracting base that enables us to be successful," creating a "recipe for disaster."). These largely Open Shop subcontractors will choose not to bid on Large-Scale Federal Projects. They

fear losing their valued craft workers, many of whom oppose forced unionization for financial and cultural reasons. Exh. B ¶ 9.

The PLA Mandate will force Contractors to rely instead on unfamiliar subcontractors who will be unable to provide sufficient numbers of skilled craft workers willing and able to help meet project deadlines. Plaintiffs' members have lived through numerous unfortunate examples of this on federal projects performed across the country. *See* Exh. D ¶¶ 10-19 (negative experience with unfamiliar subcontractors in a project in Washington); Exh. C at ¶ 12 (Tennessee); Exh. B ¶¶, (Virginia and Washington); Exh. A ¶¶ 7, 8, 10-16 (California and Oklahoma). Further, the PLA Mandate will cause Contractors' own valued craft workers to quit, directly hampering efficient contract performance. Exh. A ¶¶ 10, 20; Exh. B ¶¶ 20-21; Exh. D ¶¶ 26, 28.

These problems are applicable to Louisiana, a State with extremely low labor union membership. ECF 1 ¶ 92. RQ Contractors frequently perform construction projects at Barksdale Air Force Base, and has significant new opportunities in the pipeline. Based on experience, this Contractor expects that hardly any of its longstanding trusted subcontractors will bid on a Large-Scale Federal Project. All of them are small, non-union companies with no interest in bidding on a unionized job. For these reasons, RQ expects only 8-10% participation from its subcontractor base. Exh. B ¶¶ 25, 26-29, 30-31, 34-35.

In addition to the irreparable loss of subcontractors employing skilled craft workers familiar with the dozens of technical contractual and regulatory requirements of the federal market, *see* ECF 1 ¶ 85, the PLA Mandate will substantially increase Contractor labor costs in numerous other ways. Start with the fact that Open Shop Contractors will often be required to pay what amounts to "an unfair tax." ECF 1 ¶ 90; Exh. B ¶ 39. This tax, known as the "double contribution" obligation, is a standard feature of a PLA, requiring Open Shop Contractors to make contributions

into union-sponsored employee plans in addition to continuing to pay for benefit coverage under their existing plans and programs. Exh. B ¶¶ 32, 34-36, 38; Exh. D ¶ 23.

PLAs contain numerous other provisions that will be unfamiliar to both categories of Contractors, and which will increase operational cost. ECF 1 ¶¶, 62. As examples, wage rates and benefit contributions to be required under project labor agreements are likely to be higher than what is required by the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.,* and well above market. Exh. B ¶ 15. The PLA Mandate will require both contractors and subcontractors to comply with complex rules dictating the ratio of journeymen to apprentice in various crafts, thereby increasing costs. Exh. A ¶¶ 8, 11. Critically, general contractors, and their subcontractors, will be required to rely on union hiring halls for the majority of their employees. ECF 1 ¶ 60. This will require Contractors to employ people who are unfamiliar with their practices, and who may lack sufficient skills to be good performers, inevitably increasing project costs. Exh. A ¶¶ 4-9, 12-15; Exh. B ¶ 14; Exh. D ¶¶ 21, 29.

Most importantly, the PLA Mandate will disrupt Contractors' existing staffing practices. One of the many reasons Open Shop Contractors choose to operate on an open shop business model is that doing so allows them to cross-train and assign individual craft workers to work in more than one traditional trade for purposes of flexibility and efficiency. ECF 1 ¶¶ 47, 53. Exh. A. ¶ 9; Exh. B ¶¶ 6, 16, 40; Exh. D ¶ 24 (company's cross-training and skill development business model is incompatible with how PLAs define trade union jurisdiction). The PLA Mandate will likewise threaten the staffing practices of many Signatory Contractors, which may be accustomed to employing and assigning work to craft workers represented by different Unions from those that will be parties to the PLAs, thereby causing jurisdictional disputes that compromise timely contract performance. ECF 1 ¶ 47.

These concerns illustrate the fundamental flaw in the assumptions behind the PLA Mandate. The percentage of private sector employees who currently belong to labor unions is at a 50-year low. ECF 1 ¶ 50. Union density is particularly low outside the Northeast and industrial Midwest. There are simply not enough experienced unionized subcontractors available, particularly in rural areas in which many military bases and other facilities are located, to provide a reliable source of skilled craft labor for Large-Scale Federal Projects. Exh A. ¶ 7.

