## DECLARATION OF JEFF HARPER

I, Jeff Harper, hereby declare as follows:

1. Harper Construction Company ("Harper") is a commercial contractor that provides design and construction services across the country, primarily for the Department of Defense and Public Works entities. I have worked at Harper for 38 years and have been President and Owner of Harper for the past 18 years. In that span, Harper has completed 175 contracts, on more than 20 different federal installations, for a value of more than $4.7 billion dollars. I also own Harper Federal, which employs craft workers under separate contract for Harper Construction around the country in the following trades: light demolition, wet utilities, mass grading, masonry, HVAC, plumbing, light gauge steel framing, drywall, painting, acoustical ceilings, insulation, and final clean-up. I am on the Board of Directors for the National Chapter of the Associated General Contractors of America, and recently served as the Chair of the Federal & Heavy Division. I am past President of the Associated General Contractors of America San Diego Chapter. I have had the opportunity to serve on the Boards of two related businesses for over ten years, and the Boards or leadership roles of 3 large non-profits for over 10 years. I have personal knowledge of, and am competent to testify to, the matters contained in this declaration.

2. Harper is a construction contractor headquartered in San Diego, California specializing primarily in Design-Build and Design-Bid-Build construction for federal and public works projects. We provide a full spectrum of preconstruction, estimating, design-assist, design development, construction, and quality control services. Harper Federal is our wholly-owned subsidiary that self-performs on Harper's federal projects, principally as a subcontractor in ten trades.

3. Federal contracts work currently comprises approximately 90 percent of Harper's business. Harper primarily performs lump sum, firm-fixed price contracts for the United States Army Corps of Engineers ("USACE") and the Naval Facilities Engineering Command (NAVFAC).

4. Harper has over 135 employees, but largely relies on subcontractors to perform the work on our projects, with a preference for drawing from local subcontractors for each area as much as possible. Since we pay prevailing wages on all of our projects, we are agnostic as to whether a subcontractor is open-shop or whether its employees belong to a labor union. However, the majority of our subcontractors are open-shop and non-unionized, and not enrolled in Project Labor Agreements (PLA's). These companies are commonly referred to as "merit-based" contractors. As explained below, we firmly believe that many of the subcontractors that we currently utilize will not be amenable to signing a PLA. Therefore, we fear that we will lose our subcontracting base that enables us to be successful. As a business owner, I know the risks – both financial and performance – are substantially increased with a PLA requirement. If a PLA were imposed on federal contracting, I would be extremely unlikely to bid a large job relying on firms that I have never worked with before. That could be a recipe for disaster and I am not willing to take that risk considering the payment, performance, and schedule requirements, the safety

requirements, liquidated damages provisions, and the subcontract flow-down requirements that are inherent to government contracting.

5. A recent example of our concern about losing our subcontractor base is a project we bid in California for the Air Force. The project was a new Aircraft Hangar located at Beale AFB (near Sacramento, CA). The project scope would be considered complex, with a total contract value of greater than $100 Million. The original RFP for the project was issued in April 2022, with an anticipated contract award in Spring 2023. Initially, there was not any PLA requirement included in the original RFP. We solicited a wide range of subcontractors and received hundreds of positive responses. Subsequently, the Air Force issued an RFI response in June, 2022, which imposed a PLA requirement for the entire project including all Trades. The language in the RFI response did not provide clarification regarding the terms of the PLA. All it said was that a "Project Labor Agreement is required for this Task Order," with no details about particular provisions, so all contractors were left guessing. This prompted widespread concern and confusion.

   a. Immediately after issuance of the RFI response, subcontractors began withdrawing. This was especially prevalent with the small business firms. Within just a few days, approximately 30% of the subcontractors we had planned to use on the project completely withdrew as a direct result of the PLA requirement. Many others expressed their concerns, telling us that they would likely withdraw if this obligation were implemented.

