## DECLARATION OF GEORGE ROGERS

I, George Rogers, hereby declare as follows:

1. I am Chief Executive Officer and President of RQ Construction, LLC (RQ).  I have served in this role for 26 years.  In that span, RQ has completed more than 200 federal construction contracts, on more than 40 different federal installations in more than 9 states, in addition to federal contracts in several foreign countries, for a total value of more than $3.5B dollars.  I have personal knowledge of, and am competent to testify to, the matters contained in this declaration.

2. RQ is a privately held design-build firm located in Carlsbad, CA, with regional offices in Virginia Beach, VA, Jacksonville, FL, and Guantanamo Bay, Cuba.  Established in 1996, RQ has developed a reputation of providing quality design and construction services in a timely and cost-effective manner.  RQ typically provides design and construction services for administrative, aviation, training, hospitality, housing, education, medical, industrial, operations, waterfront and in water, and large utility projects.

3. Federal contract work, for the Department of Defense (DoD) either directly or indirectly, is RQ's sole business.  Our current project backlog is in excess of $1 billion.

4. Our recent projects include design-build on a maintenance hangar and support facility at Naval Air Station Whidbey Island in Washington state, ECI construction services to relocate the 129th CAANG into three new buildings at Moffett Federal Airfield in California,  pre-construction and construction on a new training center at Naval Station Norfolk in Virginia, and design and construction services for the infrastructure and 19 buildings at the new premier NSW Silver Strand Training Complex totaling well over $500M.

5. The average cost of our federal projects is approximately fifty million dollars.  Several of our recent projects have been valued at more than one hundred million dollars.  Our projects typically involve using skilled labor in several construction industry crafts, including but not limited to geotechnical, earthwork, land and in water foundations, site and building concrete, site utilities, masonry, structural steel, mechanical, electrical, drywall, doors/windows, interiors and all elements to complete sensitive compartmented information facility ("SCIF") and Special Access Program Facilities ("SAPF") spaces.

6. We self-perform approximately 25% of our work with our own employees, and subcontract with valued, experienced partners to procure high-quality skilled labor for the remainder of the project work.  In the U.S., we self-perform Cast-in-Place Structural Concrete, metal stud walls & drywall, doors and windows, mechanical (wet and dry), plumbing, and electrical work.

7. RQ is extremely concerned about the consequences of having to comply with Executive Order 14063, issued by President Biden on February 9, 2022.  From our review of the Order, and the proposed regulations issued by the FAR Council, it appears that RQ would be required to perform all of its federal contract work under a Project Labor Agreement ("PLA") (the "PLA mandate").  There is nothing in the regulations that suggests that

    projects on which we might submit bids will be given exemptions. Among many other concerns, we would have extreme difficulty in staffing our self-performing share of project work with experienced, skilled individuals. And we would also be unable to get skilled labor in several crafts that we typically subcontract.

8. Much of our work is performed in geographically remote locations, particularly military bases, where both we, and the subcontractors with whom we partner, are already challenged to recruit sufficient skilled manpower. An example is Marine Corps Base Camp LeJeune, located south Jacksonville, North Carolina, in a remote part of Eastern North Carolina along the Atlantic coast. The base is more than 125 miles from Raleigh, the state capital. The base is more than 240 miles from Charlotte, North Carolina or Richmond, Virginia, and more than 450 miles from Atlanta, the closest large metropolitan areas. The closest smaller city is Wilmington, North Carolina, a city of approximately 115,000 people, which is 50 miles from Camp LeJeune. We know from experience that the percentage of unionized labor in this part of Eastern North Carolina is extremely low, in the range of 2-3%. Another example is Fort Sill, Oklahoma, which is 90 miles from Oklahoma City and 195 miles from Dallas.

9. In my experience, in many of these rural areas, in the South and Southwestern states in particular, a significant percentage of the eligible workforce is simply not interested in being covered by any sort of collective bargaining agreement, including a PLA. There are historical and cultural reasons for the widespread belief that being forced to belong to a labor union and be covered by a PLA is contrary to their values. Given the current tight labor market, we expect that a significant percentage of skilled workers would simply choose to work on other projects that did not include the PLA mandate.

