## DECLARATION OF EDDIE STEWART

I, Eddie Stewart, hereby declare as follows:

1. I am the Chairman & CEO of Caddell Construction ("Caddell") and a member of Caddell's founding team in 1983. I have served in this role for over 10 years and have been with Caddell for 38 years. I have held various other positions at Caddell, including Vice President of Estimating and Purchasing, Executive Vice President, and President & Chief Operating Officer. I have 44 years of experience in the construction industry and the same amount of experience with federal government contracting. I previously served as the President of the Associated General Contractors of America. I am a current member of the National Academy of Construction, and I was inducted into the Alabama Construction Hall of Fame in 2020. I am a graduate of the Georgia Institute of Technology with a Bachelor of Science degree in Building Construction, completed The Executive Program at the Darden School at the University of Virginia, serve on the Industry Advisory Boards of both Auburn University and Georgia Tech, Past President and current Board Member of the Alabama AGC Chapter. I have personal knowledge of, and am competent to testify to, the matters contained in this declaration.

2. Caddell is an international construction contractor that offers both construction and design-build services to U.S. Government and commercial customers in 34 countries. Caddell has over 125 employees at its headquarters in Montgomery, Alabama and over 4,800 permanent employees worldwide, including in its offices in Atlanta, Georgia; Bentonville, Arkansas; and, Jacksonville, Florida. Caddell has three distinct business units which serve specific markets: 1. Governmental, which concentrates on domestic building projects (including Guam) for government entities (i.e. Federal, State, County and Municipalities; 2. International, which focuses primarily on U.S. Embassies constructed abroad; and 3. Commercial, which concentrates on building projects for privately held Fortune 500 U.S. companies.

3. Approximately 80 percent of Caddell's business is with the federal Government (domestic and international). Caddell has served as the prime contractor on various domestic federal projects, such as the Stanley J. Roszkowski federal courthouse in Rockford, Illinois and the Third Army Headquarters complex at Shaw Air Force Base in South Carolina. By way of example of the scope and complexity of Caddell's work, the latter project involved the design and construction of a 362,042 square foot, high-security U.S. Army Central Command Third Army Headquarters complex – among the most technologically sophisticated military command and control facilities in the world – that occupies a 50-acre site. For that project, Caddell designed and constructed the primary Headquarters administrative/warehouse facility, as well as a Tactical Equipment Maintenance Facility (TEMF), an Exterior covered equipment hardstand area, parking for 90% of staffing, an armory/arms vault, a vehicle maintenance shop and paved motor pool parking, training facilities, communication facilities, container storage pad, intelligence center, data processing facilities, and operations center, and a sensitive comparted information facility (SCIF).

4. We regularly bid on domestic federal projects across the country. Just in the last 3 years, we have bid on over $ 7.8 billion of domestic Federal work and been awarded $ 642 million in 4 states and Guam. Caddell has also constructed a number of U.S. Embassies for the U.S. Department of State, including the Embassy Compound at The Hague, Netherlands; Nassau, Bahamas; and Malabo, Equatorial New Guinea.

5. Caddell is currently performing approximately 12 domestic federal government contracts, totaling $ 1.2 billion and has submitted bids for 43 domestic federal solicitations during calendar years 2021 and 2022 that exceed $4.27 billion.

6. Caddell primarily bids on projects worth more than $100 million. I anticipate that 100% of our work is on projects for more than $35 million.

7. Caddell is extremely concerned about the consequences of having to comply with Executive Order 14063, issued by President Biden on February 9, 2022. From our review, it appears that Caddell would be required to perform all of its federal contract work under a Project Labor Agreement ("PLA") (the "PLA mandate"). There is nothing in the final regulations that suggests that projects on which we might submit bids will be given exemptions.

8. Caddell relies on trusted subcontractors to perform about 90 percent of the project work on U.S. domestic projects. Among many other concerns, the PLA mandate would make it extremely difficult to attract highly qualified subcontractors to perform on these contracts. The majority of our subcontractors are open shop companies, and they do not want to be subject to PLAs. Many of these subcontractors are already often reluctant to partner with us on federal contracts because of the existing regulatory obligations associated with federal work, such as the new cybersecurity regulations. I anticipate that many of the subcontractors on which we rely will simply leave the federal sector. The commercial marketplace is booming and certain vendors already appear to be withdrawing from the federal market. Without these subcontractors, neither Caddell nor its first-tier subcontractors will be able to perform. A PLA mandate with a flow-down requirement threatens to destroy Caddell's business relationships with its subcontractors.

9. Implementation of PLA requirements will cause Caddell additional problems. In many specialty trades, Caddell has worked with these subcontractors over many years and many projects to ensure that they are fully compliant with all government contracting requirements. If Caddell is no longer able to reliably choose its own subcontractors, it will need to find new, untested subcontractors to do much of the on-the-ground work on its projects. Caddell anticipates that this will result in more safety issues and present challenges to performing quality work on-schedule. As stated above, we rely heavily on our subcontractors to perform the various specialty trades on any given project. An electrical subcontractor is but one example. We require our electrical subcontractors to undergo a prequalification process to prove both their technical and financial capabilities. If we lose our prequalified electrical subcontractor due to their refusal to sign a PLA and we are forced to work with an unknown entity, we place ourselves at great risk for whatever failures may result. This could affect quality of the work, timeliness of completing the work, and more importantly, the safety and well-being of the workers on

the project. On any given project, we will have as many as 35 to 45 subcontractors. We typically subcontract mechanical, electrical, fire protection, drywall and finish work, roofing, waterproofing, just to name a few. The more unknown, unproven subcontractors we introduce on a project, the greater risk we have that the project will fail. We will not take on a project when the risk becomes too great.

