## DECLARATION OF SCOTT VICTOR

I, Scott Victor, hereby declare as follows:

1. I am the President and Chief Operating Officer of Nova Group, Inc.  I have been employed by Nova Group since 1984, and have served in multiple capacities including Project Superintendent, Project Manager, and Vice President of Operation before becoming President and CEO in June 2011.  I am responsible for all of Nova Group's worldwide operations.  I have particular specialty expertise in the construction of military hydrant fueling systems.  I have personal knowledge of, and am competent to testify to, the matters contained in this declaration.

2. Nova Group, Inc., is a general engineering contractor with home offices and a fabrication facility in Napa, California.  Nova Group's project portfolio stretches throughout the United States covering 29 states and Puerto Rico.  Nova Group also works internationally in locations including Puerto Rico, Guam, Japan, Israel, Qatar, Australia, and Diego Garcia.

3. Nova Group is strictly a federal government construction contractor.  We perform large scale infrastructure improvement projects primarily for the Department of Defense.  We have installed hydrant fueling systems for the Air Force, Navy, and National Guard on air bases under contract with either the Naval Facilities Engineering Command ("NAVFAC") or the Corps of Engineers, in Oklahoma, Texas, and Nevada.

4. We also have built waterfront construction projects in Navy shipyards including wharves and piers for the Navy and Coast Guard in various locations, including San Diego, Hawaii and Bremerton WA. Nova Group also construction electrical infrastructure and distribution projects for the Department of Defense and the Department of Energy. All of these infrastructure projects directly support the mission readiness of the Department of Defense and future reliability and resiliency of the Department of Energy. Nova Group is an open shop prime contractor.  We self-perform 80% of our contract work, which mainly consists of Civil, Mechanical and Electrical trades work.

5. Since 2021, Nova has bid on $1.3 billion dollars' worth of work for the federal Government. We are currently performing approximately $250 Million dollars' worth of work for the Federal Government with an additional $150 Million currently under review.

6. Nova Group is extremely concerned about the consequences of having to comply with Executive Order 14063, issued by President Biden on February 9, 2022.  From our understanding of the Order it appears that Nova Group would be required to perform all of its federal contract work under a Project Labor Agreement ("PLA").  We see no basis for assuming that our federal contracts will be given an exemption from the Order, which broadly requires successful bidders on large federal construction contracts, as well as subcontractors at every tier, to agree to and perform the contract work under the terms of a PLA (the "PLA mandate").

DCACTIVE-72133960.3

7.  Nova Group understands that we would be forced to perform our work on federal contracts under terms set forth in a PLA, without being able to negotiate those terms.  We would have a serious problem in performing federal contract work if we were forced to operate under terms and conditions affecting skilled labor with which we are unfamiliar.  This likely would include numerous matters necessary to Nova Group's successful performance of federal contract work, including issues such as work rules, application of seniority, job assignments, and craft jurisdictional coverage.  Nova further understands that we will be forced to require all subcontractors, at any tier, to also operate under a PLA.

8.  As a contractor using the open shop business model, Nova Group has no experience with the process of collective bargaining, or familiarity with the terms of collective bargaining agreements negotiated with labor unions, including PLA's.

9.  Our experience is that, currently, PLA's are rarely used in federal construction contracting.  Nova Group typically sees only 3-4 Special Announcements from SAM.Gov a year, in which the federal procurement agency includes inquiries regarding the possible use of PLA for a specific project in our market sector. To date, we have not seen any of these Special Announcements producing a PLA on a solicitation. Our experience is that the Corps of Engineers and NAVFAC contract administrators normally conclude that a PLA would not add value on their projects and therefore choose not to impose a PLA.  We understand the PLA mandate would eliminate that option and require a PLA on large-scale construction projects, irrespective of the views of the procurement agencies.

10. Even though PLAs have been infrequently mandated in federal construction, our company's concern with the PLA mandate is based on extremely negative personal experience.  In 2012, EHW Constructors JV, of which Nova Group was a minority JV partner, entered into a contract to perform work at the Explosives Handling Wharf Security Force Facility ("EHW SFF") at Naval Base Kitsap Bangor, WA.  The contract, which was administered by NAVFAC, included a PLA requirement.  It was a major problem for us, from the beginning.  Contrary to our expectations, after the award was made, NAVFAC elected not to participate in the development of the PLA but essentially left it to us to figure out how to navigate implementing a PLA.  The terms of the PLA had already been negotiated with several of the local unions, and we had no opportunity participate in that process.  There were many revisions of the PLA issued by NAVFAC during the bid process.  We ended up being stuck with the final version of the PLA.  The revisions amounted to 'moving the goal posts' with respect to our obligations, and the resulting cost implications.  Our challenges included significant issues with multiple trades claiming the same work on the project, and resulting jurisdictional disputes between the competing unions.  We discovered that, at least in that instance, there were no set guidelines for how to resolve issues like this, and we got little to no guidance or support from NAVFAC.  Our understanding is that NAVFAC should have assigned an administrator who is knowledgeable with PLA's to assist the Prime Contractor and the unions to resolve any issues or disputes.  But in our experience, the Navy doesn't have these resources.  Navigating those challenges consumed significant time and financial resources for EHW Constructors JV.

