# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

|  |  |
|---|---|
| Associated General Contractors of America, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 24-cv-37 |
| Federal Acquisition Regulatory Council, *et al.,* | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.    Project Labor Agreements ................................................................................... 2

II.    Past Presidential Directives Regarding The Use Of PLAs ....................................... 3

III.    The Challenged PLA Order And PLA Rule ......................................................... 5

IV.    Procedural History ............................................................................................. 6

STANDARD OF REVIEW .......................................................................................... 7

ARGUMENT .............................................................................................................. 7

I.    Plaintiffs Have Not Established A Likelihood Of Success On The Merits. ............... 8

    A.    Plaintiffs Do Not Challenge The Authority Of Federal Agencies To Require PLAs On A Project-By-Project Basis, And The President Has Authority Under Article II To Direct Executive Branch Policy With Respect To The Exercise Of That Authority .................................................. 8

    B.    In The Alternative, FPASA Confers Authority On The President To Establish A Presumption In Favor Of Requiring PLAs In Connection With Large-Scale Federal Construction Projects, Subject To Project-Specific Exceptions. .................................................................................. 11

    C.    The PLA Order And Rule Are As Well Supported As Other Exercises Of FPASA Authority That Courts Have Upheld. ........................................ 15

    D.    Historical Practice And Congressional Ratification Confirm The Validity Of The PLA Order And Rule. ........................................................ 17

    E.    Plaintiffs' Counterarguments Rest On Misapprehensions Of The Rule. ....... 18

    F.    The Major Questions Doctrine Does Not Apply. ...................................... 20

    G.    The PLA Order And Rule Do Not Violate The Private Non-Delegation Doctrine. ............................................................................................... 22

    H.    The NLRA Does Not Preempt The PLA Rule. ........................................ 23

    I.    The PLA Rule Does Not Conflict With CICA. ......................................... 26

II.    Plaintiffs Have Not Established That They Face Imminent, Irreparable Harm Absent A Preliminary Injunction ........................................................................ 27

III.  The Balance Of The Equities And Public Interest Favor Defendants. .................... 28

IV.  Any Remedy Should Be Appropriately Limited. ................................................... 29

CONCLUSION ........................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) .................................................................. 11, 15, 16, 17

*Alabama Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) (per curiam) ........................................................... 21

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) ...................................................................... 27

*BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation Dist. of Jefferson Cnty.*,
  49 F.4th 420 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2577 (2023) ................................. 11

*Biden v. Missouri*,
  142 S. Ct. 647 (2022) ................................................................................ 17

*Biden v. Nebraska*,
  600 U.S. 477 (2023) .................................................................................. 21

*Building & Construction Trades Council v. Assoc. Builders & Contractors of
  Mass./R.I., Inc.* ("*Boston Harbor*"),
  507 U.S. 218 (1993) ................................................................................ *passim*

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 ................................................................................. 4, 9, 25, 26

*Canal Auth. of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ...................................................................... 28

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) .................................................................................. 22

*Chacon v. Granata*,
  515 F.2d 922 (5th Cir. 1975) ...................................................................... 27

*Chamber of Com. v. Napolitano*,
  648 F. Supp. 2d 726 (D. Md. 2009) .............................................................. 16

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................. 25, 26

*Farkas v. Tex. Instrument, Inc.*,
  375 F.2d 629 (5th Cir. 1967) .................................................................. 12, 16, 17

*Golden State Transit Corp. v. City of Los Angeles*,
  475 U.S. 608 (1986) .................................................................................. 25

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ..................................................... 12

*Kinnett Dairies, Inc. v. Farrow,*
    580 F.2d 1260 (5th Cir. 1978) ................................................... 28

*La Union Del Pueblo Entero v. FEMA,*
    608 F.3d 217 (5th Cir. 2010) ...................................................... 7

*La. Forestry Ass'n, Inc. v. Solis,*
    814 F. Supp. 2d 655 (W.D. La. 2011) ......................................... 7

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ................................................................... 18

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) (per curiam) ........................... 29, 30

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) .......................................... *passim*

*Louisiana v. CDC,*
    603 F. Supp. 3d 406 (W.D. La. 2022) ....................................... 27

*Mich. Bldg. & Const. Trades Council v. Snyder,*
    729 F.3d 572 (6th Cir. 2013) ..................................................... 25

*Monumental Task Comm., Inc. v. Foxx,*
    157 F. Supp. 3d 573 (E.D. La. 2016) .......................................... 7

*Munaf v. Geren,*
    553 U.S. 674 (2008) ..................................................................... 7

*Myers v. United States,*
    272 U.S. 52 (1926) ....................................................................... 9

*NAACP v. Tindell,*
    90 F.4th 419 (5th Cir. 2024) ........................................................ 8

*NASA v. Nelson,*
    562 U.S. 134 (2011) ................................................................... 10

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    53 F.4th 869 (5th Cir. 2022) ............................................... 22, 23

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................... 7

*Se. La. Bldg. & Const. Trades Council, AFL-CIO v. Louisiana ex rel. Jindal,*
    107 F. Supp. 3d 584 (E.D. La. 2015) ........................................ 25

*Tab-N-Action, Inc. v. Monroe City Sch. Bd.,*
   No. CV 17-00570, 2017 WL 2273149 (W.D. La. May 24, 2017) ................................ 27

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) .................................................................. 11

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .................................................................. 29

*Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp.*
   *Easements for 3.59 Acres in Conestoga Twp., Lancaster Cnty.,*
   No. 5:17-CV-00715, 2017 WL 1283948 (E.D. Pa. Apr. 6, 2017) ............................... 28

*U.L. Coleman Co., Ltd v. Bossier City-Par. Metro. Plan. Comm'n,*
   No. CIV.A. 08-2011, 2009 WL 497634 (W.D. La. Feb. 26, 2009) ............................ 28

*UAW-Lab. Emp't & Training Corp. v. Chao,*
   325 F.3d 360 (D.C. Cir. 2003) ........................................................... 15, 16

*United States v. Miss. Power & Light Co.,*
   638 F.2d 899 (5th Cir. Unit A 1981) .................................................... 16, 17

*United States v. New Orleans Pub. Service, Inc.*
   ("*NOPSI*"), 553 F.2d 459 (5th Cir. 1977) .................................................. 16

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ...................................................................... 21

## U.S. Constitution
Art II, §1, ................................................................................. 9

## Statutes
5 U.S.C. § 705 ............................................................................... 7

5 U.S.C. § 706 ............................................................................... 7

28 U.S.C. §§ 1491(a)(1), 1295(a)(3) ........................................................ 28

29 U.S.C. § 158 (f) .......................................................................... 1

40 U.S.C. § 101 ............................................................................. 18

40 U.S.C. § 121 ...................................................................... 11, 16, 18

40 U.S.C. § 486 ............................................................................. 16

40 U.S.C. §§ 101 ................................................................... 2, 3, 11, 12

41 U.S.C. § 107 ............................................................................. 27

41 U.S.C. § 3103 ............................................................................ 12

41 U.S.C. § 3301 ............................................................................ 26

41 U.S.C. § 3703 ........................................................................................ 12

H.R. Rep. No. 86–741 at 19 (1959), 1 Leg. Hist. 777; 1959 U.S.C.C.A.N. 2424 ............. 14

