IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **ASSOCIATED GENERAL CONTRACTORS OF AMERICA,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **JOSEPH R. BIDEN, JR.,** *et al.*, <br><br><br> Defendants, | <br><br><br><br><br><br> Civil Action No. 24-cv-37 |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION AND STAY**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II.  ARGUMENT.................................................................................................................1

    A.  Plaintiffs are Likely to Succeed on the Merits.............................................. 1

        1.  The PLA Mandate is not Authorized by Article II or the Plain Language of the Procurement Act. ...................................................................................... 1

        2.  Neither the Statute nor Historical Practice Supports the PLA Mandate. .......... 5

        3.  The PLA Mandate is Contrary to the NLRA. .................................................... 8

    B.  Plaintiffs will be Irreparably Harmed Absent Preliminary Relief ................................ 9

    C.  The Balance of Harms and Public Interest Favor Preliminary Relief ......................... 11

    D.  Plaintiffs' Remedy Will Necessarily be National in Scope ......................................... 12

III.  CONCLUSION...............................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Kahn*,
 618 F.2d 784 (D.C. Cir. 1979) ................................................................................................7

*Am. Safety Council, Inc. v. United States*,
 122 Fed. Cl. 426 (2015) ...........................................................................................................5

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
 295 F.3d 28 (D.C. Cir. 2002) ...........................................................................................5, 6, 8

*Building and Construction Trades Council v. Associated Builders and*
 *Contractors of Massachusetts/Rhode Island, Inc.*,
 507 U.S. 218 (1993) .................................................................................................................8

*Chamber of Com. of U.S. v. Napolitano*,
 648 F. Supp. 2d 726 (D. Md. 2009) .........................................................................................7

*City & Cty. of San Francisco v. Trump*,
 897 F.3d 1225 (9th Cir. 2018) ..................................................................................................6

*Farkas v. Tex. Instrument, Inc.*,
 375 F.2d 629 (5th Cir. 1967) ....................................................................................................7

*Food Mktg. Inst. v. Argus Leader Media*,
 139 S. Ct. 2356 (2019) .........................................................................................................1, 6

*Georgia v. Biden*,
 46 F.4th 1283 (11th Cir. 2022) .............................................................................................4, 7

*Georgia v. Biden*,
 574 F. Supp. 3d 1337 (S.D. Ga. 2021), *aff'd in part, vacated in part*, 46 F.4th
 1283 (11th Cir. 2022) ...............................................................................................................6

*Hias, Inc. v. Trump*,
 985 F.3d 309 (4th Cir. Jan. 8, 2021) ........................................................................................6

*Kentucky v. Biden*,
 57 F.4th 545 (6th Cir. 2023) ............................................................................................ passim

*Louisiana v. Biden*,
 55 F.4th 1017 (5th Cir. 2022) .......................................................................................... passim

*Louisiana v. Biden*,
   No. 2:21-CV-778, 2021 WL 4312502 (W.D. La. Aug. 23, 2021)), *report and recommendation adopted*, No. 2:21-CV-0778, 2021 WL 4314795 (W.D. La. Sept. 22, 2021) ...................................................................................................................6

*Medellín v. Texas*,
   552 U.S. 491 (2008) ...........................................................................................................2, 5

*Metropolitan Milwaukee Assoc. Com. v. Milwaukee Country*,
   431 F.3d 277 (7th Cir. 2005) .................................................................................................9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ..............................................................................................................7

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) (Scalia, J., concurring in part and in the judgment) ..............................9

*UAW-Lab. Emp. & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) ...............................................................................................7

*United States v. Mississippi Power & Light Co.*,
   638 F.2d 899 (5th Cir. 1981) .................................................................................................7

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ..............................................................................................................4

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ...........................................................................................9, 11

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..............................................................................................................2

**Statutes**

5 U.S.C. § 705 ...............................................................................................................................12

5 U.S.C. § 706 ...............................................................................................................................11

