# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | |
|---|---|
| **ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., ET AL** | **CIVIL DOCKET NO. 6:24-cv-00037** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **FEDERAL ACQUISITION REGULATORY COUNCIL, ET AL** | **MAGISTRATE JUDGE DAVID J. AYO** |

## MEMORANDUM RULING

Before the Court is the Renewed Civil Rule 12 Motion (the "Motion") [Doc. 33] filed by Defendants, in which Defendants challenge the standing of the Plaintiffs under Article III and seek to transfer this matter on the grounds of improper venue.[1] The Motion is opposed by the Plaintiffs.[2] [Doc. 35]. For the following reasons,

---

[1] The Defendants in the instant lawsuit are: Joseph R. Biden, Jr. ("President Biden"), in his official capacity as President of the United States; the Federal Acquisition Regulatory Council (the "FAR Council"); the four federal agencies that are members of the FAR Council, including the Office of Federal Procurement Policy ("OFPP"), the Department of Defense ("DOD"), the General Services Administration ("GSA"), and the National Aeronautics & Space Administration ("NASA"), as well as the officials appointed to head those agencies, including Christine J. Harada in her official capacity as FAR Council Chair & Senior Advisor to Deputy Director for Management, OFPP; Jeffrey A. Koses, in his official capacity as Administrator of GSA; John Tenaglia, in his official capacity as Principal Director Defense Pricing & Contracting Office of Secretary of Defense; and Karla S. Jackson, Senior Procurement Executive, Deputy Chief Acquisition Officer, and Assistant Administrator for the Office of Procurement at NASA.

[2] Plaintiffs in this matter are Associated General Contractors of America, Inc. ("AGC of America") and Louisiana Associated General Contractors, Inc. ("Louisiana AGC") (hereinafter, the "Association Plaintiffs"), as well as Boggs & Poole Contracting Group, Inc.; Don M. Barron Contractor, Inc.; J.B. Mouton, LLC; Lincoln Builders, Inc.; Progressive Construction Company, LLC; Bulliard Construction Company, Inc.; Rigid Constructors, LLC; and Pat Williams Construction, LLC (hereinafter, collectively, the "Individual Plaintiffs").

Defendants' Motion is GRANTED IN PART, and this matter will be TRANSFERRED to a district of proper venue.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The instant lawsuit arises out of the issuance of a Presidential Executive Order favoring Project Labor Agreements ("PLAs") in the procurement of certain federal construction projects.  A PLA is a multi-employer, multi-union pre-hire agreement designed to systemize labor relations at a construction site.  It typically requires that all contractors and subcontractors who will work on a project subscribe to the agreement; that all contractors and subcontractors agree in advance to abide by a master collective bargaining agreement for all work on the project; and that wages, hours, and other terms of employment be coordinated or standardized pursuant to the PLA across the many different unions and companies working on the project.  The implementation of a PLA on a project underwritten by the Government almost always is accomplished by making agreement to the PLA a bid specification, thereby allowing the contracting authority to ensure that firms at every level — from the general contractor to the lowest level of subcontractor — comply with the terms of the PLA. *See generally Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002).

On February 4, 2022, President Biden issued Executive Order 14,063 ("EO 14,063"), which creates a rebuttable presumption in favor of PLAs on all government construction projects with a total estimated construction cost of $35 million or more. *See* Exec. Order No. 14,063, *Use of Project Labor Agreements for Federal Construction*

*Projects*, 87 Fed. Reg. 7363 (Feb. 4, 2022).  Under EO 14,063, unless an exception is granted, contractors bidding for work on federal constructions projects with an estimated construction cost of $35 million or more will be required to: (i) bind all contractors and subcontractors on the construction project through the inclusion of appropriate specifications in all relevant solicitation provisions and contract documents; (ii) allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements; (iii) contain guarantees against strikes, lockouts, and similar job disruptions; (iv) set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the project labor agreement; (v) provide other mechanisms for labor-management cooperation on matters of mutual interest and concern, including productivity, quality of work, safety, and health; and (vi) fully conform to all statutes, regulations, Executive Orders, and Presidential Memoranda.  EO No. 14,063, 87 FR 7363.