These facts reveal the pretextual foundation for the PLA Mandate. *See Dep't of Com. v. New York,* 139 S. Ct. 2551, 2575 (2019). In its zeal to advance the President's labor-relations policies, the Government ignores the fact that there is strong resistance to forced unionization in much of the country. Exh. B ¶¶ 20, 40. Perhaps the Administration is interested in reversing the downward trend in labor union membership, but the reality is that all of this will cause many sophisticated Contractors to exit the federal market. This will have a devastating impact on federal procurement, particularly in projects sponsored by the Army Corps of Engineers and other procurement agencies within DOD. Many AGC members are primarily, if not exclusively, focused on the federal market, with most of their work performed for DOD procurement agencies. *See* Exh. A ¶ 3; Exh. B ¶ 3; Exh. C ¶ 3; Exh. D ¶ 3. These Contractors are regularly engaged to perform highly complex projects at military bases around the country in situations where there are very few other qualified competitors. Exh. C ¶ 14 (Caddell Construction is one of a handful of Contractors qualified to manage the large, complex multi-year DOD projects awarded pursuant to a Multiple Award Task Order Contract, DOD's preferred method for such construction projects); Exh. B ¶ 44; Exh. D ¶¶ 20-21 (Nova is one of only five or six companies across the country qualified to perform in its DOD market niche). The loss of significant market participants will result in an ever-shrinking pool of qualified Contractors available to work on Large-Scale Federal Projects,

inevitably driving up prices. The only alternative for qualified Contractors willing to accept the risks and burdens described herein is to increase their bids in order to hedge against unknowable increased costs they will be unable to recover. Exh. A ¶ 21; Exh. B ¶ 18. This outcome will have the exact opposite effect of promoting economy and efficiency in procurement.

To the extent further interpretative guidance is necessary, the Major Questions Doctrine provides it. As the Supreme Court has emphasized for decades, transformative executive action with enormous economic consequences cannot be tolerated absent clear congressional authority. *See FDA. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (rejecting Executive Branch assertion of "jurisdiction to regulate an industry constituting a significant portion of the American economy" absent clear congressional authorization); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Indeed, in the past two years, the Supreme Court could not have been clearer in its messaging to the President and Executive Branch agencies on this point. *See Biden,* 143 S.Ct. at 2375; *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *Natl Fed'n of Indep. Bus. (NFIB) v. Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021).

Whatever Defendants might say in defense of the PLA Mandate, it will flunk the Supreme Court's test under the Major Questions Doctrine because (i) the Government cannot credibly deny either the transformative impact of the PLA Mandate on how Contractors undertake their work (indeed, that is the very point of the PLA Mandate, in the name of the Administration's labor policy) or the enormous economic consequences to Contractors that those impacts will have, and (ii) the Government will be unable to point to anywhere in the text of the Procurement Act that clearly gives the President authority to pursue labor policy objectives via federal procurement. *Accord Louisiana*, 55 F.4th at 1031 ("Under Supreme Court precedent, this Court cannot permit

such a mandate to remain in place absent a clear statement by Congress that it wishes to endow the presidency with such power.").

And, to be clear, this limitation is not new. By whatever rubric it might have been considered, *see*, *e.g.*, *Biden v. Nebraska,* 143 S. Ct. at 2376-584 (Barrett, J., concurring), courts have always recognized limitations on the President's authority under the Procurement Act. *See Reich*, 74 F.3d at 1330 (stating that the Procurement Act does not vest the President with "unlimited authority to make decisions he believes will likely result in savings to the government"). There is nothing special or unique about the Procurement Act that should cause this or any court to discover in it special powers for the President that are not clearly articulated. After all, the President's power to take or direct action affecting private parties must flow from either an act of Congress or from the Constitution. *See Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 585 (1952); *id.* at 635-40 (Jackson, J., concurring). As the Supreme Court has frequently observed, "Congress does not 'hide elephants in mouseholes.'" *Sackett*, 143 S. Ct. at 1340 (quoting *Whitman v. American Trucking Ass'ns., Inc.,* 531 U.S. 457, 468 (2001)). When considered in light of other recent decisions examining the scope of the President's authority, it is evident that the Order is beyond the scope of his Procurement Act authority and, accordingly, cannot stand.