   b. Harper immediately notified the government of our concerns about the lack of subcontractor competition, reduced quantity of qualified subcontractors, and the corresponding inevitable increase in our pricing. Based on the multiple questions issued in the RFI Log, it is clear that Harper's competitors also submitted similar RFI's expressing concern over the PLA requirement. Within just a few days, the Air Force reversed its direction with another RFI response that eliminated the PLA requirement in its entirety. All of this transpired early in the Proposal stage, prior to our Proposal submission to the government, and prior to receipt of final subcontractor bids. After the government provided notice that the PLA requirement had been rescinded, all of the subcontractor firms that had dropped out rejoined the competition and ultimately participated in the bidding process.

   c. Because the PLA was rescinded prior to receipt of pricing, there is no way to determine what the dollar increase might have been within any degree of accuracy. However, based on the discussions with many subcontractors and our experience in the industry, Harper is confident in predicting the following would have occurred had a PLA been mandated on this project: (1) A minimum 30% decrease in the number of bids received from subcontractors; (2) a decrease in competition across most every trade; and (3) significant pricing increases in most trades, especially major trades that represent a significant percentage of work on the project (e.g., structural concrete, framing, drywall, roofing, fire protection, plumbing, mechanical, electrical).

    d. This project is an example of the unacceptable business risks mentioned above. It is impossible to submit realistic and competitive bids if a contractor does not have information that allows the contractor to accurately project costs, particularly labor costs.

6. The example above occurred in Northern California where union firms are relatively numerous. If this same PLA requirement was imposed at a more remotely located military base location, where there are already very limited subcontractor resources, I am certain that it is inevitable that the negative impacts listed above would be compounded, prices would increase, and performance and project delivery would be jeopardized.

7. Much of the work that we do for the Department of Defense is located away from metropolitan areas of the country where most workers and subcontractors are not unionized. This is true, for example, of our projects in Fort Sill, Oklahoma; China Lake, California; Lemoore, California; Yuma, Arizona; Fallon, Nevada; Twentynine Palms, California; Edwards Air Force Base, California; and Nellis Air Force Base, Nevada. In many of these remote locations, we cannot draw workers from a union hiring hall because so few of the subcontractors in those locations are unionized, and the hall doesn't have enough qualified workers to supply to the jobsite. Imposing a PLA requirement in these areas would have the inevitable effect of increasing the cost of performance because of the inability to obtain skilled workers capable of performing on our projects in a way that would enable us to operate safely and efficiently, completing our work on-time and under budget.

8. A mandated PLA would severely handicap our ability to furnish enough skilled tradesmen to perform the work. This can be explained in two ways. First, most of our highly experienced smaller subcontractors are not willing to participate in a PLA and, therefore, will decline to perform the work. Second, based upon our recent experience and general knowledge, the nearest union hall cannot always furnish enough tradesmen to complete the project in the allotted time because they don't have enough workers. An example is a proposal that we recently submitted to USACE for a large project at Ft. Irwin, CA, where the subcontractor pricing from the only responding union firm was nearly double that of a smaller open-shop firm. That company's reasoning for the price difference was due to the lack of union labor available to draw from because of the PLA ratio rules. These rules meant that they couldn't bring their own workers to the jobsite and would have to rely upon the local hall to supply the workforce, a condition that translated into higher costs. Harper ultimately submitted a price to the government utilizing the open shop electrical firm that was millions of dollars lower than the larger union firm.

9. Both Harper Construction's subcontractors and Harper Federal rely heavily on highly specialized craft workers. Many of these specialized subcontractors and craft workers have spent years learning the federal contracting rules and bring their experience, expertise, and skill to the worksite, wherever that may be. Being able to rely upon subcontractors with workers who have recent, relevant experience to complete the job within the hours that we bid for a particular task, and to the quality standards that the

government demands, is critical to meeting our schedule. Completing the schedule within the time that we estimated is what makes us successful.