10. Almost all of our contracts are lump sum fixed price contracts. Our ability to operate profitably hinges on being able to control labor costs. Our inability to find qualified skilled labor willing to work on our projects, especially in remote areas, would jeopardize our ability to complete our projects efficiently and on time. A shortage of skilled labor would inevitably drive up labor costs in ways that we could not control. And it would also require us to submit higher bids to accommodate our added costs associated with these projects.

11. In addition to staffing concerns, the PLA mandate would cause increased costs and would result in significant project delays. The uncertainties associated with the PLA mandate would make it impossible for us to submit realistic bids for covered projects. For these and many other reasons, we believe the PLA mandate would expose RQ to unacceptable business and legal risk that would force us to decline to bid or perform on covered projects.

12. RQ is and has always been an open shop contractor. Our company has never had any type of a collective bargaining agreement with any construction industry labor union. We have always believed that we are better able to perform high quality work in a timely, safe, and profitable manner in a non-union environment, consistent with the wishes of our employees. We believe we would not be able to operate profitably if our operations were

    burdened by the many obligations and restrictions imposed by collective bargaining agreements.

13. One of the many reasons RQ participates solely in the open shop construction market is because of the way collective bargaining takes place in the construction industry.  Unlike other industries, it is legally permissible in the construction industry for a union to insist on what is called a pre-hire agreement, which is prepared before any employees are hired to work on the project.  These agreements set forth all material terms and conditions of employment for workers in the particular trade.  These agreements are typically negotiated on a local area level, by the local affiliates of the AFL-CIO Building and Construction Trades Departments, and a group of local contractors that belong to a local association.  In practice, contractors that are not members of those associations are stuck with the terms that have already been negotiated.  In our experience, labor unions have no incentive to (and therefore do not) negotiate the terms in the area pre-hire agreement, as there is no legal reason to do so.  This is an important concern for RQ, as we perform work in various locations around the country and have no opportunity to participate in negotiations for area standard pre-hire agreements.  It would be extremely difficult (and unacceptable to RQ as a matter of principle) for RQ to operate profitably and safely under terms and conditions that we had no opportunity to negotiate.  RQ has plenty of experience with unions and labor relations in the construction industry.  RQ's parent company, DPR Inc., is a large union shop contractor in the private sector.  RQ has worked with numerous subcontractors that do both federal work and private sector work who utilize unions and union labor.  When we speak about unions and union labor, we speak with experience.

14. There are many other reasons why we prefer to operate without the constraints imposed by collective bargaining agreements, including a PLA.  We would lose much of our competitive advantage if we had to staff our projects from union hiring halls, which would preclude us from using our own field employees.  Being forced to staff our projects from hiring halls would also conflict with the women and minority-owned small business goals imposed by our customer, as many small business companies would be unable to absorb the cost and administrative burdens associated with operating under a PLA.

15. A PLA would also limit our current ability to pay our skilled workers at appropriate wage rates.  Almost all of our projects are covered by the Davis Bacon Act, which specifies prevailing wage rates and fringe benefit contributions for contractors performing on federal projects through what's called a wage determination issued by the Department of Labor.  We often pay many of our skilled craftspeople at higher rates of pay than required by Davis-Bacon, in recognition of their value to the organization, particularly for skilled people who have been cross-trained in more than one trade.  A PLA would not permit us to operate in this manner.  Instead, a PLA dictates wage rates, which are often obtained from a few unrepresentative collective bargaining agreements with selected labor unions.  Many of them are substantially higher than the prevailing wage rates issued under the Davis Bacon Act.  Those rage rates do not reflect actual market conditions, and having to pay above-market wage rates obviously increases the cost of the project.

16. A PLA likewise would limit our current ability to be flexible in making job assignments. On many of our projects, we cross-train our skilled labor so that individuals can work in more than one trade when workflow allows, and to attract and retain more highly-skilled workers. This flexibility is critical to our ability to win and perform work on time and under budget. Requiring RQ to be subject to a PLA on our projects would jeopardize this flexibility and necessarily increase the costs of our projects. Like typical area-wide pre-hire agreements, PLA's contain very strict definitions of job classifications and work jurisdiction that would not permit us to have our skilled craftsman work in more than one such classification. Cross-training is very important to our business model. There are times where we have some very limited work that will release a lot of one of our self-perform trades. For example, we just recently had a small amount of drywall that needed to be installed on the inside perimeter of a building that then allowed our duct installation crews to start their work. The drywall work was very limited, so we had our mechanical crew put it up as they were putting up their duct. We also take an approach with our labor force that we want them to stay with RQ long-term and continue their career progression. Our goal for our craft is that they will become lead men, then foremen, then trade superintendents, and then project superintendents. This provides a significant upward mobility for our craft that they won't get otherwise. The cross training allows us to have consistent work in front of these crews while simultaneously giving them various skills that they will need to be successful someday as project superintendents making well over six-figure salaries. PLAs would greatly reduce our ability to do this, which would hurt both RQ and our labor force significantly.