10. We also anticipate that a PLA mandate will significantly impact our ability to meet our Small Business and Women/Minority Owned Business goals. First, in my experience, smaller subcontractors do not have the organizational infrastructure and resources to fully understand and navigate the obligations and requirements of a PLA. Caddell will be in the position of needing to educate and support those subcontractors on PLA-related compliance issues. I anticipate that most small business subcontractors will simply choose not to pursue federal work if required to be signatory to a PLA. Further, on all of our Federal contracts, we are required to meet certain goals for the percentage of our subcontractors that will be Small Business or Women/Minority Owned Businesses (or show that we made a good faith effort).

11. This requirement is also included in our existing Multiple Award Task Order Contracts (MATOC) and Indefinite Delivery Indefinite Quantity (IDIQ) contracts. If we are required to have PLAs on individual task orders issued under a MATOC or IDIQ going forward, we may choose not to bid on or accept those new task orders. As a result, we will no longer be able to work toward satisfying the stated Small Business and Women/Minority Owned Business goals to which we committed on our MATOC/ IDIQ contract, leaving us at risk of penalties for not meeting those goals. These penalties subject us to Liquidated Damages in an amount equal to the small business goals not achieved under our plan, which could be catastrophic. Likewise, Federal Agencies will fall short of their mandated goals for achieving maximum participation of Small Businesses.

12. Caddell has been a signatory to PLA's (i.e. site stabilization agreements) in the past, on projects performed for the Department of Energy on projects including such as Idaho National Laboratory in Idaho Falls, Idaho; Oak Ridge National Laboratory in Oak Ridge, Tennessee; and the Savannah River National Laboratory in Aiken, South Carolina. On our project at Oak Ridge, Caddell was dramatically limited in terms of which subcontractors it could use, because of the requirement for all parties to be signatory to the agreement. This limited pool of subcontractors willing to participate greatly inflated the price of the work, which was ultimately borne by the Government and hence, the taxpayers

13. A key concern we have as a company is how to bid on federal contracts to account for the federal PLA mandate. We are facing the choice of risking the loss of future business or the loss of profitability on a project. Specifically, Caddell may lose future solicitations due to the way it prices its bids to account for the still-unquantifiable cost impacts of achieving compliance with the federal PLA mandate (*i.e.*, pricing the costs of compliance may mean its bids are less competitive). Because the federal government has not provided a standardized PLA, we may be in a position in which we may have to try to negotiate the terms of any required PLA after award. So, the PLA mandate will convert

DCACTIVE-69390245.2

our systematic approach to project bidding into a pure guessing game, and present unacceptable business risks. The value of lost future business is incalculable because Caddell may not know with certainty whether it would have won but for the price increase. As a result, Caddell may elect to prioritize its private sector work, and not bid on future federal projects.

14. For many of the larger federal contracting MATOCS and/ or IDIQs on which Caddell bids, it is one of only five to seven qualified (meaning responsive and responsible) contractors. This is because of our unique experience performing on extremely large and complex projects for the Department of Defense. If Caddell – and other qualified contractors – elect not to bid on new task orders under existing MATOCs/ IDIQs, the government may be left with only one or two qualified bidders which would result in the government facing more of a challenge in procuring high quality, cost-effective work. This, in turn, would increase costs to the government and, ultimately, the taxpayer.

15. The same is true on other large, Federal projects, where bidders are prequalified before issuing the solicitation, thereby narrowing the pool of qualified contractors capable of successfully performing the work. Caddell is currently one of three bidders prequalified to bid on a Non-Kinetic Operations Facility at Offutt AFB, Nebraska, estimated to be $250-$500 million. Should a PLA be implemented on this project, the Government will likely lose bidders (including Caddell), resulting in higher prices due to lack of adequate competition. The current state of the construction market is such that there are more projects out for bid than qualified contractors to actually perform them. Adding one more hurdle (PLAs) to bidding a Government job will be devastating to the Government.

16. We anticipate that negotiating and instituting PLAs would also lead to significant schedule delays and increased costs. It is difficult to calculate exactly what the cost impact will be as the disruptions may also have a cumulative effect, which occurs when a series of disruptions have a compounding effect that cannot be neatly traced to a single event. The unpredictability of estimating costs would make it extremely difficult to submit accurate, realistic bids.

17. At this time, I believe it is too early for Caddell to know what it will do as a result of the PLA mandate. Although Caddell is committed to serving its Government customers, it also recognizes that being required to enter into PLAs will pose a hardship for its business. Likewise, there is more work currently bidding and on the drawing boards in the foreseeable future which does not impose the risks associated with PLAs. As a result, Caddell will be inclined to exit the federal market rather than bid on work which includes mandatory PLA provisions.

18. The construction market is at an all-time high. There is more work available to bid than contractors capable of bidding it. Prudent contractors are selecting projects to pursue which offer the greatest chance for success. Subcontractors likewise are being selective, with the same criteria for selection. The Government should be looking for ways to make its work more attractive to bid. The addition of a PLA in order to perform Government work will definitely deter competition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Executed on this 12TH day of December, at MONTGOMERY, AL.

_Eddie Stewart_
Eddie Stewart