DCACTIVE-72133960.3

11. On that project, we also experienced serious safety issues as a direct result of the PLA. Under this project, EHW Constructors JV constructed a wharf to berth a TRIDENT II SSBN (sub-surface ballistic nuclear) submarine for loading and offloading missiles, torpedoes, and ordnance.  The wharf also allows guided missile submarines handling as a backup capability and functions as a lay berth when ordnance handling is not occurring.  Our work included construction of a new wharf (73,800 square feet) with a wharf cover, a separate warping wharf (35,740 square feet), extensive approach trestles, a support building beneath the wharf cover, two 120-ton bridge cranes, lightning protection towers, and installation of new utilities, as well as upgrades to existing services.  A total of 1,016 steel pipe piles were driven to support these structures and included 292 24-inch diameter piles, 6 30-inch diameter piles, 514 36-inch diameter piles, and 204 48-inch diameter piles.  The new facility covers over 6 acres and included extensive landside work.  In short, it was imperative that our work be done with utmost precision and care, by skilled and disciplined workers.  This was difficult to accomplish under the terms of the PLA.  As an example, we had an incident in which one of the ironworkers hired by EHW Constructors under the PLA came to work intoxicated and his employment was subsequently terminated.  The other members of the ironworker's union were upset by his termination and elected to stop work on the job for two to three days.  Their work was critical to the project and the work stoppage was a serious detriment to our work and timeline.  I understood that the PLA was meant to prevent this type of issue, but it did not; NAVFAC gave us no support in resolving the issue.

12. We also experienced challenges with having work performed efficiently on that project. For example, the job required us to have on-site seven 300-ton Manitowoc cranes. Although all seven cranes were necessary for the job, not all needed to be manned at all times to perform the required work.  However, the Operating Engineers union required that each crane be manned at all times under its interpretation of the manning provisions of their collective bargaining agreement, which was incorporated into the PLA.  We were concerned there would be a work stoppage if we ended up in a dispute with that union. As a result, several of the cranes were staffed by workers who effectively did no work during the day.  We experienced similar challenges with both the electricians and the ironworkers' trades, because the PLA required more workers to be on site than were required to do the needed work.  These excessive manning requirements were a detriment to our ability to perform the work efficiently and effectively.

13. Additionally, we had serious issues hiring specialty trade subcontracts on that project including some specialty trades.  The work was being performed in a relatively remote area in Kitsap County, Washington; few unionized specialty tradesmen are located there. Instead, we needed to attract workers from across the Puget Sound in Seattle, which required us to pay a premium for labor in that trade.

14. Local 26 (Plumbers and Pipefitters) in particular had issues providing qualified workers. The nature of the project involved some rather exotic materials and process, and the welders and fitters that were dispatched lacked experience and or qualifications to weld stainless steel, copper nickel and other materials. This resulted in redundant labor requests to the Business Agent for Local 26. We experienced the same unqualified persons being sent to the job site more than once.

DCACTIVE-72133960.3

15. The geography led to additional problems, as the fitters and welders were traveling daily in excess of two hours. They were coming from as far away as Aberdeen, Longview and points south of Olympia.

16. We subcontracted with certain specialty trades, many of which were open-shop companies. But, because of the PLA's requirements, these subcontractors had to agree to sign the PLA. That meant that the subcontractors were required to utilize union craft labor in those trades and obtain their workers on referral from the union's hiring hall over in Seattle. That obligation resulted in the subcontractors providing us with extremely low-quality labor. Many of the individuals referred through the hiring hall were absolutely bottom-of-the barrel, which added significant cost to our project budget.

17. Our challenges also included significant issues with multiple trades claiming the same work on the project, and resulting jurisdictional disputes between the competing unions. Since there was no PLA administrator, there was no structure to the dispute resolution process set forth in the PLA. The unions did not allow us to participate in dispute resolution in a significant way, essentially locking us out of project planning and thereby incurring additional costs.

18. At bid time, we anticipated that EHW Constructors would make approximately $35 million profit on the project. It was a firm fixed price contract with no opportunity for requesting an equitable adjustment. When the project was complete, the JV actually lost approximately $35 million, the majority of which we attribute to additional unforeseeable costs resulting from the PLA requirements.

19. Our company's experience in the industry is that the bad experience we had at Kitsap is typical of the problems created by PLA requirements.

20. The majority of our work is on projects valued at between $25 million and $50 million. If the PLA requirement is imposed on our contracts, we may choose not to bid on contracts that are worth more than the $35 million threshold for the PLA mandate. For many of the larger projects on which Nova Group bids, we are one of only five or fewer qualified (meaning responsive and responsible) contractors. This is true especially when the bid is structured as a "best value" or "low price technically acceptable" procurement. Nova Group's decision not to bid on these contracts will reduce the number of bids submitted to the government and, accordingly, increase the price that the government will pay for the work.