**Regulations**

4 C.F.R. § 21.0 ........................................................................................ 28

57 Fed. Reg. 48,713 (Oct. 28, 1992) ................................................................. 3

58 Fed. Reg. 7045 (Feb. 3, 1993) .................................................................. 3, 4

66 Fed Reg. 11,221 (Feb. 22, 2001) ................................................................ 15

66 Fed. Reg. 11,225 (Feb. 22, 2001) ................................................................ 4

66 Fed. Reg. 18,717 (Apr. 11, 2001) ................................................................ 4

73 Fed. Reg. 33,285 (June 6, 2008) ................................................................ 16

74 Fed. Reg. 6985 (Feb. 11, 2009) ................................................................ 5, 8

75 Fed. Reg. 19,168 (Apr. 13, 2010) ................................................................ 8

87 Fed. Reg. 51,044 (Aug. 19, 2022) ................................................................ 6

87 Fed. Reg. 7363 (Feb. 4, 2022) .............................................................. *passim*

88 Fed. Reg. 88,708 (Dec. 22, 2023) ........................................................... *passim*

FAR 22.504 ............................................................................................ 15

FAR 52.222-34 ............................................................................. 13, 14, 19, 27

**Other Authorities**

THE FEDERALIST No. 72 (Alexander Hamilton) (Benjamin F. Wright ed., 1961) ............. 10

## INTRODUCTION

A project labor agreement ("PLA") is a type of pre-hire collective bargaining agreement unique to the construction industry. The government has used PLAs in connection with federal construction projects since at least the 1930s. The National Labor Relations Act of 1935 ("NLRA"), as amended, expressly contemplates the use of PLAs, as an exception to the statute's general prohibition on pre-hire labor agreements, "to accommodate conditions specific to [the construction] industry" including "the contractor's need for . . . a steady supply of skilled labor." *Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507 U.S. 218, 231 (1993); *see* 29 U.S.C. § 158 (e), (f). And the Supreme Court has held unanimously that public entities have the same prerogative to use PLAs in their proprietary construction projects as do private entities. *Boston Harbor*, 507 U.S. at 218. For decades, Presidents have issued directives imposing a wide range of constraints on agencies' discretion to use PLAs. For example, under both the Obama and Trump Administrations, agencies were encouraged to consider requiring PLAs in connection with large-scale federal construction projects. And under earlier executive orders, agencies were, at various times, prohibited from using PLAs themselves and barred from either requiring or prohibiting the use of PLAs by contractors.

Most recently, the Biden Administration issued an executive order and implementing rule establishing a presumption in favor of requiring PLAs in connection with large-scale federal construction projects, defined as those with a total estimated cost of construction of $35 million or more, subject to project-specific exceptions that may apply to as many as 50% of projects. Plaintiffs, a national organization of contractors and a regional affiliate based in Baton Rouge, Louisiana, filed this action challenging the executive order and rule as *ultra vires* and seeking the extraordinary remedy of a preliminary injunction. They do not challenge the predecessor Obama Administration order that encouraged agencies to require PLAs.

Plaintiffs' argument that federal agencies may require the use of PLAs in construction projects but that the President, as the head of the executive branch, may not direct the exercise

of that proprietary authority is meritless.  Accordingly, even if the Court had jurisdiction to address Plaintiffs' claims (which it does not, *see* ECF No. 19 ("Defs.' Transfer Mot. & MTD")), Plaintiffs have not established a likelihood of success on the merits of their claims. Moreover, the new policy fits squarely within the President's authority pursuant to the Federal Property and Administrative Services Act of 1949 ("FPASA") to "prescribe policies and directives that [he] considers necessary to carry out" government contracting, as long as such policies are "consistent with" the objective of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101(1), 121(a).

Additionally, Plaintiffs have not established that they face imminent, irreparable harm absent a preliminary injunction.  Among other reasons, they have not identified a bid solicitation requiring a PLA on which any of Plaintiffs' members intends to bid.  Plaintiffs also have an adequate alternative remedy to challenge PLA requirements imposed pursuant to the challenged order and rule: their members could pursue a bid protest if a PLA were actually required on a project they wish to bid on.  The balance of equities and public interest also favor Defendants' ability to use PLAs to reduce the impact of skilled labor shortages and address other inefficiencies in federal construction projects.  For all of these reasons, the Court should deny Plaintiffs' preliminary injunction motion.

## BACKGROUND

### I.     Project Labor Agreements

PLAs have long been used in connection with federal and other publicly funded construction projects, including the Grand Coulee Dam and the Shasta Dam in 1938 and 1940, respectively; various atomic energy and defense construction projects, including nuclear power plants, during and after World War II; and NASA facilities at Cape Canaveral during the 1960s.  U.S. General Accounting Office, GAO/GGD-92-82, *Project Labor Agreements: The*

*Extent of Their Use and Related Information* 4 (1998) ("GAO Rpt."); Cong. Rsch. Serv., R41310, *Project Labor Agreements* 2 (2012).

The private sector also has relied on PLAs to facilitate large-scale construction projects.  *See* GAO Rpt. at 3 ("[L]abor experts and union officials say that the private sector is the biggest user of PLAs . . . .").  For example, PLAs were used to construct the Trans-Alaska Pipeline and Walt Disney World.  *Id.* at 4.  More recently, companies including Toyota and Wal-Mart have used PLAs for their construction projects.  *Id.* at 10; Conn. Off. of Legis. Rsch., 2011-R-0360, *Pros and Cons of Using Project Labor Agreements* (2011).

## II.    Past Presidential Directives Regarding The Use Of PLAs

For over thirty years, Presidents have directed the federal government's policy with respect to the use of PLAs on the government's own construction projects.  President George H.W. Bush issued an executive order that prohibited the use of PLAs in federal construction projects.  Exec. Order No. 12,818, *Open Bidding on Federal and Federally Funded Construction Projects*, 57 Fed. Reg. 48,713 (Oct. 28, 1992) ("1992 Bush Order").  President Bush invoked "the Constitution and the laws of the United States . . . , including [FPASA]," as the bases for his authority to issue that order.  *Id.* at 48,713.

President Clinton revoked the 1992 Bush Order.  Exec. Order No. 12,836, *Revocation of Certain Executive Orders Concerning Federal Contracting*, 58 Fed. Reg. 7045 (Feb. 3, 1993).  He later issued a presidential memorandum authorizing federal agencies to require the use of PLAs on "large and significant" construction projects where certain discretionary requirements were satisfied, including where such use would "advance the Government's procurement interest in cost, efficiency, and quality and in promoting labor-management stability."  Presidential Memorandum of June 5, 1997, *Use of Project Labor Agreements for Federal Construction Projects* § 1 ("Clinton Memorandum").  The Clinton Memorandum also set forth certain minimum requirements for PLAs on federal construction projects, including that they must bind all contractors and subcontractors on the project; must allow all contractors and

subcontractors to compete for the project, without regard to union status; must include guarantees against strikes, lockouts, and similar disruptions; and must establish procedures for resolving labor disputes arising during the project. *Id.* § 3.  President Clinton invoked "the Constitution and the laws of the United States" as the bases for his authority to issue the memorandum. *See id.* pmbl.

President George W. Bush replaced the Clinton Memorandum with an executive order that barred agencies from either requiring or prohibiting the use of PLAs in federal construction projects.  Exec. Order No. 13,202, *Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects*, 66 Fed. Reg. 11,225 (Feb. 22, 2001) ("2001 Bush Order").  He later amended the order to exempt existing projects that already had awarded at least one contract and had either required or prohibited the use of PLAs as a condition of that contract.  Exec. Order No. 13,208, *Amendment to Executive Order 13202, Preservation of Open Competition and Government Neutrality Towards Government Contractors' Labor Relations on Federal and Federally Funded Construction Projects*, 66 Fed. Reg. 18,717 (Apr. 11, 2001).  That is, unlike under the 1992 Bush Order, federal agencies could become signatories to contracts in which the contractor and subcontractors voluntarily adopted a PLA, but agencies could not require the use of a PLA as a condition of awarding the contract, as had been true under the Clinton Memorandum.  *See id.* at 18,717.  President George W. Bush likewise invoked "the Constitution and [the] laws of the United States . . . , including [FPASA]," as the bases for his authority.  66 Fed. Reg. at 11,225; 66 Fed. Reg. 18,717.  The D.C. Circuit upheld the 2001 Bush Order as a valid exercise of the President's Article II authority and determined that it was not preempted by the NLRA.  *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002; *see infra* pages 9-10, 26.