28 U.S.C. § 1491(b)(2) ..................................................................................................................10

28 U.S.C. § 1491(b)(4) ..................................................................................................................11

41 U.S.C. § 3306 ...........................................................................................................................12

41 U.S.C. § 3306(a)(2)(B) ..............................................................................................................4

**Other Authorities**

Executive Order on Use of Project Labor Agreements for Federal Construction
    Projects, 87 Fed. Reg. 7363 (Feb. 9, 2022 ..............................................................................4, 5

Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction
Projects, 88 Fed. Reg. 88708 (Dec. 22, 2023) ...............................................................................12

Press Release, Office of Mgmt, & Budget, The White House, Fact Sheet: Biden-
   Harris Administration Announces Action to Support Economic and Efficient
   Construction Projects While Creating Good-Paying and Union Jobs (Dec. 18,
   2023) ........................................................................................................................................2

**I.      INTRODUCTION**

Nothing in the text of the Procurement Act supports the Government's position on the President's authority under either the Procurement Act or Article II to regulate *contractors*' labor relations. The PLA Mandate cannot stand, and the requested preliminary relief is appropriate.

The Government's selective recitation of the history of executive action towards the use of PLAs[1] demonstrates the weakness of its position. Rather than defending the PLA Mandate as an authorized action under the Procurement Act, it resorts principally to court decisions that either avoided addressing the statutory text or simply deferred to past Presidents' incantations of "economy and efficiency." *See* ECF #23-1 ("Resp.") at 3-5. This Court should reject that logic and recognize the Government's preferred cases for what they are: if not inapposite, then "relic[s] from a bygone era of statutory construction." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (internal citation omitted) (abrogating a 45-year-old precedent of the D.C. Circuit owing to its "casual disregard of the rules of statutory interpretation"). *Accord Kentucky v. Biden*, 57 F.4th 545, 553-54 (6th Cir. 2023) (rejecting Government's reliance on "mistaken" out-of-circuit precedent).

**II.     ARGUMENT**

      **A.     Plaintiffs are Likely to Succeed on the Merits.**

            **1.     The PLA Mandate is not Authorized by Article II or the Plain Language of the Procurement Act.**

The Government argues that the President enjoys broad authority under both Article II and the Procurement Act to set federal procurement policy regarding the use of PLAs. But it is undisputed that whatever authority the President may inherently enjoy under Article II, such

---

[1] This brief adopts all acronyms and defined terms used in Plaintiffs' Brief in Support of Plaintiffs' Motion for Preliminary Injunction and Stay. *See* ECF #2-1 ("Mot.").

1

authority must be exercised consistent with applicable law. *See Medellín v. Texas*, 552 U.S. 491, 524 (2008) (citing *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952)); Mot. at 17-18. As explained in Plaintiffs' motion, the Procurement Act is not a vehicle for the President to implement preferred policies on the backs of contractors. *See* Mot. at 11. As the Sixth Circuit thoughtfully explained just last year, the statute does not entitle a President to pursue its purpose of facilitating a more economic and efficient system of procurement at all costs. *See Kentucky*, 57 F.4th at 552. In that case, a challenge to President Biden's vaccine mandate for all employees of federal contractors, the Sixth Circuit specifically rejected the Government's reading of the Procurement Act that would allow the President to prescribe policies intended, in his subjective opinion, to "make contractors more efficient," as compared to internal policies more appropriately focused on making "contract*ing* more efficient." *Id.* at 553 (emphasis in original).