The presumption in favor of requiring a PLA can be rebutted if a senior agency official determines that a PLA requirement "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement;" "would substantially reduce the number of potential bidders so as to frustrate full and open competition;" or would otherwise be inconsistent with law. *Id.* A determination that requiring a PLA would not advance economy and efficiency must be based on one of the following factors: (i) the project "is of short duration and lacks operational complexity;" (ii) "will involve only one craft or trade;" (iii) "will involve

specialized construction work that is available from only a limited number of contractors or subcontractors;" or (iv) addresses an agency need "of such an unusual and compelling urgency that a project labor agreement would be impracticable." *Id.*

The FAR Council assists in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities within the federal government.  At President Biden's direction, the agencies that make up the FAR Council—GSA, DOD, and NASA—proposed amendments to the Federal Acquisition Regulation ("FAR") to implement EO 14,063.  *See* DOD, GSA, NASA, *Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 87 Fed. Reg. 51,044 (Aug. 19, 2022).  The FAR Council agencies promulgated a final rule in December 2023 after reviewing over 8,000 public comments, 88 Fed. Reg. 88,708, 88,709 (Dec. 22, 2023) (the "Final Rule"),[3] and the Final Rule took effect on January 22, 2024.  *Id.* at 88,708.  The Final Rule, together with EO 14,063, constitute the PLA Rule.

On January 10, 2024, the Association Plaintiffs—a nationwide organization of contractors and its regional affiliate in Louisiana—filed this action against President Biden, the FAR Council, the Office of Federal Procurement Policy and its acting Administrator, GSA, DOD, NASA, and the FAR Council members from each agency.  *See* Complaint, [Doc. 1].  In the original Complaint, the Association Plaintiffs allege that the PLA Rule exceeds the scope of the President's statutory and constitutional

---

[3]     Additionally, on December 18, 2023, the Office of Management and Budget ("OMB") issued Memorandum M-24-06, *Use of Project Labor Agreements on Federal Construction Budgets*, which provides guidance and other information to federal agencies and the contracting workforce responsible for executing large-scale federal construction projects.

authority and is contrary to law, in violation of 5 U.S.C. § 706(2)(A).  [*Id.* at ¶¶ 128-144].  On the same day, the Association Plaintiffs filed a Motion for Preliminary Injunction pursuant to FRCP 65(a) and for a stay of agency action pursuant to 5 U.S.C. § 705.  [Doc. 2].  Following a status conference with counsel, the Court set briefing deadlines on the Motion for Preliminary Injunction and a trial date of March 19, 2024.  [Doc. 18].

On February 9, 2024, Defendants filed a Motion to Transfer Case and Motion to Dismiss for Lack of Jurisdiction.  [Doc. 19].  In their Motion, Defendants argued that the Association Plaintiffs lack standing to bring the instant lawsuit and that venue is improper in this district.  Rather than oppose Defendants' Motion to Transfer and Dismiss, the Association Plaintiffs amended their Complaint on February 23, 2024 [Doc. 27] to add eight individual construction company plaintiffs (the "Individual Plaintiffs"),[4] arguing that each one has a principal place of business in cities within the Western District of Louisiana, thereby curing any potential defects with respect to venue.  Recognizing that the addition of the Individual Plaintiffs would impact the Defendants' arguments concerning venue and standing in their pending Motion, the Court denied Defendants' Motion to Transfer and Motion to Dismiss as moot and allowed Defendants to re-file their Rule 12 motion in light of the

---

[4]     The following Individual Plaintiffs were added: Boggs & Poole Contracting Group, Inc. of Bossier City; Don M. Barron Contractor, Inc. of Farmerville; J.B. Moulton, LLC of Lafayette; Lincoln Builders, Inc. of Ruston; Progressive Construction Co., LLC of Boyce; Bulliard Construction Co., Inc. of St. Martinville; Rigid Constructors, LLC of Lafayette; and Pat Williams Construction, Inc. of Lake Charles.

Amended Complaint.  [Doc. 28].  On February 28, 2024, Defendants filed the instant motion [Doc. 33]; Plaintiffs opposed the Motion on March 4, 2024 [Doc. 35].[5]

Thus, all issues before the Court, including venue, standing, and injunctive relief, have been fully briefed, and the issues are now ripe for review.

## LEGAL STANDARDS

### I. Standing

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S. Ct. 2207, 171 L.Ed.2d 1 (2008) (citation omitted).[6]  Nor can a preliminary injunction properly be requested by a plaintiff who lacks standing to sue.  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020), *citing Lujan*, 504 U.S. at 561.  Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146, 185 L.Ed.2d 264 (2013).  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the

---

[5]     All briefing on the Motion for Preliminary Injunction and Motion to Stay [Doc. 2] has been completed as well. Defendants filed an opposition to the Plaintiffs' Motion for Preliminary Injunction and Motion to Stay [Doc. 25]; Plaintiffs filed a Reply Brief [Doc. 32]; and Defendants filed a Sur-Reply Brief on March 7, 2024 [Doc. 38].