Further, interpreting the Procurement Act to authorize the President to promulgate something as sweeping and disruptive as the Order would raise serious constitutional questions. The Order permits the FAR Council to essentially delegate implementation of the PLA Mandate to the Unions and thus dictate the terms of the resulting new collective bargaining agreements that will bind Contractors. There is no basis on which to believe that procurement officials employed by the federal contracting agencies subject to the PLA Mandate have any experience in formulating collective bargaining agreements. And nothing in the Final Rule suggests otherwise—to the

contrary, the Final Rule makes it clear that the Government plays no role in crafting the PLA.  88 Fed. Reg. at 88723 ("The Government does not participate nor is it a signatory to the PLA."). Instead, it is almost certain that the specific language of PLAs will be drafted by the Unions with every reason to advance their interests. ECF 1 ¶¶ 59-61. This is wrong. As the Fifth Circuit recently explained in *Nat'l Horseman's Benevolent & Protective Ass'n v. Black,* 53 F.4th 869, 881 (5th Cir. 2022), Congress cannot delegate executive decision-making to private parties, unbound from ultimate agency decision-making authority. If the Procurement Act were interpreted to allow the President and the FAR Council to do what Congress itself cannot do, it would violate the private non-delegation doctrine.

In sum, because the Procurement Act does not authorize the President to dictate federal labor policy through the federal procurement process, the President acted *ultra vires* in doing so.

### 2. Executive Order 14063 Exceeds the President's Constitutional Authority (Count 2).

In addition to the Procurement Act, President Biden relied on "the authority vested in me as President by the Constitution" to justify Executive Order 14063. But the Order (and the requirements resulting from the Final Rule) find no support in the President's inherent authority under Article II of the U.S. Constitution, and thus are also in violation of Article II.

As established by Article II, the function of the President is—through his subordinate officers and agencies—to execute the duly enacted laws of the United States. The President has broad inherent authority to manage the functioning of the Executive Branch and carry out the other functions assigned to the Office by Article II, such as commanding the armed forces and engaging in international diplomacy. But in executing the laws enacted by Congress, the Executive Branch—including the President—is necessarily cabined by what those laws say. Put bluntly, the

President finds no authority in Article II to execute the laws in a manner not authorized by those laws. *See Youngstown Sheet & Tube*, 343 U.S. at 635-40 (Jackson, J., concurring).

Plaintiffs are likely to succeed in showing that the Order exceeds the President's authority under Article II. Under basic separation-of-power principles, Executive Order 14063 is unlawful because it attempts to execute labor law policy revisions that are not authorized by any law of Congress or authority vested in the Office of the President under Article II.

### 3. The Implementing Regulations are Contrary to Law (Count 3).

Plaintiffs are also likely to succeed in showing that the Final Rule is unlawful, both because the Order authorizing the Final Rule is unlawful for the reasons stated above, and because, on its own, the Final Rule violates established law, including the Procurement Act, the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301 *et seq.*, and the NLRA. Further, the PLA Mandate unlawfully conflicts with settled principles of federal labor law. *See Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Emp.t Relations Comm'n.*, 427 U.S. 132, 140 (1976) ("*Machinists*").

***First***, the Final Rule is contrary to the Procurement Act because it purports to bind the procurement agencies, including FAR Council members, without a shred of statutory authority to do so. Even with respect to the President, Congress only authorized the President to "prescribe policies and directives that the President considers necessary to carry out" the Procurement Act. 40 U.S.C. § 121(a). The Procurement Act does not grant the President the power to issue orders with the force or effect of law; neither does it authorize the President to deputize the FAR Council to do so. The FAR Council is not authorized by any act of Congress to issue the Final Rule, and it would be no defense that it was merely carrying out the orders of the President, as the President was not authorized to order this action.

In addition to being unauthorized by the Procurement Act, the Government's assertion in the Final Rule that the PLA Mandate will serve the practical needs of procurement is factually incorrect. In fact, the FAR Council disregarded substantial evidence to the contrary. As the Final Rule itself notes, since 2009, PLAs have been rarely adopted in practice in federal procurement. Data collected by the Office of Management and Budget (OMB) between the years of 2009 and 2021 show that when given the choice, federal government contracting agencies reviewing more than 2,000 eligible contracts decided to use PLAs only 12 times, or once for every 167 eligible contracts annually. *See* 88 Fed. Reg. at 88723. ECF 1 ¶ 77 (PLAs used in less than 1% of eligible projects).