10. However, PLA rules prohibit subcontractors and Harper Federal from bringing all the necessary skilled workforce employed by them to the jobsite because of the ratio hiring restrictions embedded within PLA's. Under the rules contained in a typical Project Labor Agreement, our subcontractors and Harper Federal would be required to hire local craft workers from the local union halls. The workers that are available from hiring halls may not have the experience and specialized skillset needed to perform the work we need them to perform in the time that we need, and to the skill level that is needed. This specifically leads to inefficiency and delays the project completion. We see this from firsthand experience where some of our larger union contractors cannot supply the quantity of skilled labor to the remote job sites due to the shortage of workers available in the nearest hall. Consequently, they cannot maintain the schedule. We have also experienced situations in which the local union hiring hall, after acknowledging they could not provide enough workers, refused to allow the subcontractor to bring in help from another hall in the region.

11. Local union halls want to control the hiring, the working rules, and the type of work that a craft trade is allowed to handle. So, under a PLA, subcontractors are subject to a local "ratio" of journeyman to apprentice. This costs money because the merit-based firms cannot bring in all their own trained employees to perform the work, but rather they are forced to hire locals, in greater quantities, that may not have the experience and that they don't even know. Furthermore, there are jurisdictional disputes between unions that dictate what "type" of labor can be performed by a particular trade in that region. For instance, where a concrete craftsman may need to shovel some concrete in a particular situation, that worker cannot pick up a shovel in certain states. They are only allowed to pick up a rake during a concrete pour. This means you have to hire additional workers to work a shovel if needed during a concrete pour. This causes massive oversight, more paperwork, regulatory fears, and confusion for the subcontractors and craftsmen just trying to perform their contract.

12. We have a recent example where a large union electrical subcontractor is currently unable to furnish enough skilled electricians to the jobsite at the Naval Air Weapons Station China Lake, CA, to complete the project before the contract completion date. The owner and VP's of the subcontractor have told me that they are only getting 50% production rates out of the local union electricians that they have to hire. This is causing them to hire twice the number of electricians that it should have taken. On this project that translated from the estimated 35 electricians to 70 electricians needed per day for over half a year, an extraordinary and unacceptable inefficiency. These inefficiencies resulted in substantially higher cost for the project. You cannot simply plug and play craft workers into a particular scope of work and expect them all to perform at the same level of your highly experienced employees. The local union business agent admitted this problem, telling our subcontractor that they cannot supply the necessary labor force to keep up with the schedule on this project.

13. Another recent example from this same project is from a union firm that provides the low voltage wiring that was told by the local hall that they are were not permitted to work overtime even though the government was pleading with us to provide overtime to complete the fiber installation for the sake of the schedule. Hence, Harper had to bring 6 tradesmen in from 100 miles away, and also fly 4 tradesmen in from 1300 miles away, to maintain the project schedule, at a significant cost impact. This is another example of how the PLA rules would preclude a prime contractor from taking steps necessary to complete a schedule that the government earnestly desires for the sake of the mission. This Navy Base was deemed inoperable due to damage suffered by the recent California earthquake. Over 2 billion dollars of emergency funding was approved by Congress and the Naval Facilities Engineering Command Southwest was charged with repairing and replacing the damaged facilities as soon as possible in the interests of national security.

14. As mentioned above, we are also concerned about subcontractor resistance to having to perform under the terms of a PLA. For example, we perform a significant amount of work for the Army at Fort Sill, Oklahoma. We have been advised that some of our most valued subcontractors are not interested in executing a PLA and will withdraw from military contracting. An example is a roofing contractor, (a small business, Hub Zone company) that has been in business since 1954. They were a union company in the 60s, but withdrew from that market because the union hiring hall sent them unqualified workers. This company will not bid on any projects requiring a PLA. Another example is a small business landscaping contractor with whom we have done business. We have been advised that this firm also would not be interested in a PLA and would move to bidding on Indian funded projects and other opportunities. Currently, federal contracting makes up 30% of this company's revenue. Federal contracting perpetuated their business beginning in the early 2000's. They have made a considerable investment in this process, and moving into different markets would have a material adverse effect on their company.