17. Our costs would be further increased by other provisions found in most PLA's, including matters such as the exclusive use of seniority (instead of qualifications and experience) in job bidding and layoffs, work rules, and overtime eligibility. Our ability to remain competitive in a firm fixed price environment depends heavily on access to and utilization of the most skilled labor force, which can become greatly limited when operating under the constraints of a PLA.

18. It would be extremely difficult for us to prepare responsible bids for projects in the face of the various uncertainties presented by these and other obligations imposed by a PLA. If we decided to bid on such projects, we would necessarily have to increase our bid price accordingly, to try to anticipate these contingencies.

19. RQ would be forced to make a fundamental change in the way we do business if we were to agree to operate under a PLA, which would require us to recognize several labor unions as the exclusive representative of our employees. We are unwilling to do this, as we are committed to operating as an open shop contractor. Having to operate under a PLA would be inconsistent with our rights under federal labor law, which permits companies to operate non-union at their choice, consistent with the wishes of their employees.

20. We also believe that the PLA mandate would create serious employee retention problems for RQ. Our employees would be unhappy with having to take the pay cut inevitably associated by having to pay union dues. Many of our employees would be frustrated with the imposition of new work rules and other restrictions imposed by PLAs. Many of our

employees would resent the prospect of being subject to often coercive union organizing tactics used by union business agents who have access to the construction site. And many of our employees are philosophically opposed to being forced to be represented by an outside organization like a labor union, without the opportunity to express their preference on the question of unionization.

21. I anticipate that a significant number of our employees would quit and go work elsewhere, rather than be forced to work in a unionized environment under a PLA. The commercial construction market is very strong and unemployment in the industry is at a historic low. It is very easy for employees to find new employment in a short period of time.

22. Our roster of subcontractors includes a mix of open shop contractors, and companies that have existing collective bargaining agreements with labor unions in specific trades. Our current roster is approximately 90% open shop. Our roster of unionized subcontractors includes some companies that are covered by area pre-hire agreements that they have had an opportunity to negotiate, as well as other companies that have engaged in conventional bargaining with labor unions in specific crafts.

23. Although we place great value in our relationship with some of our unionized contractors, we cannot simply transfer work back and forth between open shop and unionized contractors. Because we are open shop, RQ is able to contract to either, depending on the needs of the project.

24. Of our approximately 422 U.S. employees, about 304 are field employees and 89 are craft and operators. Many of these individuals are highly skilled craft workers in one or more of the trades. Our field employees often travel from project to project and constitute the core group of the workforce for the work we self-perform on a particular project. Their expertise is essential to our ability to be able to perform our work successfully. We believe our roster of experienced field employees is a distinct competitive advantage for RQ. There are multiple reasons our craft is growing rapidly. We seek long-term hires that fit our culture and share our mission. We have found by paying them more than just prevailing wage, we can boost efficiencies by having craft work different scopes of work in a win-win-win scenario for the project, the customer, and the employee. Obligations to a PLA would turn a win-win-win into a lose-lose-lose. Efficiencies would be lost, cost would go up for the customer, and craft employees would lose out.

25. RQ has substantial business in Louisiana, principally with the U.S. Navy's Naval Facilities Engineering Systems Command ("NAVFAC"), most of which is performed at Barksdale Air Force Base. NAVFAC is one of our largest customers, across the country and internationally.