21. We know that there is a very small number of contractors, perhaps 5 or 6 across the country, that are qualified to perform in the DOD fueling market in which we compete. To my knowledge, all of these firms operate under an open shop model; none are signatory to any collective bargaining agreements. Procurements in the fueling market generally require expertise in the following crafts: operators, pipefitters, carpenters, and electricians. Open shop contractors like Nova do not have an existing cadre of skilled unionized workers in these trades and will end up with the least qualified workers referred off the bench from the union hiring halls. That will inevitably increase our costs.

Page **4** of **6**

22. The implications of being forced to comply with a PLA would present Nova Group with unacceptable business risk. If the PLA requirement is imposed on our bids, I anticipate that we will be unable to accurately price our bids because we will not be able to anticipate the added costs created by those compliance obligations and the obligations imposed by the terms of a PLA. As noted above, we have no experience with collective bargaining and I am not sure how I would go about bidding the work. So much of this work requires past performance and past experience to qualify; unionized contractors can't just walk into this market space. Being forced to become signatory will put Nova at a competitive disadvantage and cost the federal government more in bid costs. The alternative strategy of subcontracting our work to union subcontractors is also unattractive. In that scenario, because we are not self-performing the work, we will be stacking margin on top of margin which in the end, will also cost the government more money.

23. Among other additional financial burdens, I anticipate that a PLA requirement will require Nova Group to "double-contribute" to employee benefit plans. We currently provide our employees with health insurance, pension contributions, and 401k matching contributions. If we are required to also pay into PLA-stipulated benefits funds, we will be double-paying for these benefits, which will raise our costs and decrease our ability to provide the government low cost services.

24. Our open shop business operating model would be impossible to use on contracts with a PLA mandate. As part of our commitment to safe and timely completion of our work, we do not follow traditional union trade definitions. We cross-train our skilled craft workers who help us with our self-performed work. As examples, we often have laborers perform duties in the pipefitting trade, as well as tasks that might be performed by operating engineers. Likewise, we often have carpenters performing duties that could also be performed by cement masons. All these skilled workers are paid the wage rates and benefits required by the Davis Bacon Act for the trade they are performing at the time. Craft workers must be dual-hatted in our business, and a mandatory PLA would prevent us from operating in this way.

25. All our federal contracts have certain Small Business participation requirements. The majority of these Small Business subcontractors are open shop contractors. If a PLA was required on all Federal projects, the Prime Contractor will be placed into a very high-risk situation trying to find Small Business subcontractors who are signatory to the local unions. This will increase the pricing of construction to the Federal Government, and put a significant strain on the Federal Government to meet the SBA goals. I predict that 80% of the qualified open shop small business subcontractors will find work elsewhere which will leave a very small pool of small business contractors to do the work. If a Prime Contractor does not make the Small Business participation requirement, they are subject to Liquidated Damages in the amount of the value of the goals not being met.

26. We also anticipate that the PLA mandate would be very unpopular with our workforce. I believe that a significant percentage of our skilled craft workers would quit, and seek work elsewhere, rather than be forced to pay union dues, have additional money deducted

DCACTIVE-72133960.3

from their paychecks, work under a PLA, and be represented by a labor union.  I anticipate similar reluctance from employees working for our open-shop subcontractors.

27. We believe the imposition of a PLA would be an improper interference with Nova Group's rights under federal labor law, which guarantee the right of an employer to voluntarily enter into collective bargaining agreements with labor unions, or to decide to operate on an open shop business model, consistent with the wishes of its employees. Federal labor law principles likewise preclude the imposition on any party (either employer or labor union) of any substantive term and condition of employment in a collective bargaining agreement.

28. I also anticipate that a PLA requirement will make our workplace and job sites less safe. It is already challenging to instill a safety culture on brand new employees.  Roughly 70% to 80% of Nova Group's specialty craft and trade workers travel between Nova Group's job sites and work only for Nova Group.  These workers are our core cadre of workers who have adopted Nova Group's safety plan and safety culture, and inculcate this culture in our other workers.  We sometimes supplement our core group with local hires as necessary. In either case, Nova Group would be required to get workers from the hiring halls(s). If Nova Group is required by a PLA to hire local workers "off the bench," the continuity and consistency of our safety culture will be compromised, resulting in less safe job sites.  This would also result in jobs that are less time and cost efficient which ultimately will increase cost the Federal Government

29. The financial risks and uncertainties imposed by the PLA requirement will force us to reconsider the extent to which we will continue to bid on federal projects.  For the time being, we are very hesitant to bid on new federal projects in order to minimize the business risk to our company.  Because federal contracting is our sole business, the concerns I've summarized here, if not resolved, would effectively change our cost-effective business model and increase costs to the Federal Government. Among other things, existing federal contractors who are currently signatory to the unionized trades will have an unfair competitive advantage because they will not have to draw their labor source from the "bottom of the barrel" as a new contractor would.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is correct.

Executed on this 2 2 day of May 2023 in 2023      .

Scott Victor

Page **6** of **6**