President Obama revoked the 2001 Bush Order, as amended, and replaced it with a new executive order "encourag[ing] executive agencies to consider requiring the use of [PLAs] in connection with large-scale construction projects." Exec. Order No. 13,502, *Use of*

*Project Labor Agreements for Federal Construction Projects*, 74 Fed. Reg. 6985 (Feb. 11, 2009) ("Obama Order").  The Obama Order defined "large-scale construction projects" as those with a total cost to the government of at least $25 million.  *Id.* at 6985.  It also required that, to the extent that agencies entered into PLAs, the agreements include the same essential terms as the Clinton Memorandum required.  *Id.* at 6986; *see supra* page 4.  President Obama invoked "the Constitution and the laws of the United States . . . , including [FPASA]," as the bases for his authority to issue the order, *id.* at 6985, which remained in effect throughout the Trump Administration.

### III.   The Challenged PLA Order And PLA Rule

Most recently, President Biden revoked the Obama Order and replaced it with the PLA Order at issue here.  *See* Exec. Order No. 14,063, *Use of Project Labor Agreements for Federal Construction Projects*, 87 Fed. Reg. 7363 (Feb. 9, 2022) ("PLA Order" or "Order").  The PLA Order establishes a rebuttable "[p]resumption" that federal agencies require the use of PLAs in connection with large-scale construction projects.  *Id.* at 7364.  It defines "large-scale construction projects" as those with a total estimated cost of construction of at least $35 million.  *Id.* at 7363.  To the extent that agencies enter into PLAs, they must include the same essential terms as the Clinton Memorandum and Obama Order required.  *Id.* at 7364; *see supra* page 4.

The presumption in favor of requiring a PLA can be rebutted if a senior agency official determines that a PLA requirement "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement"; "would substantially reduce the number of potential bidders so as to frustrate full and open competition"; or would otherwise be inconsistent with law.  *Id.*  A determination that requiring a PLA would not advance economy and efficiency must be based on one of the following factors: the project "is of short duration and lacks operational complexity"; "will involve only one craft or trade"; "will involve specialized construction work that is available from only a limited number of

contractors or subcontractors"; or addresses an agency need "of such an unusual and compelling urgency that a project labor agreement would be impracticable." *Id.* Like his predecessors, President Biden invoked "the Constitution and the laws of the United States . . . , including [FPASA]," as the bases for his authority to issue the order. *Id.* at 7363.

At President Biden's direction, the agencies that make up the Federal Acquisition Regulatory Council ("FAR Council")—the General Services Administration ("GSA"), the Department of Defense ("DoD"), and the National Aeronautics and Space Administration ("NASA")—proposed amendments to the Federal Acquisition Regulation ("FAR") to implement the PLA Order. *See* DoD, GSA, NASA, *Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 87 Fed. Reg. 51,044 (Aug. 19, 2022).

The FAR Council agencies promulgated a final rule in December 2023 after reviewing over 8,000 public comments. *See* DoD, GSA, NASA, *Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 88 Fed. Reg. 88,708, 88,709 (Dec. 22, 2023) ("PLA Rule" or "Rule"). The Rule took effect on January 22, 2024. *See id.* at 88,708. The FAR Council agencies estimated that approximately 119 federal construction projects annually cost the government at least $35 million, thereby triggering the Rule's presumption in favor of a PLA requirement. *Id.* at 88,723. Because the PLA Rule is new, "[t]here is no data on the number of exceptions that may be granted," but the FAR Council agencies recognized that "[i]t is possible there may be a higher usage of exceptions in the initial year as industry and the Government work to implement the requirement." *Id.* at 88,724. In total, the agencies estimated that "exceptions may be granted for 10 percent to 50 percent of covered contracts," resulting in "an estimated 60 to 107 construction contract awards [that] may require PLAs" annually. *Id.*

## IV.    Procedural History

On January 10, 2024, Plaintiffs the Associated General Contractors of America ("AGC") and the Louisiana Associated General Contractors ("LaAGC")—a nationwide

organization of contractors and its regional affiliate—filed this action against President Biden, the FAR Council, the Office of Federal Procurement Policy and its acting Administrator, the three federal agencies that provide members for the Council (GSA, DoD, and NASA), and the FAR Council members from each agency.  *See* Compl., ECF No. 1.  Plaintiffs claim that the PLA Order exceeds the scope of the President's statutory and constitutional authority and that the PLA Rule is contrary to law, in violation of 5 U.S.C. § 706(2)(A).  *Id.* ¶¶ 128-44.  That same day, Plaintiffs filed a motion for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and for a stay of agency action pursuant to 5 U.S.C. § 705.  *See* ECF No. 2 ("Pls.' Mot.").

On February 9, 2024, Defendants filed a motion to transfer venue or to dismiss the complaint for lack of Article III standing.  *See* Defs.' Transfer Mot. & MTD.  That motion remains pending.

## STANDARD OF REVIEW

"A preliminary injunction" pursuant to Rule 65(a) "is an 'extraordinary and drastic remedy.'"  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted).  Such an injunction "should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest."  *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010).  The last two factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The same standard governs a motion for a stay of agency action pursuant to 5 U.S.C. § 705.  *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff'd*, 678 F. App'x 250 (5th Cir. 2017).

## ARGUMENT

As a threshold matter, the Court should grant Defendants' motion to transfer venue or to dismiss for the reasons set forth therein.  *See* Defs.' Transfer Mot. & MTD.  Because Plaintiffs have not established that venue is proper in this District, the Court should deny their

preliminary injunction motion without prejudice.  *See, e.g.*, *La. Forestry Ass'n, Inc. v. Solis*, 814 F. Supp. 2d 655, 656 (W.D. La. 2011) (granting a motion to transfer venue and denying a pending motion for a preliminary injunction without prejudice to refiling in the transferee court).  Alternatively, because "an injunction is always improper if the district court lacks jurisdiction," the Court should deny the preliminary injunction motion because Plaintiffs lack standing.  *NAACP v. Tindell*, 90 F.4th 419, 423 (5th Cir. 2024) (brackets and citation omitted).

Even if the Court were to deny Defendants' motion to transfer venue or to dismiss, it should nonetheless deny Plaintiffs' preliminary injunction motion because Plaintiffs have not satisfied their burden to establish that any of the requisite factors—much less all four of them—warrant the extraordinary relief that they seek.

## I.     Plaintiffs Have Not Established A Likelihood Of Success On The Merits.

### A.     Plaintiffs Do Not Challenge The Authority Of Federal Agencies To Require PLAs On A Project-By-Project Basis, And The President Has Authority Under Article II To Direct Executive Branch Policy With Respect To The Exercise Of That Authority.

Plaintiffs do not dispute that federal agencies have authority to require the use of PLAs in connection with their own construction projects on a project-by-project basis.  To the contrary, Plaintiffs acknowledge that, if this Court enjoined the PLA Order and Rule, "PLAs c[ould] still be used pursuant to [FAR provisions implementing] the terms of President Obama's PLA Order," Pls.' Mot. at 25,[1] which encouraged executive agencies "to consider requiring the use of [PLAs] in connection with large-scale construction projects," *Use of Project Labor Agreements for Federal Construction Projects*, 75 Fed. Reg. 19,168, 19,178 (Apr. 13, 2010); *see also* Obama Order, 74 Fed. Reg. at 6985.  Plaintiffs contend only that the President lacks authority to shift that encouragement to a rebuttable presumption, but they fail to advance

---

[1] The PLA Rule provides that, in the event that the PLA Order or Rule were stayed or invalidated, "provisions of the FAR implementing [the Obama Order] as those provisions existed prior to issuance of [the PLA Rule] (i.e., subpart 22.5, and sections 52.222-33 and -34) would remain in effect."  *See* PLA Rule, 88 Fed. Reg. at 88,726.

any persuasive argument to distinguish the legal authority for the two directives.  Both the Obama Order and the PLA Order at issue here (and the FAR provisions implementing those directives) guide agencies in the exercise of their own unchallenged authority to require PLAs in connection with large-scale federal construction projects.  And it is beyond reasonable dispute that the President, as head of the executive branch, may direct executive branch policy with respect to PLA requirements on large-scale federal construction projects—here, by establishing a rebuttable presumption in favor of such requirements.