The Government attempts to downplay the obvious and intended effects of the PLA Mandate—*more PLAs, with more favorable terms for organized workers, to facilitate President Biden's expressed desire to be the "most pro-union" President in history*—by pointing to theoretical flexibilities that are nominally afforded to contractors, while ignoring the practical consequences of giving unions veto power over a contractor's eligibility for federal awards. *Compare* Mot. at 11-15 *with* Resp. at 18-20. For example, the Government asserts that "non-union contractors may negotiate core employee provisions in PLAs" including provisions guaranteeing their ability to use their own employees, Resp. at 19 (internal quotation and citation omitted), without ever addressing how non-union contractors are realistically supposed to do so when the White House itself admits the PLA Mandate "will empower workers"—*i.e.*, unions—to set the terms of each PLA. *See* Press Release, Office of Mgmt, & Budget, The White House, Fact Sheet: Biden-Harris Administration Announces Action to Support Economic and Efficient Construction

2

Projects While Creating Good-Paying and Union Jobs (Dec. 18, 2023), https://www.whitehouse.gov/omb/briefing-room/2023/12/18/fact-sheet-biden-harris-administration-announces-action-to-support-economic-and-efficient-construction-projects-while-creating-good-paying-and-union-jobs/. Because the Government's argument fails to grapple with the inordinate negotiating leverage the PLA Mandate provides to organized labor by effectively requiring their consent to a contractor's participation in the federal construction marketplace, its attempts to sidestep application of the private non-delegation doctrine miss the mark, because the unions have neither a legal obligation nor any incentive to actually negotiate with contractors. *See* Mot. at 16-17.

The Government's push-back on the Major Questions Doctrine—which the Fifth Circuit has expressly held applies to the President no less than his subordinate agencies, *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022)—similarly relies on a mischaracterization of the PLA Mandate's scope and intended effect. *See* Resp. at 20-22. Whatever the immediate impact of the PLA Mandate, it represents a breathtaking and unprecedented arrogation of authority: allowing the President, by leveraging federal purchasing power, to regulate labor relations between contractors and their employees in a manner inconsistent with the balance already struck by Congress. *See* Mot. at 15-16. Tellingly, the Government does not identify any limiting principle that would prevent this power—if condoned by the Court—from later requiring the use of unionized labor for all federal awards (or, in the alternative, excluding union contractors from the federal marketplace).[2] As such, allowing that mandate "to remain in place would be to ratify an 'enormous

---

[2] In footnote 2 of its Response, the Government criticizes Plaintiffs for ostensibly failing to "develop any argument that President Bush lacked authority to issue" the 1992 Executive Order prohibiting use of PLAs in federal construction projects, baselessly assuming AGCs opposition to that order was strictly limited to "policy grounds." Resp. at 20 n.2. Not so. Plaintiffs' position,

3

and transformative expansion in' the President's power under the Procurement Act" of the sort sufficient to implicate the Major Questions Doctrine. *Louisiana*, 55 F.4th at 1031 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).

The Court need not reach the Major Questions Doctrine, however, because irrespective of the scope of the President's authority to pursue "economy and efficiency" in federal procurement, the Government does not contest that this authority must be exercised consistent with CICA's mandate of "full and open" competition. *See* Mot. at 19 (citing *Georgia v. Biden*, 46 F.4th 1283, 1294 (11th Cir. 2022), *Kentucky*, 571 F. Supp. 3d at 727). And as explained in Plaintiffs' Motion, that mandate requires not only that federal contracting agencies formally permit all responsible sources to compete, but also to refrain from including unnecessary contract terms or conditions that may implicitly exclude or discourage capable offerors. *Id.* ("CICA is a clear statutory mandate for 'full and open' competition in federal procurement, which Congress has specifically instructed, requires that agencies 'include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law.'") (quoting 41 U.S.C. § 3306(a)(2)(B)). The Government does not explain how a blanket presumption in favor of PLAs is necessary to meet the needs of executive agencies, nor does it identify any provision of law authorizing such agencies to require PLAs when not necessary to their needs.[3] Moreover, by limiting availability of the competition exception to only circumstances where requiring a PLA "would ***substantially*** reduce the number of potential bidders," Resp. at 27 (quoting Executive Order on Use of Project Labor Agreements for Federal Construction Projects, 87 Fed. Reg. 7363

---

clearly stated in their Motion, is that the President is prohibited from abusing the Procurement Act to put a thumb on the scale of labor relations in favor of either labor *or* management.