[6]     To demonstrate eligibility for such relief, a plaintiff must clearly show: (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted).  Whether to grant preliminary injunctive relief is committed to the district court's sound discretion.  *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S. Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted); *Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted); *see, e.g., Summers v. Earth Island Institute*, 555 U.S. 488, 492–93, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009). "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Lujan*, 504 U.S. at 560.

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper*, 568 U.S. at 409, *citing Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743, 2752, 177 L.Ed.2d 461 (2010). *See also Louisiana v. Biden*, 575 F. Supp. 3d 680, 689 (W.D. La. Dec. 16, 2021) (Drell, J), *aff'd*, 55 F.4th 1017 (5th Cir. 2022). It is well-established that a court's standing review is "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," as Plaintiffs request here. *Clapper*, 568 U.S. at 408, *citing Raines, supra*, at 819–820, 117 S. Ct. 2312. *See also Louisiana by & through Landry v. Biden*, 64 F.4th 674, 680 (5th Cir. 2023); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473–74, 102 S. Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221–22, 94 S. Ct. 2925, 41 L.Ed.2d 706 (1974). Indeed, "[r]elaxation of standing requirements is directly related to the expansion of judicial power."

*Clapper*, 568 U.S. at 408-09. *See also United States v. Richardson*, 418 U.S. 166, 188, 94 S. Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Whether a plaintiff has standing is determined at the time of filing, *Lujan*, 504 U.S. at 570 n.5, (noting that "standing is to be determined as of the commencement of suit"), and the party invoking federal jurisdiction bears the burden to show standing. *Lujan*, 504 U.S. at 561.

Because Defendants challenge the standing of all Plaintiffs under Rule 12(b)(1), and because they have submitted materials outside the pleadings, they have asserted a factual attack on the subject matter jurisdiction of the court. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Under these circumstances, the Plaintiffs are required to submit facts through some evidentiary method, and they have the burden of proving by a preponderance of the evidence that the trial court has subject matter jurisdiction. *Id.* at 523. The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981). "[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Williamson*, 645 F.2d at 413.

### A.    Imminent Injury

Plaintiffs allege, generally, that they and their members, all contractors, face certain and imminent injury from the PLA Rule in multiple ways. In being forced to make what they deem a Hobson's choice, the Plaintiffs argue that they will either

walk away from large-scale federal projects because of the requirement to use a PLA, or they will continue to bid on federal contracts to their detriment.  Under either scenario, Plaintiffs allege they will incur increased costs and lower profit margins because of the requirement to use a PLA.  Specifically, the Plaintiffs allege that the PLA Rule poses imminent harm because it causes business uncertainty and an inability to plan for future projects; will change their business models; and will cause them to expend resources on PLA-related actions which, but for the PLA Rule, they would not need to expend.  Plaintiffs allege that for those contractors who decide to abandon the federal market, they will incur additional cost related to developing bids in the private and local sectors in order to continue to provide their employees with steady employment.  If they decide to continue competing for large scale federal contracts, they allege they will incur additional compliance costs stemming from the collective bargaining agreements required by the PLA Rule.

"Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Lujan*, 504 U.S. at 565, n.2 (internal quotation marks omitted).  Accordingly, "threatened injury must be certainly impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient.  *Clapper*, 568 U.S. at 1147.  *See also Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 109 L.Ed.2d 135 (1990); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Farm Workers*, 442 U.S.

289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979).  Mere probability of a disfavored outcome does not suffice to create a legally cognizable injury.  *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 538–39 (5th Cir. 2019).  *See Texas v. United States*, 787 F.3d 733, 747–48 (5th Cir. 2015), *citing Clapper*, 568 U.S. at 409.  *See also US Inventor Inc. v. Vidal*, 2022 WL 4595001, at *3 (5th Cir. Sept. 30, 2022) (unpublished) (the injury itself must be certainly impending, not speculative).