**Second**, the Final Rule is contrary to CICA. CICA amended the Procurement Act to require, in relevant part, that federal agencies obtain full and open competition through the use of competitive procedures when procuring property or services. *See* 41 U.S.C. § 3301. CICA is a clear statutory mandate for "full and open" competition in federal procurement, which Congress has specifically instructed, requires that agencies "include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law." *Id.* § 3306(a)(2)(B); *see, e.g.*, *Piedmont Propulsion Sys., LLC v. United States*, No. 23-330 C, 2023 WL 5341505, at *8 (Fed. Cl. July 31, 2023) (enjoining solicitation that unduly restricts competition). In the COVID vaccine mandate litigation, both the Eleventh and Sixth Circuits suggested that the requirement for full and open competition should be interpreted to limit the President's discretion under the Procurement Act. *See Georgia v. Biden*, 46 F.4th 1283, 1294 (11th Cir. 2022) (citing 41 U.S.C. §§ 3301(a), 3306), *Kentucky v. Biden*, 571 F. Supp. 3d 715, 727 (E.D. Ky. 2021) (citing 41 U.S.C. § 3301(a)), *aff'd as modified,* 57 F.4th 545 (6th Cir. 2023). These concerns apply with particular force to the Order, which expressly recognizes that the PLA Mandate will, in at least

19

some instances, unduly restrict competition. *See* Order § 5, 87 Fed. Reg. at 7364 (authorizing exceptions to PLA requirement where, *inter alia*, "requiring a project labor agreement on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition"). Because Open Shop Contractors are unfamiliar with operating under a collective bargaining agreement, the PLA will make it particularly challenging for them to compete. Because such provisions unduly restrict competition, federal agency solicitations that contain such provisions are presumptively unlawful and may be set aside by a reviewing court or agency. *See, e.g.*, *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435-38 (2015), Booz Allen Hamilton, Inc., B-418449, 2020 CPD ¶ 178 (May 18, 2020).

**Third,** the Final Rule is contrary to the NLRA. The NLRA sets forth a complex set of rules governing private sector labor relations in this country. ECF 1 ¶¶ 18, 51-52, 64, 81. The NLRA established the National Labor Relations Board ("NLRB"), which has primary, exclusive jurisdiction to resolve unfair labor practices and to administer labor union requests for recognition as the exclusive bargaining representative in an appropriate unit. ECF 1 ¶¶ 115-122. The NLRA clearly limits the authority of the President in this area, delegating to the NLRB almost all of the key functions involved with administering national labor policy, and critically here, responsibility for enforcing its terms. The NLRA thus operates as a congressional expression that limits the authority of the President to regulate labor relations policy. *See, e.g.*, *Reich*, 74 F.3d at 1330 (holding unlawful a President Clinton executive order that transgressed the NLRA).

Through NLRA amendments in the Taft-Hartley Act[1] and the Landrum Griffin Act, federal labor law also dictates the scope and process for collective bargaining. As made clear in a series

---

[1] The Procurement Act was passed only 18 months after Congress overrode President Truman's veto of the Taft-Hartley Act, in one of the most hotly contested political issue of that time. 93 Cong. Rec. 7485-7489 (1947) (Presidential veto and House override), 7538 (Senate override) It is inconceivable that the 81st Congress, which

of landmark Supreme Court decisions, both state and federal governments are broadly precluded from putting a thumb on the scale of collective bargaining, which is intended to be left to the parties to sort out through the free play of economic forces. *E.g., Golden State Transit Co. v. City of Los Angeles,* 493 U.S. 103, 111 (1989 ("The *Machinists* rule creates a free zone from which all regulation, 'whether federal or State,' is excluded.") (quoting *Machinists,* 427 U.S. at 153).[2]

Moreover, as explained above, the Final Rule attempts to implement Executive Order 14063 in a manner that not even Congress could authorize under the Constitution. The Final Rule effectively delegates the power to set the terms of PLAs to the Unions, which will have all of the bargaining power and leverage in negotiating terms with Contractors. ECF 1 ¶¶ 59-61.

Given the substantial legal shortcomings, it is no salvation that the Final Rule permits exceptions. The FAR Council anticipates that the exceptions will extend to as few as 10% of affected contracts. 88 Fed. Reg. at 88724. This is no great surprise; after all, it would be pointless to promulgate a rule only to allow it to be swallowed by its exceptions. But even on its own terms, the Final Rule's allowance for "exceptions" comes up woefully short. It does not establish any concrete criteria for exceptions to the PLA Mandate, but instead provides to "senior procurement executive[s]"[3] the discretion to determine if any of a list of circumstances apply; *see* 88 Fed. Reg. at 88727. This list includes such nebulous catch-all circumstances as "specialized construction

---

enacted the Procurement Act, was unaware of the dynamic that led to the Taft-Hartley Act. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

[2]   As explained in the Complaint, ECF 1 ¶ 17, 125, the PLA Mandate will also operate in conflict with the right-to-work laws enacted by 28 States, including Louisiana, with respect to Large-Scale Federal Projects performed at military facilities, like Barksdale Air Force Base and Fort Polk, that are federal enclaves.