15. A third example is one of our trusted concrete subcontractors in Oklahoma. This company has built its business in the Federal contracting market and their employees are well taken care of due to the contract requirements. The owner will abandon this market because of his belief that a PLA would be devastating to both the company and the employees. The owner has told us that he will "chain the front door" rather than comply with a PLA. A fourth example is the Oklahoma office of Trane, a leading national mechanical controls company. Although their service technicians are part of a craft union, their controls technicians are not. They have communicated to us that they prefer not to force their controls wiring employees into a PLA project for business reasons. The Oklahoma Trane office is not aware of a single unionized contractor that provides controls technicians, and is unsure how it would be able to either bid or perform on a project requiring the PLA.

16. For these reasons, we anticipate that several of our subcontractors will choose not to bid on our projects if they will be subject to a PLA requirement. This will severely hurt Harper Federal's capabilities and, consequently, Harper Construction's bottom line, including our ability to complete work on-time and under budget.

17. Furthermore, open shop merit-based subcontractors have shared that they don't want to bid on a PLA project because they will be less competitive than a union firm. This is due to the fact that the open shop firm already has a company-wide medical plan in place and that they would have to pay for the PLA medical plan as well. Therefore, the open-shop firm will have to pay for medical coverage twice. This burden makes their bid less competitive, and they know they will get beaten by the union firm in a competitive bid scenario. So, they simply don't participate in the bid and take their services elsewhere.

18. I also am very concerned about the loss of our ability to utilize effective apprenticeship programs to help us obtain skilled trades people. For example, the Associated General Contractors of America, San Diego Chapter Apprenticeship is the largest open-shop apprenticeship program in America. Approximately 80-85% of the workforce in Southern California is associated with open-shop companies. Some of our subcontractors utilize this Apprenticeship training. From my understanding, they would be shut out of federal work since the federal PLA rules would not recognize the AGC's apprenticeship program. Also, there are several unique trades like elevators, cranes, and DDC controls that are very specialized, government oriented, and where qualified firms are scarce in the government/federal contracting market. In some cases, we receive only one bid for this specialized work, and many of these firms are non-union. If any of those specialty subcontractors decide to exit the federal market due to PLA requirements, we are concerned about where to find firms to perform that specialized work.

19. We are very concerned about incurring liquidated damages penalties as a result of project delays caused by the restrictions imposed by a PLA. Each of our contracts contains owner-assessed liquidated damage clauses that sometime exceed $20,000 per day for each day we are late in turning over the project. We will be unable to maintain control of the schedule when a PLA requires us to hire the overwhelming majority of tradesmen from the union hall within the locale of each of our federal projects. This is one of many examples supporting our belief that a PLA creates inefficiency in the workforce and delays the completion of the construction schedule.

20. Harper Federal employees have informally been asked their position regarding a pending requirement to assent to a PLA and the overwhelming response has been negative. In today's economy employees need the fringe benefits in cash, not in a long-term union pension or other benefit plans that come with a PLA. It would devastate families should their take-home pay be cut nearly 25-35%, a burden that is made worse by the fact that it is unlikely that these employees would ever receive the value of the dollars contributed to the union plans.

21. We don't know what it will mean to assent to a federal PLA since there are no details available. For example, we don't know what terms and conditions will be included in the PLA. We don't know what amounts we will have to pay into the Trust Funds required by the PLA. We don't know the amount of union dues that will be required? And we don't know how our employees who would be covered by a PLA would qualify for medical benefits since they are not union members. And, assuming that contributions into a union retirement plan are also required, we don't know how a worker that performs work for a limited number of months would ever collect on those benefits. We

understand that they will not, and that they would basically be forfeiting that retirement money as the job concludes and they move on.