26. On June 3, 2022, RQ was awarded into the NAVFAC Southeast MACC (Multiple Award Construction Contract) Program. This MACC Program will result in the award of a series of Firm-Fixed-Price (FFP), Indefinite-Delivery/Indefinite-Quantity (IDIQ), Design-Build (DB) Multiple Award Construction Contracts for NAVFAC SE's Southeast

US Area of Responsibility, and is projected to include construction projects at Naval facilities in seven states including Louisiana.  Projects to be performed on this Program may include Design-Build construction and/or 100% Plans and Specifications construction contracts for general construction. Construction will primarily consist of general building type projects (new construction or renovation and any necessary design) including Administrative Facilities, Training Facilities, Hangars, Dormitories, Maintenance Facilities, Commissaries/Retail and other similar types of facilities for the areas managed by NAVFAC SE.  The Program has a total maximum value of $900 million.

27. That same date, RQ was awarded into the seed project of this Program, to be performed at Barksdale Air Force Base.  This project is a design and build contract for a new entrance road and a new Entry Control Facility (EFC) at Barksdale.

28. As the program goes forward, RQ expects to receive the opportunity to bid on several other projects, likely to be awarded on a task order basis.  We chose to participate in this Program based on a series of financial assumptions, one of which is that RQ would be free to operate under its existing business model, and that we would not be mandated to perform projects under a PLA.  If that were to change, it would require a complete change to our business model.

29. The underlying base assumptions for the Program include a "must bid" requirement for task orders released within the Program.  In our experience, if a contractor decides not to bid on a particular task order, the Navy could then decide to "off ramp" the contractor and therefore no longer allow the contractor to bid on the remaining task orders released in the Program.  If RQ were presented with a task order on this Program that requires a PLA, we would seriously consider walking away from the Program.

30. In our experience at Barksdale Air Force Base, substantially all of the local subcontractors who are available to help us perform our work are smaller, non-union contractors.  They will not bid on a contract that requires a PLA.

31. The implications of being forced to comply with a PLA would present RQ with unacceptable business risk.  Among other things, it would jeopardize our long-standing relationships with our subcontractors.  We work with several very high-quality subcontractors, particularly in the electrical trades, which have non-unionized workforces.  These open shop subcontractors, in my experience, would have very little interest in bidding on a project covered by a PLA.  As with us, having to comply with the various requirements of a PLA would be fundamentally inconsistent with their business model.  They are committed to operating exclusively in the open shop market.  We have developed a strong relationship with these subcontractors through years of collaborating on projects.  We trust their work and their workers to complete critical electrical work on our projects.  If we were subject to a PLA for projects requiring electrical work, we would be precluded from using these subcontractors.  This is because a PLA requires the prime contractor to imposes its terms on all subcontractors of any tier that are retained to work on the project.  The vast majority of the subcontractors we typically work with would simply refuse to bid on such projects.  The commercial sector of the construction

industry is very busy, and many subcontractors would decide to exit the federal sector and focus their business on the commercial sector.

32. Berg Electric is one of our primary subcontractors for electrical work, working with us primarily on the West Coast. Berg is an open-shop contractor and, based on my experience with its leadership, Berg will not and cannot bid on work where a union contract – including a PLA – would be required. In that event, Berg would no longer be available to us as a subcontractor, which would greatly impede our ability to bid on contracts involving significant electrical work.

33. We would face the same problem with other trades for which we typically retain subcontractors. Highly qualified, non-union mechanical firms who regularly bid DoD work with RQ include Countywide Mechanical, Paradigm Mechanical, and ALPHA Mechanical.

34. Based on my many years of experience in the industry, I estimate that we would get only 8-10% of our existing subcontractors to agree to bid on a project covered by PLA. Our inability to retain experienced, qualified subcontractors would jeopardize our ability to continue providing high-quality work.

35. We also anticipate that many small-business subcontractors – including many women and minority owned small business enterprises ("W/MBEs") – will be unable and/or unwilling to meet the requirements imposed by a PLA. In my experience, many of these companies lack the resources necessary to comply with the many restrictions imposed by a PLA; many of them, for example, do not have in-house legal departments or an internal human resources/labor relations function. They would be overwhelmed by the additional obligations. As a result, we anticipate that many of these small-business subcontractors will choose not to participate in federal contracting as subcontractors on our work, if PLA requirements are placed on our contracts. Many of our contracts contain specific requirements to engage W/MBEs for a certain percentage or amount of our subcontracted work. In the event that these subcontractors are no longer willing to work with us, we will not be able to meet those goals. Failing to meet these goals could result in RQ receiving marginal or unsatisfactory ratings from our primary Federal DoD customer, thereby jeopardizing our ability to secure future contracts and putting the sustainability of our business at risk.