The D.C. Circuit addressed a closely related question in *Allbaugh*, 295 F.3d 28, in which it held that the 2001 Bush Order fell within the scope of the President's inherent authority under Article II.  As noted above, that order barred agencies from either requiring or prohibiting the use of PLAs in construction projects.  *See supra* page 4.  In a decision echoing Plaintiffs' arguments in the instant action, the district court in *Allbaugh* enjoined enforcement of the grant-related portion of the 2001 Bush Order, reasoning in relevant part that "the President could not impose the conditions in [the 2001 Bush Order] upon the administration of federal funds without the express authorization of the Congress and that neither [FPASA] nor any other statute authorize[d] the President to do so."  *Allbaugh*, 295 F.3d at 31 (citations omitted)

The D.C. Circuit reversed.  It noted at the outset that the plaintiffs did not challenge the proprietary authority of federal agencies to choose whether to require or prohibit PLAs in connection with their own grant-related construction projects, *see id.* at 32—just as, here, Plaintiffs do not challenge agencies' proprietary authority to require the use of PLAs in particular projects.  Thus, the question before the court was whether the President was empowered to direct the government's exercise of that proprietary authority.  *See id.*  The D.C. Circuit held that he was, pursuant to Article II, Section 1, of the Constitution, which provides that the "executive Power shall be vested in a President of the United States of America."  *Id.* (quoting U.S. CONST. art II, §1).  The court observed that "the President's [Article II] power necessarily encompasses 'general administrative control of those executing the laws,'

throughout the executive branch, of which he is the head." *Id.* (citation omitted) (quoting *Myers v. United States,* 272 U.S. 52, 164 (1926)).  And executive officers are "duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law." *Id.* (citing THE FEDERALIST NO. 72, at 463 (Alexander Hamilton) (Benjamin F. Wright ed., 1961)).  Thus, to the extent that agencies could lawfully follow the 2001 Bush Order, they were required to do so.  *Id.* at 33.  And if particular circumstances arose in which the plaintiffs believed the agencies' implementation of the executive order was unlawful, the plaintiffs could *"*seek redress through any of the procedures ordinarily available to [an aggrieved party]: a bid protest, a motion for administrative reconsideration, or an action in the district court challenging that specific decision." *Id.*  As discussed further below, *see infra* pages 25-26, the D.C. Circuit also correctly rejected the plaintiffs' claim that the NLRA preempted the 2001 Bush Order as to both federal contracts and grant-funded construction.

This Court should follow the D.C. Circuit's decision in *Allbaugh* and hold that the President has Article II authority to direct executive branch policy with respect to federal agencies' exercise of proprietary authority—a conclusion that would require sustaining both the PLA Order and the Rule implementing that lawful directive.  Indeed, Plaintiffs do not dispute that federal agencies, which are subject to the President's direction and control, enjoy proprietary authority to require the use of PLAs in connection with individual construction projects.  *See also, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1032 (5th Cir. 2022) ("Certainly, the Government has a much freer hand in dealing "with citizen employees and government contractors than it does when it brings its sovereign power to bear on citizens at large." (cleaned up) (quoting *NASA v. Nelson*, 562 U.S. 134, 148 (2011))); *see infra* pages 20-22 (addressing *Louisiana*).  The Court need go no further to conclude that Plaintiffs have not established a likelihood of success on the merits of their *ultra vires* claim against the President, and in turn their claim regarding the FAR Rule, which rests on their assertion that the President lacks authority to promulgate the Order.

**B.    In The Alternative, FPASA Confers Authority On The President To Establish A Presumption In Favor Of Requiring PLAs In Connection With Large-Scale Federal Construction Projects, Subject To Project-Specific Exceptions.**

In any event, regardless of the President's constitutional authority to direct agencies' exercise of their own contracting authority, the PLA Order at issue here also is valid as an exercise of the President's statutory authority under FPASA to "prescribe policies and directives that [he] considers necessary to carry out" government contracting, as long as such directives are "consistent with" the objective of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101(1), 121(a).  The plain text of FPASA vests the President with broad authority to set the federal government's policies with respect to its own procurement decisions.  Congress authorized the President to act as he "*considers* necessary" to promote economy and efficiency in government contracting. 40 U.S.C. § 121(a) (emphasis added); *cf. Texas v. EPA*, 983 F.3d 826, 827 (5th Cir. 2020) (explaining that, where a statute provided that the EPA "'may' make changes that it '*deems* necessary,'" it was "clear that Congress ha[d] delegated discretionary authority to EPA to determine when adjustments should be made" (emphasis added)).  In the context of this broad delegation, the word "necessary" is best understood to mean "convenient, useful, appropriate, suitable, or conducive to the end sought."  *BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation Dist. of Jefferson Cnty.*, 49 F.4th 420, 428 (5th Cir. 2022) (quoting *Black's Law Dictionary*), *cert. denied*, 143 S. Ct. 2577 (2023).  And "'[e]conomy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions."  *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979).

Accordingly, courts "generally" have applied "a lenient standard" in reviewing directives pursuant to FPASA, upholding them as long as they bear "a sufficiently close nexus" to "the values of economy and efficiency."  *Louisiana*, 55 F.4th at 1026 (citation

omitted); *see also Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (recognizing that FPASA confers "broad authority" on the President).  And Plaintiffs accept that this standard governs the President's FPASA authority.  *See* Pls.' Br. at 9-10.

To the extent that Plaintiffs argue in a cursory manner that FPASA "only authorizes the President 'to implement systems making the government's entry into contracts less duplicative and inefficient,'" but not to "impose requirements on contractors themselves regardless of what the Administration might say about how its actions will enhance the efficiency of those contractors," *id.* at 11 (emphasis omitted) (quoting *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023)), any such argument is inconsistent with decades of precedent— including that of the Fifth Circuit—affirming directives governing the conduct of federal contractors as consistent with the President's FPASA authority.  *See infra* pages 15-17.  In any event, establishing a government-wide presumption, subject to project-specific exceptions, improves efficiency across the contracting system.  *See, e.g.*, PLA Rule, 88 Fed. Reg. at 88,711-12.  Additionally, for good reason, Plaintiffs do not assert any inconsistency between FPASA and the PLA Order, the latter of which carries out numerous provisions of FPASA.  *See id.* at 88,718 (citing 40 U.S.C. §§ 101, 111, 501(b)(2); 41 U.S.C. § 3103(a), (c); *id.* § 3703).

The PLA Order readily satisfies the applicable legal standard.  Indeed, the Order and Rule cite ample empirical support for President Biden's determination that those actions will promote economy and efficiency in federal contracting and thus fall within the scope of the President's FPASA authority.  In the PLA Order, the President explained that problems particular to large-scale construction projects "threaten the efficient and timely completion of construction projects undertaken by Federal contractors."  87 Fed. Reg. at 7363.  For example, "[c]onstruction employers typically do not have a permanent workforce, which makes it difficult to predict labor costs when bidding on contracts and to ensure a steady supply of labor on contracts being performed."  *Id.*  Additionally, "construction projects typically involve multiple employers at a single location."  *Id.*  Therefore, "a labor dispute involving one employer can delay the entire project," and "[a] lack of coordination among

various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism." *Id.* PLAs "are often effective in preventing these problems from developing because they provide structure and stability to large-scale construction projects." *Id.* In particular, PLAs "avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts." *Id.* In light of these advantages, President Biden directed "agencies to use project labor agreements in connection with large-scale construction projects to promote economy and efficiency in Federal procurement," except where an exception applies, for example, where project-specific factors dictate that "[r]equiring a project labor agreement on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." *Id.* at 7363-64.