[3] The Government does not explicitly argue that the PLA Mandate is "authorized by law" through the Procurement Act, but any such argument is foreclosed by the Government's tacit acceptance of CICA as a constraint on the same. *See, e.g.*, *Georgia*, 46 F.4th at 1294.

(Feb. 9, 2022)) (emphasis added), the PLA Mandate still requires agencies to include PLA requirements in circumstances where doing so would impermissibly reduce competition. *Cf. Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 436 (2015) ("[T]he very inclusion in the Act of the qualification on the extent of the restrictions in a solicitation indicates that the goal of CICA is not just *any* level of competition but the best level possible under the circumstances.") (emphasis in original). As such, the PLA Mandate runs afoul of CICA's clear instructions, and for that reason as well must be treated as unlawful.

      **2.**      **Neither the Statute nor Historical Practice Supports the PLA Mandate.**

Tellingly, the Government's principal line of defense to this lawsuit is not the Procurement Act itself but, rather, a curated selection of favored historical precedents. Resp. at 3-5, 8-10, 15-17. Setting aside that historical practice cannot override the plain text of the statute, *see Medellín*, 552 U.S. at 531-32; *Kentucky*, 57 F.4th at 554, none of the cited examples supports the authority claimed under the PLA Mandate.

First, although the Government lists four examples of presidential directives addressing use of PLAs in public procurement, Resp. at 8-10, only one of those four was ever subject to judicial review. *Cf. Louisiana,* 55 F.4th at 1030 (dismissing persuasive value of "order [that] was never considered by a federal court"). And in the lone instance where a reviewing court sanctioned the President's authority in this regard, that decision sidestepped the substantive question of what limits—if any—apply to the President's authority to pursue collateral political objectives via procurement policy. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (upholding order that directed subordinate officials to implement stated policy "only to the extent permitted by law") (cleaned up). But as another court of this District has observed, "savings clauses as qualifiers in an executive order should not insulate an executive order from judicial review when that qualifying language would override the substance of the order itself."

5

*Louisiana v. Biden*, No. 2:21-CV-778, 2021 WL 4312502, at *6 (W.D. La. Aug. 23, 2021), *report and recommendation adopted*, No. 2:21-CV-0778, 2021 WL 4314795 (W.D. La. Sept. 22, 2021) (citing *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018); *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. Jan. 8, 2021)). As such, *Allbaugh* does not answer the question presented by Plaintiffs: whether the PLA Mandate is substantively contrary to law.

The other exercises of Procurement Act authority cited by the Government are similarly unpersuasive. *See* Resp. at 15-17. As a threshold matter, each of these decisions predate CICA or otherwise rely on a pre-CICA view of the Procurement Act that ignores its subsequent enactment. And as noted in Plaintiffs' Motion, both the Sixth and Eleventh Circuits have otherwise rejected the effectively unlimited authority those decisions would confer on the President. Mot. at 11 (citing *Kentucky*, 57 F.4th 545, *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1355 (S.D. Ga. 2021), *aff'd in part, vacated in part*, 46 F.4th 1283 (11th Cir. 2022)). For its part, the Fifth Circuit has expressed its shared skepticism of those earlier decisions. *See Louisiana*, 55 F.4th at 1030 (questioning the historical pedigree of "Procurement Act authority to issue social-policy oriented procurement orders to contracting entities"). This Court should pass on the reasoning of out-of-circuit decisions from an earlier era and of questionable interpretative integrity. *See Argus*, 139 S. Ct. at 2364 (admonishing other courts for following incorrectly decided D.C. Circuit precedent "[w]ithout much independent analysis"); *Kentucky*, 57 F.4th at 553 (same).