To support their arguments of imminent harm to all Plaintiffs, the eight Individual Plaintiffs, added as parties after venue was challenged, filed largely identical declarations explaining the impact of the PLA Rule on their construction companies.  With one exception, each declarant states that his company has experience performing federal work funded 100 percent by federal dollars and requiring compliance with the FAR; that part of the business plan of his company is to continue bidding on and performing federal construction projects; and that his company is not now and never has been a union contractor.[7]  Each declarant also avers the following:

> I am aware that certain federal projects are already being discussed for possible bidding, indicating they will be let in accordance with the PLA Rule. [Contractor] has no intention of bidding any new federal work that would require our company to sign a Project Labor Agreement. We prefer, and our subcontractors historically prefer, to be open shop.[8]

---

[7]    *See* Barron Decl., [Doc. 32-1]; Billeaud Decl., [Doc. 32-2]; Boggs Decl., [Doc. 32-3]; Bulliard Decl., [Doc. 32-4]; Cavys Decl., [Doc. 32-5]; Comeaux Decl., [Doc. 32-6]; Graham Decl., [Doc. 32-7] Urbina Decl., [Doc. 32-8].

[8]    This language appears in Paragraph 9 of each of the Declarations.

Despite stating that there are current federal projects being discussed for bidding, none of the Individual Plaintiffs specify what those projects are, where the projects would take place, or the basis for their certainty that such projects will require a PLA.  Furthermore, the Individual Plaintiffs' declarations are belied by their histories of actual federal contracting practices.  To support their argument that it is unlikely the PLA Rule poses imminent harm to any of the Plaintiffs—but particularly to the Individual Plaintiffs—Defendants proffered records kept by the Federal Procurement Data System (FPDS), a GSA website, which shows no evidence that any Individual Plaintiff has ever been a signatory to a federal contract that reached the $35 million  threshold that would trigger application of the portions of the PLA Rule Plaintiffs challenge here.  As the Defendants point out, one Individual Plaintiff, Rigid Construction, has entered into a handful of contracts with the federal government worth tens of millions of dollars, but the highest cost contract on the public record is $22,387,000.  [Doc. 33-8].  Individual Plaintiff, Bulliard Construction Co., Inc., has no record of having entered a federal government contract for nearly thirty years.  [Doc. 33-3].  The Court's own review of the GSA records shows that, of the eight Individual Plaintiffs, only three have contracted with the federal government in the last ten years.  [Boggs and Poole, Doc. 33-2]; [Progressive, [Doc. 33-7]; [Rigid Construction, Doc. 33-8].  Of those three, only Progressive and Rigid have ever had federal government contracts that exceeded $10 million in contract

costs.[9]  Thus, importantly, none of the Individual Plaintiffs have ever been signatory to a federal construction project with costs exceeding $35 million.

This factual scenario significantly compromises the Individual Plaintiffs' argument that the PLA Rule is an imminent threat to their business interests.  If none of the Individual Plaintiffs have ever been a party to a federal contract worth $35 million or more in the past, any likelihood that they would be signatories to such a contract in the future is wholly speculative.  And without such a showing, there is no basis to believe the PLA Rule would impact their businesses.  Indeed, if any of the Individual Plaintiffs were to successfully bid on a federal government contract that could, potentially, trigger application of the PLA Rule, it would be the first time.

The Individual Plaintiffs' argument of imminent harm is further undercut by the existence of enumerated exceptions to the presumption of PLA requirements.  The Plaintiffs argue that the possibility of exceptions to the PLA Rule is "illusory."  In other words, the Individual Plaintiffs urge this Court to accept—with no supporting evidence—that the exceptions outlined in the PLA Rule are pretextual and will never be granted.  The FAR Regulations themselves, however, require that, in addition to the market research that must be conducted under FAR Part 10, the Final Rule requires contracting officers to conduct an "inclusive market analysis" to evaluate whether a PLA requirement for any particular project would advance the Government's interests in accordance with EO 14,063.  This inclusive market

---

[9]     The Individual Plaintiff with the highest contract amount is Rigid Construction, with a contract valued at $22,387,000, well shy of the $35 million amount to trigger application of the PLA Rule.  [Doc. 33-8 at p. 6].

analysis must consider the market conditions in the project area and the availability of unions and unionized and non-unionized contractors. *Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 88 FR 88708-02.[10] Thus, in determining whether it is appropriate to require a PLA in a federal construction contract, agency officials must conduct market research. There is, therefore, a built-in mechanism for determining whether the project at issue is one that is aligned with the purposes and benefits of the PLA Rule. *See also* FAR 22.504(d) and 36.104(c).