[3]   It is telling that the individuals most familiar with the operation of project labor agreements – people like the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers – are not among the list of senior procurement officials authorized to consider requests for exceptions. FAR Council members who are responsible for federal construction procurement have little interest in imposing the PLA Mandate, as demonstrated by their extremely rare use since 2009 when President Obama's Order was announced. ECF 1 ¶¶ 10-11, 73. It is widely understood in the industry (and in the Administration) that procurement agency officials do not endorse the notion of imposing mandatory project labor agreements on large federal construction projects. Exh. D ¶ 9.

work that is available from only a limited number of contractors or subcontractors," or the "need for the project is of such an unusual and compelling urgency that a project labor agreement would be impractical." Even putting to one side this lack of concrete guidance on how these exceptions will be administered, we can end where we began: the Procurement Act allows none of it.

### B.      The Plaintiffs will be Irreparably Harmed Absent Preliminary Relief.

Absent preliminary relief, Plaintiffs will suffer irreparable injury. Among many other things, "[c]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment).

In addition, Plaintiffs' members will incur significant and immediate losses as a result of the PLA Mandate, which will imperil their members' businesses moving forward for several reasons. To begin, Plaintiffs' members simply do not have sufficient information to make informed decisions about what to do. There is nothing in the Final Rule that provides necessary details about either the timing or the content of the PLAs to be required on covered projects, beyond a broad statement summarizing several required topics. 88 Fed Reg. at 88729 (to be codified at 48 C.F.R. § 52.222-34(c)). The agreements themselves are likely to be materially different from Signatory Contractors' existing agreements. ECF 1 ¶¶ 48, 62; Exh. A ¶ 21 (AGC members do not know "what it will mean to assent to a federal PLA since there are no details available" concerning key metrics). There is no reasonable basis for Contractors to expect an exemption on contracts they would be likely to pursue. Exh. B ¶ 7; Exh. C ¶ 7. And, as noted above, Contractors have grave doubts as to whether they will be able to count on members of their existing subcontractor base as part of their bid.

These concerns illustrate the dilemma facing many Contractors, which operate in a world of firm, fixed-price contracts for complex construction projects that DOD and other federal

procurement agencies consider essential. Successful completion of these projects, safely, on time and within budget, requires many specialized subcontractors. Exh. C ¶ 9. Much of this work takes place on military bases located in remote areas where there are hardly any unionized subcontractors available, and very few individuals interested in being forced to work under a collective bargaining agreement. In these situations, PLAs simply do not make sense. Exh. B ¶¶ 9, 50.[4]

The uncertainties caused by the PLA Mandate will frustrate Contractors at every turn. It will make it extremely difficult for Contractors to formulate responsive bids for federal projects, all but guaranteeing significant project delays and increased costs to the Government. Exh. C ¶ 16. Many Open Shop Contractors have no experience with collective bargaining agreements and, because they do not know how to develop competitive profitable bids for performing on a covered contract under a collective bargaining agreement, they will be particularly disadvantaged. ECF 1 ¶ 56; Exh. D ¶ 7, 22. These uncertainties will inevitably force prudent Contractors in both market segments to raise their bids for covered projects. Exh. B ¶ 18 (noting that bid prices will go up because it will be "impossible" to prepare accurate bids); Exh. C ¶¶ 13, 15 (same).

As noted above, Plaintiffs' members, both large and small, stand immediately to lose critical subcontractors without which they will be unable to perform on federal Large-Scale Federal projects. For many members, the business risk presented by the PLA Mandate has already

---

[4]   RQ Contractors faces an additional conundrum that will be shared by other Contractors. RQ was recently selected to participate in a large multi-year Multiple Award Construction Contract Program (MACC) developed by the U.S. Navy's Naval Facilities Engineering Systems Command (NAVFAC). Like many such MACC programs this one will be administered through a series of firm-fixed-price Indefinite-Delivery/Indefinite Quantity (IDIQ) contracts, in which specific projects will be awarded on a task order basis. As with many IDIQ arrangements, the task orders include a "musts bid" requirement, which gives NAVFAC the discretion to decide to "off-ramp" the Contractor if it decides not to accept a tendered task order. RQ expects that, given the size of the program, many of the task orders to be issued will contain the PLA Mandate. Because operating under a PLA is not an acceptable option, RQ would seriously consider abandoning the business opportunities presented by the program. Exh. B ¶¶ 26-29.

caused them to decide they are likely to abandon the federal construction marketplace in these circumstances. Others will follow suit.