22. If Harper Federal is required to enter into PLAs on its federal contracts, it will likely shut down. We have spent 18 years building up Harper Federal into a company to self-perform ten trades on projects round the country. This workforce is the backbone of many projects and drives the schedule. USACE has stated that this self-performance ability sets Harper apart and plays a big role in our success. USACE contract selection criteria place a big emphasis on a firm's ability to self-perform work, and control quality, productivity, and schedule. Namely, they state that self-performance reduces risk to the project, and that factors into determining to whom the government awards the project to. Harper Construction can compete better and obtain more awards because of Harper Federal's competitive pricing due to our experience and buying power. A PLA mandate ultimately will be the death knell for Harper Federal resulting in the eventual layoff of roughly 100 valued employees. More generally, a PLA mandate will have a devastating impact on the people that have invested their lives into Harper, as our firm will inevitably have to downsize.

23. Not only could the PLA mandate put Harper Federal out of business, but it would also drastically reduce the ability of Harper Construction to obtain federal contracts because our bid price inevitably will be higher. This can be explained in several ways. First, Harper Construction would lose its competitive advantage in material purchases since we currently avoid the typical 20% mark-up on equipment purchases that subcontractors place on the bids for handling the material. This makes us more competitive and helps us get the job during a competitive bid. This results in a substantially better value and lower risk to our federal government customers. Second, Harper's labor efficiency without the PLA mandated worker rules enables us to bid prices to the government that are lower when we self-perform. Regarding labor, using our own workforce, via Harper Federal, allows us to control the schedule and workflow as previously described. Schedules are more readily maintained because we control the work hours, the material procurement, and the sequencing of construction for the items we are self-performing. Furthermore, our tradesmen are more efficient due to the ability to complete 8-hour days by performing multiple tasks in related trade work. For instance, a properly trained individual can install the framing and the drywall as needed. This is not allowed with PLA's where union rules disallow a framer from also installing drywall.

24. We are also worried that losing Harper's small subcontractors would make it nearly impossible to meet our contractual subcontracting goals for small businesses. The majority of our subcontractors are small business, non-union firms; particularly in Fort Sill, where most of our subcontractors are open-shop small businesses. We will not be able to meet our Small Business, Hubzone, Women-Owned Small Business, Service-Disabled Veteran-Owned Small Businesses, Small Disadvantaged Business, and AbilityOne goals if we lose our ability to subcontract with these businesses. Harper is typically faced with having to include mandatory high goals in our proposals. However, if most of the small business subcontractors leave the federal market because they refuse to participate in a PLA, then Harper would not be able to propose or meet those goals due to the unavailability of compliant subcontractors. As mentioned above, per the Federal

Acquisition Regulations, we could then be liable for liquidated damages dollar for dollar, based upon the subcontract value, for failure to meet those goals. We fear that this could open our business up to millions of dollars in liquidated damages per job – which will have catastrophic effects on our business.

25. As mentioned above, mandated PLA's will eliminate many of the smaller subcontractors that we currently utilize, causing projects to cost more and take longer to complete. There is no doubt in my mind that this will happen. Therefore, being forced to use larger unionized firms through a mandated PLA, and the resultant inefficiencies summarized above, will inevitably cause Harper to raise its proposal prices to the government. Raising our prices will reduce our success rate in terms of winning new projects which will invariably reduce the current size of our firm, which has experienced steady growth over the last 50 years.

26. The financial risks and uncertainties imposed by the PLA requirement will force us to reconsider the extent to which we will continue to bid on federal projects. The lack of our ability to control the completion of a project within the budget that we anticipated, within the time that we anticipated, within the time allotted by the contract, couched with the certainty of falling far short of the small business goals will add tremendous risk to our company. The construction industry currently is very busy. Our company has turned down numerous projects in recent months. If we decide to exit the federal market, there will be a significant decrease in contractor competition for the kind of work we bid on, to the ultimate detriment of the U.S. taxpayers.

27. It is quite obvious to see the real end game of this PLA mandate. It is to eliminate open shop merit-based firms. However, this discriminatory practice reduces competition and invariably raises the cost to complete, and the time to complete the vital buildings and infrastructure that serve our national interests throughout the world.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Executed on this 13 day of September, 2023, in San Diego, California.

Jeff Harper, President