36. A significant reason that we anticipate these subcontractors, including small-business subcontractors, would be unwilling to work under a PLA is the cost associated with what's called "double-contribution" to employee benefit plans. PLAs require employers to contribute to union-administered multi-employer pension and employee welfare plans, which cover matters such as group health insurance coverage. However, like RQ, most of our roster of subcontractors already administer and contribute to employee benefit plans for their employees. If they agreed to be subcontractors on contracts covered by the PLA mandate, they would be forced to absorb the cost of maintaining their own pre-existing plans, in addition to making contributions required by a PLA. In addition to causing a significant cost increase, many subcontractors would be concerned about being exposed to significant additional liability because of a federal law that imposes

withdrawal liability on companies that no longer have a contractual obligation to contribute to a multi-employer pension plan. In many situations, this can amount to a seven-figure liability, exposure to which would be financially untenable for most subcontractors.

37. The government and the Federal Acquisition Regulations require us to submit a bid of our lowest possible cost. RQ's philosophy is to provide quality work at the lowest possible cost. For example, on a recent project in Norfolk, VA – a $300 million project to build a waterfront pier, in which we were joint venture partners with another contractor – we ended up deciding to self-perform the mechanical work because the only available qualified subcontractor available to us was too expensive. The subcontractor was forced to raise the cost of its bid because of union collective bargaining obligations. We could not afford to pass that extra cost on to the customer. It was a significant issue; the mechanical work constituted approximately 30% of our $100 million portion of the job.

38. RQ provides its employees with a generous package of employee benefits. Currently, RQ pays between 88% - 71% of the premium for Employee Only group medical coverage, and between 78% - 60% of the Dependent Premiums, depending on the plan design the employee chooses. We also cover a significant portion of dental and vision insurance for our employees, as well as 100%-Employer-paid Life & Disability insurance. We provide 56 hours of sick leave per annum. We also provide a 401k plan with a 3% employee match up to the statutory cap. We estimate that employee benefits account for an additional 28% to 30% cost, added to our base wage costs. Forcing RA into a PLA would necessarily cause us to double-contribute to both our existing benefits plans and to benefits plans established by the PLA. If we are required to double-contribute under a PLA, we would need to reduce or eliminate some of these benefits to offset that additional cost.

39. Due to the duration of our projects, our employees would not receive the benefit of the contributions RQ would be forced to make to union-administered multi-employer plans, because they would not work long enough to be vested in such plans. This amounts to an unfair tax on us, and on our employees.

40. As a historical open-shop contractor, we would have serious operational problems in performing federal contract work if we were forced to operate under a PLA that imposed terms and conditions with which we are unfamiliar. This likely would include numerous matters necessary to RQ's successful performance of the work, including unfamiliar work rules, application of seniority, holiday and time-off provisions, and work jurisdiction issues. We would also be severely restricted in our ability to use our existing workforce because of PLA hiring hall restrictions. We also place a heavy emphasis on creating crews that are willing and able to travel. Our work is in very unique locations, often with limited labor available, especially skilled labor so we need to be able to supplement. But that is very difficult to do in a PLA environment, particularly because there is a significant lack of available skilled labor in the remote locations of many of the military bases where we work. When there is a lack of the quantity of skilled labor in an area, RQ typically has to hire and train unskilled workers who are looking for a good career. This also fits in with our business model to create long-term RQ employees. We are looking

for people of character and work ethic; we then train them and cross train them and continue to elevate them as far as they can go within RQ.  This model will not work in a PLA environment because of the lack of available skilled workers.

41. The bids we submit for our projects are comprehensive and highly technical.  Our process for developing each bid costs between $25,000 and $100,000 in direct internal costs.  If we were forced to accept a PLA after submitting a bid, we would likely withdraw from the bidding process.  In that event, we would not be able to recover the costs of assembling the bid materials.

42. We believe the imposition of a PLA would be an improper interference with RQ's rights under federal labor law principles, which preclude the federal government's imposition on any party (either employer or labor union) of any substantive term and condition of employment in a collective bargaining agreement.

43. For non-unionized workforces like RQ's, forced application of PLAs also interferes with our employees' rights under Section 7 of the National Labor Relations Act to refrain from unionizing activity.