The preamble to the PLA Rule provides further support for the reasonableness of the President's judgment. In particular, PLAs create efficiencies by standardizing "start times, break times, rules governing overtime, holidays, and dispute resolution procedures" across all workers on the project, without regard to their employer or union status, including by superseding any separate collective-bargaining agreements that would otherwise bind employers on the project. PLA Rule, 88 Fed. Reg. at 88,711. For example, a 2011 study by the Department of Labor ("DOL") found that a PLA used by the New York City School Construction Authority ("NYCASA") "to rehabilitate and renovate city schools saved $221 million dollars over the course of the project by standardizing construction workers' shifts." *Id.* (citing Dep't of Labor, *Implementation of Project Labor Agreements in Federal Construction Projects: An Evaluation* 4-5 (2011) ("DOL Study")). Additionally, because the same PLA contained no-strike and no-lockout clauses—which the Rule at issue here also requires, FAR 52.222-34(3)—"a strike by a trade union resulted 'in a shutdown of numerous large construction projects across the City and substantial delay and related costs' to parties involved[,] while construction on the projects covered by NYCASA's PLA continued

13

uninterrupted." *Id.* at 88,711-12 (quoting DOL Study at 4-5).  The Rule also cites a study of school construction projects in San Diego, which "found that 'project delays [we]re considerably lower' on projects covered by a PLA." *Id.* at 88,712 (quoting Richard Parker & Louis Rea, *San Diego Unified School District, San Diego Unified School District Project Stabilization Agreement: A Review of Construction Contractor and Labor Considerations* iii (2011)).

Additionally, PLAs can help prevent skilled labor shortages by providing "higher compensation for craft positions" across the entire project and by providing access to union hiring halls, in turn ensuring a steady supply of skilled labor for the duration of the project. *Id.* at 88,711.  Once again, the DOL study cited in the Rule found that "there were 'no instances of shortages in skilled labor on any of the' [New York City] schools' projects," while the PLA was in effect, "although such shortages occurred regularly elsewhere in the city during this same period." *Id.* (quoting DOL Study at 4-5).  Accordingly, "[u]se of PLAs is expected to help the Government efficiently complete projects in a tight construction labor market." *Id.* at 88,713.

This data is consistent with the Supreme Court's recognition in *Boston Harbor* that PLAs address "conditions specific to [the construction] industry," including the "need for . . . a steady supply of skilled labor."  507 U.S. 231.  It likewise accords with the considerations that motivated Congress to authorize the use of PLAs pursuant to the NLRA.  In particular, Congress recognized that pre-hire agreements address unique circumstances in the construction industry, including short-term employment, the employer's need to know labor costs in advance of a project before making an accurate bid, and the employer's need for a steady supply of labor for referral. *See* H.R. Rep. No. 86–741 at 19 (1959), 1 Leg. Hist. 777; *reprinted in* 1959 U.S.C.C.A.N., 2424, 2442.

Moreover, and as noted, the PLA Order and Rule expressly account for the possibility that, notwithstanding the general economy and efficiency advantages of a presumption in favor of a PLA requirement, economy and efficiency may be better served in the context of certain projects by declining to impose such a requirement.  Accordingly, the presumption

established in the Order is rebuttable, including where requiring a PLA "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement."  PLA Order, 87 Fed. Reg. at 7364; FAR 22.504(d).  This exception authority further supports the reasonableness of President Biden's determination that the Order will promote economy and efficiency overall.

### C.   The PLA Order And Rule Are As Well Supported As Other Exercises Of FPASA Authority That Courts Have Upheld.

The rationale for the President's determination with respect to the economy and efficiency benefits of PLAs is as compelling as the justifications for other FPASA actions that courts have upheld.  In the labor-relations context, for example, the D.C. Circuit upheld an executive order requiring federal contractors to post notices of certain labor rights, including the right not to join a union or to pay certain union dues, on the basis of President George W. Bush's judgment that "'[w]hen workers are better informed of their rights, . . . their productivity is enhanced,'" and that "'[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.'"  *UAW-Lab. Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (quoting Exec. Order No. 13,201, 66 Fed Reg. 11,221, 11,221 (Feb. 22, 2001)).  The court did so even as it recognized that "[t]he link" asserted by the President might "seem attenuated" and that one could "with a straight face advance an argument claiming opposite effects" on the economy and efficiency of government procurement "or no effects at all."  *Id.* at 366-67.

In other contexts as well, courts have declined to second-guess presidential directives issued pursuant to FPASA, provided the court can identify a reasonable basis for the President's determination.  For example, in *Kahn*, the en banc D.C. Circuit upheld an executive order directing agencies "to require that all contractors certify . . . compliance with" recent "wage and price standards" established to reduce inflation.  618 F.2d at 785-86.  The court noted that the order could cause contracts to be "diverted from low bidders who [were] not in compliance with the wage and price standards to higher bidders" who were in

compliance, potentially causing "an unwarranted drain on the public fisc." *Id.* at 792; *see Chao*, 325 F.3d at 366 (observing that, "in the short run," the order at issue in *Kahn* would "plainly" have "increase[d] procurement costs"). But the D.C. Circuit deferred to the President's judgment that "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the government would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." *Kahn*, 618 F.2d at 793.

For similar reasons, the court in *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), upheld an executive order by President George W. Bush requiring that federal contractors use the E-Verify system to determine employment eligibility. *Id.* at 737-38. The court deferred to the President's explanation that "[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources than contractors that do not employ the best available measures to verify the work eligibility of their workforce." *Id.* at 738 (quoting Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 6, 2008)). To demand more, the court concluded, would be to "substitut[e] [the court's own] policy determinations and fact finding ability for that of the President," in violation of the statutory delegation. *Id.*

The Fifth Circuit's decisions in *Farkas*, in *United States v. New Orleans Public Service, Inc.* ("*NOPSI*"), 553 F.2d 459 (5th Cir. 1977) ("*NOPSI*"), *vacated*, 436 U.S. 942 (1978), and in *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981), reflect a similar understanding of the statute. In *NOPSI* and *Mississippi Power & Light*, the court of appeals upheld an executive order "impos[ing] on government contractors the obligation to take affirmative action to achieve . . . equal opportunity goals." *Miss. Power & Light*, 638 F.2d at 901. In *NOPSI*, the court identified as one "source[] of legislative authorization for the Executive Order" the provision now codified at 40 U.S.C. § 121(a). 553 F.2d at 466 & n.7

(citing 40 U.S.C. § 486(a)).  After the Supreme Court vacated that ruling for reconsideration on other grounds, the Fifth Circuit reaffirmed its conclusion that the affirmative action order "was a proper exercise of congressionally delegated authority."  *Miss. Power & Light*, 638 F.2d at 905.  And in *Farkas*, the Fifth Circuit determined that FPASA authorized a related executive order directing agencies to require federal contractors to comply with certain antidiscrimination requirements, albeit in a case where the validity of that order was not directly challenged.  375 F.2d at 632 n.1 ("We would be hesitant to say that the antidiscrimination provisions . . . are so unrelated to the establishment of 'an economical and efficient system for . . . the procurement and supply' of property and services that the order should be treated as issued without statutory authority." (citation omitted)); *see Louisiana*, 55 F.4th at 1023-1024 (discussing *Farkas*).  Likewise, here, Plaintiffs have not come close to establishing that the PLA Order is "so unrelated" to the statutory objectives that Plaintiffs are likely to succeed on the merits of their *ultra vires* claim.  *Farkas*, 375 F.2d at 632 n.1.