And "[e]ven assuming, *arguendo*, that as a matter of historical practice and judicial construction that the Procurement Act has been used to advance policy positions," each of the aforementioned uses of the Procurement Act is readily distinguishable from the PLA Mandate. *Louisiana*, 55 F.4th at 1030. Specifically, whereas the PLA Mandate ***disrupts*** the balance struck by Congress between labor and management interests, *see* Mot. at 20-21, each of the exercises of

6

Procurement Act authority cited by the Government merely sought to *facilitate* previously enacted federal policies. *Cf. UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003) (ensuring employees assigned to federal contract work were aware of congressionally secured labor rights); *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Kahn*, 618 F.2d 784, 785 (D.C. Cir. 1979) (ensuring federal contract spending not used to circumvent wage and price standards applicable to federal agencies); *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009) (ensuring contractor compliance with applicable immigration statutes); *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. 1981) (ensuring contractor compliance with affirmative action policies)[4]; *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629 (5th Cir. 1967) (ensuring contractor compliance with antidiscrimination policies).

The historical examples relied upon by the Government are thus inapposite and provide no support for the unprecedented arrogation of regulatory authority embodied in the PLA Mandate. Whatever authority the President may have to promote economy and efficiency in federal contracting by *removing* frictions that would ensue were the procurement system at cross-purposes with other federal policies, it does not follow that *creating* such frictions achieves the same end. This was made abundantly clear in the universal rejection of this Administration's vaccine mandate for federal contractors. *See Louisiana*, 55 F.4th at 1031-33; *Georgia*, 46 F.4th at 1297-1301; *Kentucky*, 57 F.4th at 550-55. Dictating labor relations by executive fiat is no less an overstep.

For this same reason, the Government's assertion of implied congressional ratification fails. *See* Resp. at 17-18. That is a narrow canon of interpretation in the best of circumstances. *See Kentucky*, 57 F.4th at 554 (rejecting ratification argument). In any event, the most that Congress

---

[4] It can also be observed that it is questionable whether the executive action at issue in *Mississippi Power & Light* would withstand scrutiny in light of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

7

might have "ratified" in the 2002 recodification of the Procurement Act is the understanding stated above: the President may ensure alignment between the procurement system and collateral federal policies. Given that this recodification occurred less than ten years after the Executive began issuing (contradictory) orders addressing the use of PLAs in public procurement—and before any court had subjected such an order to review, *cf. Allbaugh*, 295 F.3d 28—it assumes too much to think Congress sanctioned the authority now claimed.

### 3. The PLA Mandate is Contrary to the NLRA.

Finally, the PLA Mandate is unlawful for the independent reason that it is contrary to the NLRA. Mot. at 20-21. In response to this point, the Government once again skips over the applicable statutory provisions to chide plaintiffs for not acknowledging the Supreme Court's decision in *Building and Construction Trades Council v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993), commonly referred to as *Boston Harbor*. But there is an obvious reason for why plaintiffs did not mention *Boston Harbor*: it is inapposite. First, *Boston Harbor* addressed state action taken under state law, and whether that action was preempted by the NLRA. The case says absolutely nothing about, and offers no insights into, the President's authority under the Procurement Act, and neither does it analyze how that authority should be understood alongside the NLRA and CICA. Second, as the Government takes pains to point out in its motion to transfer venue (ECF #19 at 18), the challenge here is to the FAR Council's Final Rule and the underlying executive order, not any particular proprietary undertaking. This disposes of the *Boston Harbor* comparison because the PLA Mandate is not *proprietary* action; it is *regulatory* action. It is an entirely new *labor* policy, codified in the FAR, regulating how procurement agencies and contractors alike must comport themselves for any project valued at $35 million or more. Whatever comparison the Government might make to *Boston Harbor* to justify a single instance where a PLA is required for a particular project, this lawsuit does not invite that

8

comparison.[5] *See Reich*, 74 F.3d at 1337 (rejecting the Government's reliance on *Boston Harbor*).