Furthermore, the challenged regulations themselves enumerate several exceptions to the PLA Rule, including projects that are of short duration and are not operationally complex, projects that are not heavily dependent on crafts or trades or will involve specialized construction work that is available from only a limited number of contractors or subcontractors, and projects where a PLA is impracticable. The Individual Plaintiffs have presented no evidence that these exceptions would not apply or be considered by the agencies with respect to future projects. And while the Individual Plaintiffs argue that only a small percentage of contracts will qualify for

---

[10]     This practice is already in place, as demonstrated by the Supplemental Declaration of George Rogers, CEO and President of RQ Construction, LLC ("RQ"), a California-based construction firm, which has responded to numerous requests for information made by the government about PLA requirements, including one for a forthcoming project to build a child-care center at Barksdale Air Force Base that does not fall under the challenged portion of the PLA Rule because the value of the contract is less than $35 million. [Rogers Supp. Decl., Doc. 32-9, ¶¶ 6–9]; [Rogers Letter to Bourgault, Doc. 32-15]. The Court notes that neither Mr. Rogers nor RQ are parties to this lawsuit. To the extent that the claims of RQ may be represented by the Association Plaintiffs, that matter is for another day and another court, as venue is not proper in this district as discussed below.

an exception, such conjecture is both highly speculative and, without any statistical data given the newness of the Rule, completely unsupported.

Historically, the Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.  Thus, a prospective injury that is contingent on the choices of a third party is less likely to establish standing.  *Id.  See also US Inventor Inc. v. Vidal*, 2022 WL 4595001, at *4 (5th Cir. Sept. 30, 2022) (unpublished) ("[T]o clearly connect Plaintiff-Appellants' procedural harm to their injury, we must engage in conjecture about how independent third parties, i.e., the PTAB and a district court, would act.  *Clapper* rejected such conjectures as speculation insufficient to support a redressable injury.").

In *Clapper*, the Supreme Court rejected standing premised on a "speculative chain of possibilities."  568 U.S. at 414.  There, the plaintiffs challenged a new Government surveillance program and alleged injury from the Government's interception of plaintiffs' communications with foreign contacts.  *Id.* at 404–07.  The Court held that plaintiffs lacked standing because connecting the injury (the interception of communications) with the proffered cause (the new program) required speculation as to how the Government and Article III judges would act in a "chain of possibilities," namely the complex series of events needed for the Government to actually surveil plaintiffs.  *Id.* at 410.  Such speculation meant that the resulting injury to plaintiffs was not "certainly impending" to constitute an injury in fact despite an "objectively reasonable likelihood" of plaintiffs' communications being

intercepted.  *Id.  See also Biden*, 64 F.4th at 674 (finding no "injury in fact" where Plaintiffs' alleged harms "rel[y] on a highly attenuated chain of possibilities").  Here, the Individual Plaintiffs' argument that exceptions will not be granted is a theory that requires guesswork as to how senior agency officials will navigate the complex issues associated with solicitation of large-scale federal construction projects.  How these independent decisionmakers will exercise their judgment is, at this juncture, unknown.  But the agencies' solicitations for market data evaluations, which are already occurring, suggest that GSA, DOD, and NASA are following the procedures implemented by the FAR Council; therefore, the Individual Plaintiffs' argument that senior agency officials will not consider, and grant, exceptions is unpersuasive.

Finally, to the extent that "some" of the Individual Plaintiffs argue, generally, that they are experiencing ongoing, immediate injury because they are actively assessing whether they can afford to write off the expense they have incurred to procure equipment necessary to bid for federal contracts and comply with various certification requirements, this argument is unpersuasive, and a similar argument was rejected in *Clapper*.  568 U.S. at 415-16 (internal citations omitted) ("In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.  Any ongoing injuries that respondents are suffering are not fairly traceable to § 1881a.").  Again, given that the Individual Plaintiffs have never been signatories to the type of contract that will trigger application of the PLA Rule, planning, spending, and general uncertainty about the outcomes of contracts a

business is not likely to engage in does not create immediate harm for the purposes of Article III standing.  *See Clapper*, 568 U.S. at 416 (rejecting standing argument where court found plaintiffs brought the action "based on costs they incurred in response to a speculative threat").

Thus, the Court concludes that the Individual Plaintiffs have not carried their burden of showing that the PLA Rule poses the threat of concrete, particularized, or imminent injury to their business interests.