These losses are irreparable. Plaintiffs' harm is not simply monetary harm for which they can claim a contractual remedy—their harm goes to the core of their business models. *See Wages & White Lion Inv., L.L.C. v. FDA*, No. 21-60766, 2021 WL 4955257 (5th Cir. Oct. 26, 2021). Whether Open Shop or Signatory, Contractors will be forced by the PLA Mandate to incorporate new, non-negotiated new labor terms into their relationships with their employees. As discussed above, this will cause fundamental unquantifiable damage to the way they conduct their business.

**C.      The Balance of the Harms and Public Interest Favor Preliminary Relief.**

The balance of the equities and public interest factors also weigh in favor of granting Plaintiffs' request for injunctive relief. As a general matter, any harm to the government is "'outweigh[ed] by the greater public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Here, the lack of either statutory or constitutional authority for the PLA Mandate is contrary to the public interest. *See Ingebretsen v. Jackson Public School Dist.*, 88 F. 3d 274, 280 (5th Cir. 1996); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). Furthermore, procurement policy obviously is not advanced when Contractors are forced to perform on federal projects without trusted subcontractors, have limited ability to accurately price bids, and are operating in constant fear of liquidated damages and other costly penalties over which they have little control. Exh. A ¶¶ 4, 19, 24; Exh. B ¶ 31. Moreover, the PLA Mandate is directly contrary to the public interest of encouraging additional small business (including minority-owned and women-owned firms)

participation in the federal market, because they will choose not to bid on covered projects. Exh. A ¶ 12; Exh. B ¶ 14, Exh. C ¶¶ 10-11; Exh. D ¶ 25.

The harms to Plaintiffs' members summarized above are *per se* public harms given the very nature of federal contracting. The public's interest is best served by a functional, competitive federal construction contracting system in which the most highly qualified contractors win work on Large-Scale Construction Projects. Plaintiffs' members engage in sealed, competitive bidding for most federal contracts. Their bids depend on predictability of costs, including labor costs. The PLA Mandate will force Contractors to increase their bids to hedge against the uncertainties it causes, thus increasing taxpayer cost.

Many prudent Contractors may decide to abandon the federal market altogether, out of understandable reluctance to assume the additional risks and burdens stated above. Exh. A ¶ 21-26; Exh. B ¶ 50; Exh. C ¶¶ 17-18; Exh. D ¶ 29. This would result in an outcome directly contrary to the cardinal goal of federal procurement of maximizing competition in contracting. Taxpayers rely on the competitive pressures of "full and open competition" by sealed bidding to keep the Government's prices for construction projects down. *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012). The PLA Mandate will radically upend that competitive system.

Finally, whatever public interest exists in using PLAs where appropriate will not be compromised by granting preliminary injunctive relief: where they make sense, PLAs can still be used pursuant to the terms of President Obama's PLA Order, which remains in effect until the Final Rule takes effect—staying the effective date of the Final Rule will preserve the status quo. ECF 1 at ¶ 73.

## V.    CONCLUSION

The preliminary injunctive relief Plaintiffs request is necessary and appropriate. *See Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015). Accordingly, the Court should grant Plaintiffs'

motion and (i) enter a nationwide injunction preventing Defendants from taking any action to implement or enforce the PLA Mandate, and (ii) stay the effective date of the Final Rule.

January 10, 2024

Respectfully submitted,

**Breazeale, Sachse & Wilson, LLP**
One American Place
301 Main Street, Suite 2300
Baton Rouge, LA 70801
Telephone: 225.387.4000
Facsimile: 225.381.8029

/s/ *Murphy J. Foster, III*
Murphy J. Foster, III
Louisiana Bar No. 5779
Catherine Maraist
Louisiana Bar No. 25781
*Local counsel for Plaintiffs*

**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2595
Telephone: 202-624-2500
Facsimile: 202-628-5116

Thomas P. Gies, T.A. (*Pro Hac Vice* Motion Forthcoming)
District of Columbia Bar No. 943340
Daniel Wolff (*Pro Hac Vice* Motion Forthcoming)
District of Columbia Bar No. 486733
William B. O'Reilly (*Pro Hac Vice* Motion Forthcoming)
District of Columbia Bar No. 1046686
*Lead counsel for Plaintiffs*