44. PLA's are very uncommon in the construction industry, particularly projects built by private owners.  In my experience, we rarely see them, and then only on a small minority of projects located in large urban centers in the Northeast and Midwest, where these is a historically high percentage of unionized labor in the industry.

45. PLA's are also very rare in federal procurement construction contracting in our experience.  The federal government has had regulations encouraging (but not requiring) PLA's on large-scale federal construction projects since 2010, following President Obama's announcement of Executive Order 13502 in 2009.  The federal procurement agencies with which we interact have very rarely required a PLA.  I cannot remember a situation in which a PLA was required on any of the dozens of projects we've performed during this time period.

46. The majority of large national general contractors are non-union, so requiring PLA's on federal construction projects will have a significant impact on the pool of federal construction competitors.  Federal construction contractors are already required to pay Davis-Bacon prevailing wage rates, so PLA's are not necessary for ensuring appropriate wages on federal construction projects and only serve to increase costs for contractors, and accordingly, the federal government.

47. The PLA mandate requires the prime contractor to obligate that every subcontractor, at any tier, also agree to be covered by the PLA.  RQ is very concerned that this requirement would make it impossible for RQ to perform its work on schedule and within budget.  Our experience in the industry makes us very reluctant to be dependent on an unreliable subcontractor.  One example of this concern was RQ's work, on the SOF BN Ops project at Joint Base Lewis McChord, WA. Awarded in May, 2015, and completed in April, 2018, this was a complicated a project to construct a multi-building Battalion Headquarters Facility for the U.S. Army.  During this project, our team used Totem

Electrical as our electrical subcontractor. Totem was a Union contractor. Totem's performance was poor and overall decreased the efficiency of the project. Totem employees took more breaks than the non-union contractors and there was a significant amount of "standing around" and not executing work, which of course decreased Totem's productivity significantly.  It also negatively affected the other trades due to the standard interdependence of all the trades during construction. Totem was also limited on manpower because of a union hiring hall shortage which also decreased their productivity on the job.

48. Because we perform such specialized and high-level work, very few other contractors bid for the projects for which we are qualified.  For example, we were recently awarded the $110,000,000 Hurricane Elsa Building Repairs, Trident Refit Facilities in Kings Bay, GA, where there were only two other bidders. In Puerto Rico, we recently bid and were awarded the $125,000,000 Rebuild Base Detachment and Air Station Borinquen, which only had one other bidder.  Ultimately, if it is required to enter into PLAs on specific federal projects, RQ will almost certainly choose not to bid on them.  Our withdrawal from the proposal process would mean fewer qualified bidders on any given project, which would in turn mean less competition and result in the government facing more of a challenge in procuring high quality, cost-effective work.  This, in turn, would increase costs to the government and, ultimately, the taxpayer.

49. For all the reasons summarized above, working under a PLA would not even be a topic of discussion for us based on what we know now.  With the customer already asking the contractor to take on considerable risk, and then taking away the means to manage and control that risk, it creates an impossible environment to responsibly price a job solicitation.  We're unwilling to assume that sort of risk.

50. Based on what we know at present, we would be extremely hesitant to bid on a new solicitation covered by the PLA mandate. There are too many uncertainties.  We have no basis to believe our projects will be covered by any exception to the mandate.  Based on what we know about the final rule, it will not provide any details about the actual terms to be imposed in a mandatory PLA.  And we will not have any assurance that we would have an opportunity to negotiate those terms.  Because the entirety of our business is currently contracting for the Department of Defense, either directly or indirectly, if we are required to enter into PLAs, RQ will be effectively forced out of the federal sector. This would result in RQ needing to either drastically restructure in order to enter a new line of business by trying to develop work in the private sector, or ceasing to operate altogether.  We can only commit to firm-fixed prices if we know we can get and control the labor to execute the project.  If the labor doesn't exist and we can't reliably train our own labor or bring in labor we've already trained in from one of our other remote locations, we simply cannot commit to a firm fixed price contract.  PLAs may work in larger cities, but in most of the areas where we work, the bases are far from larger cities in areas that simply do not make sense for PLAs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Executed on this 15th day of September, 2023, in Carlsbad, CA.

                                                              George H. Rogers, III, CEO  
                                                              RQ Construction, LLC