### D.   Historical Practice And Congressional Ratification Confirm The Validity Of The PLA Order And Rule.

In addition, the longstanding practice of Presidents exercising FPASA authority to direct agencies on the extent to which they may require or prohibit the use of PLAs in federal contracting is further powerful evidence of President Biden's authority to issue the PLA Order.  As noted above, for over three decades, Presidents have issued a wide range of directives to federal agencies regarding the use of PLAs in federal construction projects.  *See supra* pages 3-5.

When "the President's view of his own authority under a statute . . . has been acted upon over a substantial period of time without eliciting congressional reversal, it is entitled to great respect" and "should be followed unless there are compelling indications that it is wrong.'"  *Kahn*, 618 F.2d at 790 (internal quotation marks omitted); *see also Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (relying in part on an agency's "longstanding practice" to determine the scope of its statutory authority).

Additionally, Congress has implicitly ratified this broad understanding of the President's authority under FPASA, pursuant to which Presidents have issued, and courts have upheld, numerous directives addressing PLAs and other matters of federal contracting. Congress "is presumed to be aware of an administrative or judicial interpretation of a statute *and to adopt that interpretation* when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (emphasis added). And Congress did exactly that when, in 2002, it recodified both FPASA's statement of purpose and the operative provision (authorizing the President to set contracting policies to achieve the statute's goals). *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law . . . .").

### E.    Plaintiffs' Counterarguments Rest On Misapprehensions Of The Rule.

Many of Plaintiffs' arguments appear to rest on their view that, in practice, the PLA Order may have an injurious effect on their members' ability to work on large-scale government construction projects. Not only are many of these assertions factually unsupported, for the reasons explained below, but they also are legally irrelevant to the merits of Plaintiffs' claims. In enacting FPASA, Congress delegated to the President, not to courts or the construction industry, the authority to determine what procurement policies best serve the government's interest in economy and efficiency. Plaintiffs provide no legal basis for this Court to substitute Plaintiffs' view of optimal procurement policy for that of the President. Moreover, Plaintiffs' policy arguments ultimately run to the merits of project-specific PLAs themselves—the legality of which Plaintiffs do not challenge—and not the authority for the President's directive at issue here.

In any event, Plaintiffs' arguments fail even on their own terms. For starters, Plaintiffs contend that contractors "will have no effective or meaningful role [in] negotiating" required PLAs. ECF No. 2-1 ("Pls.' Br.") at 5. To the contrary, the PLA Rule explains that contractors

have broad authority to negotiate the terms of any PLA they enter in connection with a federal construction project.  *See* PLA Rule, 88 Fed. Reg. at 88,710.  For example, "[n]on-union contractors are free to negotiate provisions in PLAs to accommodate existing fringe benefits," such as by "allow[ing] non-union contractors to opt out of contributing to health and welfare funds designated under the PLA, if the benefits provided by the non-union contractor are equal in value to those provided under the PLA."  88 Fed. Reg. at 88,710; *contra* Pls.' Br. at 12-13 (asserting that PLAs will require employees of non-union contractors "to make contributions into union-sponsored employee plans in addition to continuing to pay for benefit coverage under their existing plans and programs").

Likewise, Plaintiffs' suggestion that PLAs will prevent them from working with "Open Shop subcontractors" is baseless.  Pls.' Br. at 11.  The PLA Order and Rule require that PLAs "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements."  PLA Order, 87 Fed. Reg. at 7364; FAR 52.222-34(2).  Indeed, "[s]tudies and court cases have shown that PLAs can have significant non-union contractor participation."  PLA Rule, 88 Fed. Reg. at 88,712 (citing, *inter alia*, *Boston Harbor*, 507 U.S. at 231, and noting that 102 of 257 of subcontractors governed by the Boston Harbor PLA were non-union, although as many as three-quarters of Boston construction contractors at that time were unionized).

Plaintiffs also are wrong to suggest that PLAs result in "forced unionization."  Pls.' Br. at 11.  To the contrary, employees of contractors and subcontractors that are subject to a PLA are not required to become union members.  *See* PLA Rule, 88 Fed. Reg. at 88,715.

Plaintiffs are similarly mistaken to contend that PLAs will categorically prevent non-union contractors from choosing their own employees.  Pls.' Br. at 1, 6.  Rather, as the Rule explains, non-union contractors may "negotiate core employee provisions in PLAs," which "allow non-union contractors to use their own employees without those employees registering with a union's hiring hall."  PLA Rule, 88 Fed. Reg. at 88,716.  Alternatively, even without

such a provision, if a union that is a signatory to the PLA operates an exclusive hiring hall, "a non-union contractor's workers may register with that hiring hall for referrals to the project." *Id.* And they may do so without joining the union; "union hiring halls are legally required to refer workers to the project without regard to whether the workers are union members." *Id.* at 88,713. If the union operates a non-exclusive hiring hall, "contractors may hire their prior workers without those workers registering for a referral." *Id.* at 88,716. "Ultimately, the contractor retains the right to decide whom to hire." *Id.* at 88,713.

Finally, contrary to Plaintiffs' contention that PLAs will "disrupt" contractors' "staffing practices," Pls.' Br. at 13, the Rule preserves considerable flexibility for contractors to negotiate accommodations for their existing staffing practices in any PLA. *See* PLA Rule, 88 Fed. Reg. at 88,710 ("Contractors can negotiate PLAs that include flexibility in how work is assigned."); *id.* at 88,714 ("Non-union contractors may negotiate with the union that is party to the PLA to use their own apprenticeship programs during the project.").

## F.    The Major Questions Doctrine Does Not Apply.

There is no basis for Plaintiffs' suggestion that this action implicates the major questions doctrine, Pls.' Br. at 15-16, which "applies only to interpretations of statutes that result in 'enormous and transformative expansions in regulatory authority without clear congressional authorization,'" *Louisiana*, 55 F.4th at 1029 (citation omitted). The PLA Order and implementing Rule at issue here do not fit that description. Unlike the vaccination requirements the Fifth Circuit struck down in *Louisiana*, the PLA Order and Rule are not novel. Rather, Presidents have set the government's policy with respect to the use of PLAs on federal construction projects for over three decades, in orders whose legality the Plaintiffs accept.[2] *See supra* pages 3-5; *cf. Louisiana*, 55 F.4th at 1030 (reasoning that the COVID-19

_____

[2] Plaintiffs state that they "opposed" the 1992 Bush Order on policy grounds, Pls.' Br. at 3, but they do not develop any argument that President Bush lacked authority to issue the order. And they expressly accept the validity of the Obama Order. *See id.* at 25; *supra* page 8.

vaccine requirement at issue in that case was "strikingly unlike" any other exercise of FPASA authority surveyed by the court).

Additionally, the Fifth Circuit emphasized in *Louisiana* that the vaccination mandate "require[d] employees to take an action not limited temporally or physically to their place of employment."  55 F.4th at 1030 n.39.  The same is not true of a PLA, which sets relevant terms only for the specific federal construction project to which it applies.  The Fifth Circuit also emphasized that the vaccination requirement applied to "employees of covered contractors who [we]re not themselves working on or in connection with a covered contract." *Louisiana*, 55 F.4th at 1032.  By contrast, the PLA Rule does not impose any requirements on employees of covered contractors and subcontractors beyond the context of the specific federal construction project that a PLA governs.

Moreover, the expected impact of the PLA Rule is between $8.87 million and $53.54 million annually, PLA Rule, 88 Fed. Reg. at 88,725—orders of magnitude less than the economic effects at issue in cases that have triggered application of the major questions doctrine.  *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (action in question "cancel[ed] $430 billion of student loan principal"); *West Virginia v. EPA*, 142 S. Ct. 2587, 2604 (2022) (Energy Information Administration projected that the Clean Power Plan "would reduce GDP by at least a trillion 2009 dollars by 2040"); *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("$50 billion" was "a reasonable proxy of the … economic impact" of the eviction moratorium at issue); *cf. Louisiana*, 55 F.4th at 1019 (vaccination requirement would affect "one-fifth of all employees in the United States").