### B. Plaintiffs will be Irreparably Harmed Absent Preliminary Relief

Plaintiffs will also suffer irreparable harm absent preliminary relief. The relevant question is whether the injuries Plaintiffs allege will be felt, and irreparably so, before this Court is otherwise expected to issue a final ruling on the merits. For at least two reasons, the answer is yes.

First, federal agencies have begun issuing solicitations, requests for information, and related requests for projects requiring PLAs in accordance with the Mandate, requiring federal contractors to adjust *now* to this new regime. *See* Rogers Supp. Dec. ¶ 6 (attesting that RQ has "already responded to at least ten such requests" and incurred "substantial costs" in doing so); ¶¶ 16, 22, 24); Howard Dec. ¶¶ 5-11 & Exs. 2-8. These are classic compliance costs that are irreparable if Plaintiffs prevail. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment) ("Complying with a regulation later held to be invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, (5th Cir. 2021) (same).

Second, federal contractors right now face extreme business uncertainty, including deciding whether to walk away entirely from large-scale federal projects that represent a core, if not exclusive, part of their business models. *See* Mot. at 22-24. The hardship imposed is not merely the added effort required to address the PLA-related issues now imposed on the system as a result of the PLA Mandate, but the uncertainty and competitive disadvantage that inheres to this new

---

[5] Even as to state action, courts have made clear that NLRA preemption applies where, as here, government "spending power" is "used as a pretext for regulating labor relations." *Metropolitan Milwaukee Assoc. Com. v. Milwaukee Country*, 431 F.3d 277, 279 (7th Cir. 2005). The "economy and efficiency" pretext to the PLA Mandate is obvious in light of President Biden's various pre and post campaign pronouncements that he wants his Administration to be the most pro-union Administration in the country's history. *See* Mot. at 4.

world order with which Plaintiffs or their members have little or no experience. Victor Dec. ¶ 22 (attesting that Nova Group has "no experience with collective bargaining and I am not sure how I would go about bidding the work," leaving Nova "unable to accurately price our bids"); Harper Dec. ¶ 21 (attesting to Harper Construction not knowing "what terms and conditions" will be imposed in a PLA "since there are no details available"); Rogers Dec. ¶ (attesting that "contractors that are not members of" the local associations of contractors in an area that historically negotiate pre-hire agreements with the local unions "are stuck with the terms that have already been negotiated"); Stewart Dec. ¶ 13 ("Because the federal government has not provided a standardized PLA, we may be in position in which we may have to try to negotiate the terms of any required PLA after award," which poses substantial risk of lost business or profitability); Brown Dec. ¶ 9 (attesting that Glen/Mar Construction will lose its longstanding subcontractors that do not want to sign on to any PLA, resulting in Glen/Mar having "no way" to "prepare sensible competitive bids"). Moreover, the agencies are making it abundantly clear that contractors should not expect any exceptions. *See* Rogers Supp. Dec. ¶ 5 & Exh. 1 (NAVFAC procurement official stating in email to contractors that exceptions should be expected only in "extreme circumstances"); ¶ 10 ("we have heard nothing from any of our contacts in the procuring agencies to suggest that any such exceptions will be forthcoming").

      The Government says the right of contractors to challenge the inclusion of a PLA in a particular bid solicitation through a bid protest is "fatal" to Plaintiffs' request for preliminary injunction in this case. Resp. at 28. That makes no sense. The authority of the U.S. Court of Federal Claims to grant relief is limited. *See* 28 U.S.C. § 1491(b)(2) ("the courts may award any relief that the court considers proper, including declaratory and injunctive relief ***except that any monetary***

*relief shall be limited to bid preparation and proposal costs*") (emphasis added).[6] Contractors' rights to file future bid protests in response to specific solicitations do nothing to resolve the costs accruing, and adjustments to business plans being made, now in response to the Final Rule. To some contractors, the PLA Mandate is existential, *e.g.*, Harper Dec. ¶ 23 (attesting that PLA Mandate could "put Harper Federal out of business"), Rogers Supp. Dec. ¶¶ 14, 25 (if "we are required to enter into PLAs, RQ will be effectively forced out of the federal sector" and required to "drastically restructure" or consider "ceasing to operate altogether");[7] outcomes that are *per se* irreparable harm. *See Wages & White Lion*, 16 F.4th at 1142.