## B.    Traceability

Traceability requires a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61, *citing Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S. Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Furthermore, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561.  Because the Court finds no imminent injury, the Associated Plaintiffs cannot meet the traceability threshold.

For all of these reasons, the Court concludes that the Individual Plaintiffs' standing theory rests on a speculative chain of possibilities that does not establish that their potential injury is certainly impending.  Accordingly, the Court concludes that the Individual Plaintiffs do not have standing under Article III to seek injunctive

relief against the Defendants for promulgation and enforcement of the PLA Rule, and they will be dismissed from this lawsuit without prejudice.

## II.   Venue

Under Rule 12(b)(3) and 28 U.S.C. § 1406(a),[11] a party may move to dismiss, or in the alternative transfer, a case filed in an improper venue. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55, 134 S. Ct. 568, 187 L.Ed.2d 487 (2013).  In determining whether venue is proper, "the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007). However, the Court may consider evidence in the record beyond the facts alleged in the complaint and its attachments, including affidavits or evidence submitted by defendants in support of a motion to dismiss, or by a plaintiff in response to the motion. *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 449 (5th Cir. 2008).  When it is determined that a case is filed in a division or district of improper venue, the district court may either dismiss the case or transfer it to any district or division of proper venue. *See* 28 U.S.C. § 1406(a).  *See also Texas v. United States Dep't of Health & Hum. Servs.*, 2023 WL 4629168, at *3 (W.D. Tex. July 12, 2023; *Umphress v. Hall*, 2020 WL 4731980, at *2 (N.D. Tex. Aug. 14, 2020).

The applicable venue statute, 28 U.S.C. § 1391(e), provides that a civil action in which the defendant is the federal government may be brought in any judicial

---

[11]     28 U.S.C. § 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

district: (1) where the defendant resides, (2) where a "substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated," or (3) where the plaintiff resides if no real property is involved in the action.  Because the Individual Plaintiffs will be dismissed from the lawsuit for lack of standing, the Court must determine whether venue is proper in this district in their absence.  *See, e.g., Miller v. Albright*, 523 U.S. 420, 426-27, 118 S. Ct. 1428, 140 L.Ed.2d 575 (1998); *Ga. Republican Party v*. SEC, 888 F.3d 1198, 1202-05 (11th Cir. 2018) (transferring case where only party that satisfied venue failed to provide evidence establishing standing); *Immigrant Assistance Project v. INS*, 306 F.3d 842, 867 n.20 (9th Cir. 2002) (holding that the standing of one plaintiff was "important because it is the only plaintiff ... who is a resident of Washington and on whom, therefore, venue in the Western District of Washington could be based"); *Nat'l Infusion Ctr. Ass'n v. Becerra*, — F. Supp. 3d. —, 2024 WL 561860, at *5 (W.D. Tex. Feb. 12, 2024) (ordering transfer because, after dismissal of lead plaintiff, "no defendant would reside in this district, no plaintiff resides in this district, and nothing suggests that a substantial part of the events or omissions giving rise to the claim occurred in this district"); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1304 (N.D. Ala. 2003) ("Venue is proper in this court because at least one Alabama plaintiff had standing."); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) ("Having found that the Institute lacks standing to bring this action and has failed to state a claim upon which relief can be granted, plaintiff cannot manufacture venue by adding the Institute as a party."); *see also* 14D

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed.) ("[V]enue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district.").

The Association Plaintiffs do not reside in the Western District of Louisiana, as neither maintains a principal place of business here. The Defendants reside, for the purposes of venue, in the district where they perform their official duties, which in this case is Washington, D.C. *Fla. Nursing Home Ass'n v. Page*, 616 F.2d 1355, 1360 (5th Cir. 1980), *rev'd sub nom. Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 101 S. Ct. 1032, 67 L.Ed.2d 132 (1981). Thus, for venue to be proper in this district, it must be proper under § 1391(e)(1)(B), which allows suit to be brought "in any judicial district where … a substantial part of the events or omissions giving rise to the claim occurred." Plaintiffs argue that venue is proper in Louisiana because "decisions applying" the PLA Rule "are and will be made in this district," and because "actions that this Complaint challenges have been taken, in material part, in this judicial district." [Amended Complaint, Doc. 27, at ¶ 25].