Finally, the PLA Order and Rule are not exercises of regulatory authority at all, but rather of proprietary authority.  *See infra* pages 24-26.  In *Louisiana*, the Fifth Circuit found that the distinction was not meaningful because the vaccination requirement in question was not limited to employees working on or in connection with federal contracts; it applied to any of a contractor's employees who shared a workplace with employees working on or in connection with a federal contract.  55 F.4th at 1032.  The court found "little internal about

a mandate which encompasses even employees whose sole connection to a federal contract is a cubicle in the same building as an employee working 'in connection with' a federal contract." *Id.* at 1032-1033 (footnote omitted).

The Fifth Circuit recognized, however, that the distinction between exercises of proprietary and regulatory authority could "carry more weight" as to a more limited requirement, *Louisiana*, 55 F.4th at 1032-33, and the requirement here is limited in precisely the way that the Court found the requirement in *Louisiana* was not.  Whereas the requirement in *Louisiana* could govern employees who did not work on federal contracts, and affected them during their non-working hours, this requirement simply governs work in connection with a particular federal contract.  It is difficult to see how that sort of specification for the work done on government contracts could be any more "internal," *id.*, to the government's proprietary functions.

### G.   The PLA Order And Rule Do Not Violate The Private Non-Delegation Doctrine.

Plaintiffs' contention that the PLA Order and Rule implicate the private non-delegation doctrine is also unpersuasive.  *See* Pls.' Br. at 16-17.  That doctrine does not apply here because the Order and Rule do not delegate governmental authority to a union or any other private entity.  In *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022), on which Plaintiffs rely, a statute vested a private entity with the authority to formulate rules pertaining to anti-doping, medication control, and racetrack safety that would bind all support personnel, such as trainers, owners, breeders, jockeys, racetracks, and veterinarians, of particular racehorse breeds nationwide.  *Id.* at 873.  The Fifth Circuit held that scheme violated the private non-delegation doctrine because it "delegat[ed] unsupervised government power to a private entity."  *Id.* at 890.  Likewise, the leading case on the private non-delegation doctrine, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), on which the Fifth Circuit relied in *Black*, invalidated a law that bestowed general regulatory authority to fix the

22

wages and hours for the entire coal industry on a majority of coal producers.  *See Black*, 53 F.4th at 880-81.

By contrast, neither the PLA Order nor any PLA delegates authority to a union to bind any entity, including a prime contractor, subcontractor, or another union, without that entity's consent.  The negotiation of such terms accordingly does not constitute an exercise of government power.  To analogize, the private non-delegation doctrine might be relevant if the government delegated to a private entity, such as a union, the authority to craft worker safety rules that would govern all large-scale construction projects nationwide.  But it is wholly inapposite here, where the PLA terms negotiated with any union do not bind any entity without that entity's contractual agreement.  *Cf. Boston Harbor*, 507 U.S. at 231 ("Confronted with . . . a purchaser [who requires a PLA], those contractors who do not normally enter such agreements are faced with a choice.  They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement.").

### H.    The NLRA Does Not Preempt The PLA Rule.

Plaintiffs also fail to establish a likelihood of success on their argument that the NLRA preempts the PLA Rule.  *See* Pls.' Br. at 20-22.  In *Boston Harbor*, the Supreme Court unanimously recognized the authority of a public agency to require contractors and subcontractors on a major construction project to agree to be bound by a PLA.  507 U.S. 218. In a separate action, a district court had ordered a Massachusetts state agency to clean up pollution in Boston Harbor—a project that was expected to last ten years and to cost $6.1 billion dollars.  507 U.S. at 220-21.  The district court had "required construction to proceed without interruption, making no allowance for delays from causes such as labor disputes." *Id.* at 221.  Thus, to prevent delays and ensure compliance with the district court's order, the state agency authorized its project manager to negotiate a PLA with a local labor union council.  *Id.*  Among other provisions, the resulting PLA "recogni[zed]" that labor union

council "as the exclusive bargaining agent for all craft employees"; "specified methods for resolving all labor-related disputes"; required all employees to "become union members within seven days of their employment"; required "primary use of [the labor union's] hiring halls to supply the project's craft labor force"; imposed "a 10-year no-strike commitment"; and "require[d] that all contractors and subcontractors agree to be bound" by the PLA as a bid specification.  *Id.* at 221-22.

An association of non-union contractors challenged the PLA on various grounds, including that it allegedly was preempted by the NLRA.  *Id.* at 223.  The district court enjoined enforcement of the PLA, in a decision affirmed by a First Circuit panel and by the en banc First Circuit.  *Id.*

The Supreme Court reversed, holding unanimously that the PLA was not subject to preemption because it was "proprietary conduct on the part of the Commonwealth of Massachusetts" and "not government regulation."  *Id.* at 232-33.  The Court observed that the state agency "was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost," just as a private entity could do.  *Id.* at 232.  The Court concluded that, "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement," as the NLRB authorizes in the construction context, "a public entity as purchaser should be permitted to do the same."  *Id.* at 231 (emphasis omitted).  "[C]ontractors who do not normally enter such agreements are [then] faced with a choice," the Court continued.  *Id.* "They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement."  *Id.*

Plaintiffs do not even acknowledge *Boston Harbor*, in which the Supreme Court held unanimously that a public entity, like a private one, is entitled to require a PLA in connection with its own construction project, as contemplated by the NLRA.  And in *Boston Harbor*, the

Supreme Court discussed at length and distinguished *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986), on which Plaintiffs rely here.  *See* Pls.' Br. at 21; 507 U.S. at 227.

The only potentially relevant distinction between *Boston Harbor* and this action is that *Boston Harbor* addressed a PLA requirement tied to a single construction project, whereas the PLA Rule establishes a presumption in favor of imposing PLA requirements on all large-scale federal construction projects, subject to project-specific exceptions.  But as a court in this Circuit reasoned persuasively in considering a state law that prohibited the use of PLAs in state-funded construction projects, "[t]he effect of [the state's] corporate or 'executive' decision is no different than the effect of a public officer deciding each and every time . . . not to enter into PLAs for any specific project."  *Se. La. Bldg. & Const. Trades Council, AFL-CIO v. Louisiana ex rel. Jindal*, 107 F. Supp. 3d 584, 606 (E.D. La. 2015) (citation omitted); *accord Allbaugh*, 295 F.3d at 35-36 ("[T]here simply is no logical justification for holding that if an executive order establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only decisions governed by the executive order are those that the federal government makes as a market participant." (cleaned up) (citation omitted)); *Mich. Bldg. & Const. Trades Council v. Snyder*, 729 F.3d 572, 574, 579 (6th Cir. 2013) ("Such an across-the-board determination could be made by a private developer.  [A governmental entity] can do the same because in this respect the state is acting as a market participant rather than as a regulator.").  The same is true of an across-the-board presumption in favor of requiring PLAs, subject to exceptions, which is functionally the same as making a decision to require a PLA on each individual non-excepted project.

Compounding their failure to engage with relevant precedent, Plaintiffs also cite the D.C. Circuit's decision in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), in which the court held that the NLRA preempted an executive order barring the federal government from contracting with employers who permanently replace lawfully striking employees on the ground that the order exercised regulatory, not proprietary, authority.  *See id.* at 1325; Pls.' Br. at 20.  But in that case, the executive order governed the conduct of federal

contractors, not just on their contracts with the government, but on all their business operations.  By contrast, the executive order at issue here affects only the agreements between the federal government and contractors, without regard to whether contractors use PLAs in connection with their other projects.

Indeed, Plaintiffs fail to acknowledge the D.C. Circuit's subsequent decision in *Allbaugh*, holding that the NLRA did not preempt the 2001 Bush Order, which was proprietary in nature.  *See* 295 F.3d at 34-36.  The *Allbaugh* decision underscores the relevant distinction: "A condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it 'addresse[s] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].'"  *Id.* at 36 (citation omitted).  Like the order at issue in *Allbaugh* and unlike the order at issue in *Reich*, the PLA Rule challenged here "extends only to work on projects funded by the government" and "does not address the use of PLAs on projects unrelated to those in which the Government has a proprietary interest."  *Id.* at 36.  Accordingly, Plaintiffs have not established a likelihood of success on their claim that the NLRA preempts the PLA Rule.

## I.     The PLA Rule Does Not Conflict With CICA.

Plaintiffs also have not established a likelihood of success on their claim that the PLA Rule violates the Competition in Contracting Act of 1984 ("CICA").  That statute generally requires procuring agencies to "obtain full and open competition" and to "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement."  41 U.S.C. § 3301(a).  And it defines "full and open competition" to "mean[] that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement."  41 U.S.C. § 107.  The PLA Rule does not prevent any source from submitting a sealed bid or competitive proposal on any procurement; to the contrary, any PLA that a federal agency enters must "allow all contractors and

subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements."  PLA Order, 87 Fed. Reg. at 7364; FAR 52.222-34(2).

Moreover, the PLA Rule provides for an exception in the event that requiring a PLA "would substantially reduce the number of potential bidders so as to frustrate full and open competition."  *Id.* at 7363.  Plaintiffs suggest that the inclusion of this exception in the Rule indicates that the government "expressly recognizes that the PLA Mandate will, in at least some instances, unduly restrict competition."  Pls.' Br. at 19-20.  But the opposite is true; in circumstances where a PLA requirement *would* frustrate full and open competition, such a requirement will *not* be imposed pursuant to the cited exception.

## II.    Plaintiffs Have Not Established That They Face Imminent, Irreparable Harm Absent A Preliminary Injunction.

Plaintiffs' motion for a preliminary injunction also fails because they do not establish that any harm they may face as a result of competing for contracts that require a PLA is either imminent or irreparable.  *See, e.g.*, *Tab-N-Action, Inc. v. Monroe City Sch. Bd.*, No. CV 17-00570, 2017 WL 2273149, at *6 (W.D. La. May 24, 2017) ("Irreparable harm requires a showing that: (1) the harm to the plaintiff is imminent, (2) the injury would be irreparable, and (3) the plaintiff has no other adequate legal remedy." (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975))).  As explained in Defendants' motion to transfer or to dismiss, Plaintiffs have not submitted any evidence of concrete plans to bid on a project for which a PLA is required. *See* Defs.' Transfer Mot. & MTD at 19-20.  "An injury that is based on a 'speculative chain of possibilities' does not confer Article III standing," *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017), much less irreparable harm for purposes of a preliminary injunction, *see, e.g.*, *Louisiana v. CDC*, 603 F. Supp. 3d 406, 420 (W.D. La. 2022) ("For purposes of a preliminary injunction . . . , unverified allegations are not sufficient, standing alone, to support relief.").

Even if the Court disagrees and finds that Plaintiffs have demonstrated harm that is imminent, Plaintiffs have not even attempted to establish that any allegedly irreparable harm

will materialize before this Court can render a final judgment.  *See, e.g.*, *U.L. Coleman Co., Ltd v. Bossier City-Par. Metro. Plan. Comm'n*, No. CIV.A. 08-2011, 2009 WL 497634, at *9 (W.D. La. Feb. 26, 2009) ("[O]nly those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974))).

Plaintiffs also fail to establish that any alleged harm is irreparable because they retain the ability to challenge the inclusion of a PLA requirement in any particular bid solicitation through a bid protest, with judicial review available in the Court of Federal Claims and subsequently in the Federal Circuit.  *See* 4 C.F.R. § 21.0 *et seq.*; 28 U.S.C. §§ 1491(a)(1), 1295(a)(3).  That alternative remedy is fatal to their preliminary injunction motion.  *See, e.g.*, *Transcon. Gas Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Twp., Lancaster Cnty.*, No. 5:17-CV-00715, 2017 WL 1283948, at *5 (E.D. Pa. Apr. 6, 2017) ("The availability of an adequate alternative remedy generally precludes a finding of irreparable harm sufficient to warrant injunctive relief." (cleaned up) (citation omitted)).

### III.   The Balance Of The Equities And Public Interest Favor Defendants.

On the other side of the ledger, the government and the public have a strong interest in the efficient completion of large-scale federal construction projects through expanded use of PLAs.  A preliminary injunction would limit the government's ability to ensure that large-scale federal construction projects are completed with fewer skilled labor shortages; work stoppages; and inefficiencies resulting from disparate rules governing start times, break times, rules governing overtime, holidays, and dispute resolutions procedures.  *See supra* pages 15-17.  Moreover, the Fifth Circuit has recognized the public interest generally in the government's ability to execute its procurement policy free of judicial interference.  *See, e.g.*, *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978) ("We have previously

28

recognized the strong public interest in avoiding disruptions in procurement . . . ." (internal quotation marks omitted)).

**IV.    Any Remedy Should Be Appropriately Limited.**

In the alternative, if this Court grants Plaintiffs any preliminary injunctive relief, any such relief should be appropriately limited.  If the Court determines that any portion of the PLA Rule is invalid as to any Plaintiff that has established Article III standing and an imminent threat of irreparable harm, the Court should enjoin enforcement of that portion of the Rule only as to that Plaintiff and the relevant project.  Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018).  When a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).  Consistent with these principles, the Fifth Circuit has cautioned that nationwide injunctions are not "the norm."  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam).

Plaintiffs' only cited case in support of their request for a nationwide injunction underscores why such an injunction is unwarranted here.  *See* Pls.' Br. at 25 (citing *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015)).  In *Texas*, the Fifth Circuit affirmed a nationwide injunction in an immigration case, because the Constitution expressly requires national uniformity in immigration law and because the court perceived a risk that patchwork rulings would not provide complete relief to the plaintiff states, because it would allow beneficiaries of an immigration program held to be illegal to travel freely to those states.  *Texas*, 809 F.3d at 187-88; *see also Becerra*, 20 F.4th at 263-64 (discussing *Texas*).  Here, by contrast, PLAs operate on a contract-by-contract basis.  Thus, "[l]acking is either the constitutional uniformity principle in *Texas* or that case's concern that patchwork rulings

29

would undermine an injunction limited to certain jurisdictions," and a nationwide injunction is accordingly unwarranted.  *See Becerra*, 20 F.4th at 264 (granting partial stay of injunction).

Finally, if the Court were to broadly enjoin enforcement of the Order and Rule, it should emphasize that the FAR provisions implementing the Obama Order remain in effect and that federal agencies accordingly retain discretion to require the use of a PLA in connection with any particular federal construction project.  In the prayer for relief at the conclusion of their preliminary injunction motion, Plaintiffs purport to seek an injunction preventing the government from "incorporating or attempting to incorporate any clause or other contractual requirement mandating the use of PLAs into any federal construction contract."  Pls.' Mot. at 3.  But Plaintiffs proceed to disclaim any such request in stating that if the Court grants the preliminary injunctive relief that they seek, "PLAs can still be used pursuant to the terms of President Obama's PLA Order," which encouraged agencies to consider requiring PLAs in connection with federal construction contracts.  Pls.' Mot. at 25; *see supra* page 8.  And the Rule itself proclaims the agencies' intent that, in the event of an injunction, the FAR provisions implementing the Obama Order should "remain in effect." 88 Fed. Reg. at 88,726.  There accordingly is no basis to enjoin agencies from exercising that unchallenged authority.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: February 16, 2024          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LESLEY FARBY
*Assistant Branch Director*
*Federal Programs Branch*

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
(N.Y. Bar No. 5859137)
*Trial Attorney*
MICHAEL J. GERARDI
*Senior Trial Counsel*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3786
taisa.m.goodnature@usdoj.gov

*Attorneys for Defendants*