    **C.**    **The Balance of Harms and Public Interest Favor Preliminary Relief**

The Government asserts that the balance of harms and public interest tilt in its favor due to the interest in efficient completion of federal construction projects. Resp. at 28. But tellingly, at *no* point throughout the development of the PLA Mandate has the Government ever identified *even a single example* of a federal construction project that was delayed due to lack of a PLA; to the contrary, despite authority to do so, federal agencies have consistently declined PLAs as unnecessary to meet their needs. Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708, 88718 (Dec. 22, 2023) ("[U]nder current policy approximately 2,000 contracts were eligible for a PLA between 2009 and 2021, but PLAs were only required 12 times"). As such, the Government is likely to suffer minimal harm from an injunction, whereas the contracting community will suffer myriad impacts in the absence of one.

---

[6] Moreover, the Claims Court's function is limited to reviewing *agency* action; it does not have jurisdiction to review whether a President's actions are *ultra vires*. *See* 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706).

[7] Indeed, each of the individual contractor Plaintiffs states it will abandon federal contracting if a PLA is required. *See* Declarations of Ronald S. Barron (¶ 9), Francois Billeaud (¶ 9), Ander Michael Boggs (¶ 9), Thomas Knight Bulliard, II (¶ 9), Jared Cavys (¶ 9), Mark Comeaux (¶ 9), Clint Graham (¶ 9), and Todd Urbina (¶ 9).

Mot. at 24-25.

### D.  Plaintiffs' Remedy Will Necessarily be National in Scope

Finally, the Government urges the Court to tailor any preliminary relief, but in practice, any such relief must effectively suspend the PLA Mandate in its entirety. Resp. at 29-30. The Government cites no authority for the proposition that a reviewing court may limit the scope of a stay issued under 5 U.S.C. § 705. And even if this Court issued a tailored injunction under Rule 65, federal procuring agencies may not selectively apply different requirements to Plaintiffs and/or AGC's members without violating CICA. *See* 41 U.S.C. § 3306.

### III.  CONCLUSION

The preliminary injunctive relief Plaintiffs request is necessary and appropriate. Accordingly, the Court should grant Plaintiffs' motion and (i) enter a nationwide injunction preventing Defendants from taking any action to implement or enforce the PLA Mandate, and (ii) stay the effective date of the Final Rule.

| | |
|---|---|
| February 26th, 2024 | Respectfully submitted, |
| | **Breazeale, Sachse & Wilson, LLP**<br>One American Place<br>301 Main Street, Suite 2300<br>Baton Rouge, LA 70801<br>Telephone: 225.387.4000<br>Facsimile: 225.381.8029 |
| | Murphy J. Foster, III<br>Louisiana Bar No. 5779<br>Catherine Maraist<br>Louisiana Bar No. 25781<br>*Lead Counsel for Plaintiff Louisiana Associated General Contractors and Individual Plaintiffs, and Local Counsel for Plaintiffs* |

12

**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2595
Telephone: 202-624-2500
Facsimile: 202-628-5116

By: */s/ Thomas P. Gies*
Thomas P. Gies
District of Columbia Bar No. 943340
Daniel Wolff
District of Columbia Bar No. 486733
William B. O'Reilly (*Pro Hac Vice* Motion Forthcoming)
District of Columbia Bar No. 1046686
*Lead Counsel for Plaintiff Associated General Contractors of America*