In assessing venue under § 1391(e)(1)(B), the Court must examine which alleged acts or omissions by [the defendant] 'gave rise' to [the plaintiff]'s claim[.]" *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003); *see also Turentine v. FC Lebanon II LLC*, 2022 WL 16951647, at *2 (N.D. Tex. Nov. 15, 2022) ("in determining whether or not venue is proper, the Court looks to the defendant's conduct and where that conduct took place."). As an initial matter, the Court notes that the claims in the Amended Complaint concern the promulgation of the PLA Rule

and its enforcement nationwide.  Thus, the claims and legal theories pled by the Plaintiffs do not hinge on the application of the PLA Rule to any particular contract solicitation; rather, they seek to enjoin the rule's application to contract solicitations across the board.  *See Experian Info. Sols., Inc. v. FTC*, 2001 WL 257834, at *3 (N.D. Tex. Mar. 8, 2001) (adopting findings and recommendation) (venue was not proper in the Northern District of Texas where plaintiff's claim involved a pure question of law about an agency rule rather than any enforcement action taken within the district).  Thus, the events giving rise to the PLA Rule took place where EO 14,063 and the Final Rule were both drafted and enacted, that is, in Washington, D.C.

With respect to their argument that venue is proper in the Western District of Louisiana because the "decisions applying" the PLA Rule "are and will be made in this district," [Doc. 27 at ¶ 25], the Plaintiffs cite a federal construction contract at Barksdale AFB in Bossier Parish, Louisiana, as one example of decision-making with respect to the PLA Rule in Louisiana.  In connection with this contract solicitation, George Rogers, CEO and President of RQ Construction, submitted a Supplemental Declaration, attesting that he has responded to numerous requests for information made by the government about PLA requirements, including one for a forthcoming project to build a child-care center at Barksdale AFB.  [Rogers Supp. Decl., Doc. 32-9, ¶¶ 6–9]; [Rogers Letter to Bourgault, Doc. 32-15].  But the record shows that Commanding Officer Bourgault, the contracting officer for the Barksdale project, is in Jacksonville, Florida, and all communication between George Rogers of RQ and Officer Bourgault took place with Mr. Rogers in Carlsbad, California, and Officer

Bourgault in Jacksonville, Florida. [Doc. 32-15]. Thus, to the extent that the Plaintiffs focus on this particular contract to establish venue in Louisiana, the decision-making process appears to be taking place in Florida. Otherwise, they fail to show that any decision-making process has taken place in Louisiana.

For these reasons, the Court finds that venue is not proper in the Western District of Louisiana and the instant lawsuit will be transferred to a court having proper venue. The Defendants seek transfer to the District Court for the District of Columbia, but the Plaintiffs have not indicated an alternate preferred venue. The Court will allow them to so indicate within seven (7) days.

Finally, because the Court has determined that venue is not proper in the Western District of Louisiana without the Individual Plaintiffs as parties, the Court need not consider the Article III standing of the Association Plaintiffs. *See, e.g., Miller v. Albright*, 523 U.S. 420, 426-27, 118 S. Ct. 1428, 140 L.Ed.2d 575 (1998); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202-05 (11th Cir. 2018) (transferring case where only party that satisfied venue failed to provide evidence establishing standing).[12]

CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that Defendants' RENEWED CIVIL RULE 12 MOTION [Doc. 33] is GRANTED IN PART. Having concluded that the Individual Plaintiffs in this case do not have Article III standing to challenge the PLA Rule, the claims of

---

[12]   The Court notes that the Individual Plaintiffs were added as parties only in response to a well-founded Motion to Dismiss or Transfer for lack of venue.

Boggs & Poole Contracting Group, Inc; Don M. Barron Contractor, Inc.; J.B. Mouton, LLC; Lincoln Builders, Inc.; Progressive Construction Company, LLC; Bulliard Construction Company, Inc.; Rigid Constructors, LLC; and Pat Williams Construction, LLC are DENIED AND DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that, with venue being improper upon the dismissal of the Individual Plaintiffs, this matter will be transferred to a court with proper venue. Within seven (7) days, the Plaintiffs shall advise the Court whether they wish this matter to be transferred to the residence of the Association Plaintiffs, i.e., the Middle District of Louisiana or the Eastern District of Virginia, or to the residence of the Defendants, the District Court for the District of Columbia.

IT IS FURTHER ORDERED that the status conference currently set for March 14, 2024, and the Bench Trial currently set for March 19, 2024, are CANCELLED.

THUS, DONE AND SIGNED in Chambers on this 12th day of March 2024.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE